ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
DAVID L. KIRMAN (Cal State Bar No.: 235175)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4442
    Facsimile: (213) 894-2387
    E-mail: david.kirman@usdoj.gov

JAIKUMAR RAMASWAMY, Chief
KEVIN G. MOSLEY, Trial Attorney
Asset Forfeiture and Money Laundering Section
Criminal Division, U.S. Department of Justice
    1400 New York Avenue, N.W.
    Washington, DC 20530
    Telephone: (202) 598-2801
    Facsimile: (202) 616-2547
    E-mail: kevin.mosley@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>KAREN GASPARIAN,<br><br>        Defendant. | CR No. 12-560-JFW<br><br>GOVERNMENT'S SENTENCING POSITION AND OBJECTIONS TO PSR FOR DEFENDANT KAREN GASPARIAN; DECLARATION OF FBI SPECIAL AGENT DARRELL TWEDT<br><br>[CONSOLIDATED EXHIBITS FILED SEPARATELY UNDER SEAL] |

i

1    Plaintiff United States of America, by and through its

2  attorneys of record, Assistant United States Attorney David L.

3  Kirman and Department of Justice Trial Attorney Kevin G. Mosley,

4  hereby files its sentencing position and objections to the

5  presentence report for defendant Karen Gasparian ("defendant").

6  For the reasons set forth below, the United States submits that

7  the Court should adopt the facts and Guidelines contained in the

8  presentence report and add two points for defendant's role in

9  the offense pursuant to USSG § 3B1.1(c).  The United States

10  submits that the Court should sentence defendant to a 120-month

11  sentence, a two-year period of supervised release, and a $200

12  special assessment.  The United States is filing a separate

13  motion for forfeiture.

14    This position is based on the attached memorandum of points

15  and authorities along with the exhibits submitted with the

16  memorandum; the Declaration of Darrell Twedt; the files and

17  ///

18

19

20

21

22

23

24

25

26

27

28

1   records in this case; and other argument the Court may wish to

2   hearing at the sentencing hearing.

3   Dated: December 17, 2012        Respectfully submitted,

4                                   ANDRÉ BIROTTE JR.

5                                   United States Attorney

6                                   ROBERT E. DUGDALE

7                                   Assistant United States Attorney
                                    Chief, Criminal Division

8

9

10                                  _____/s/_____

11                                  DAVID L. KIRMAN
                                    Assistant United States Attorney

12

13                                  JAIKUMAR RAMASWAMY, Chief
                                    Asset Forfeiture and Money
14                                  Laundering Section
                                    Criminal Division
15                                  U.S. Department of Justice

16

17                                  _____/s/_____

18                                  KEVIN MOSLEY
                                    Trial Attorney
19                                  Asset Forfeiture and Money
                                    Laundering Section
20                                  U.S. Department of Justice
                                    Attorneys for Plaintiff
21                                  United States of America

22

23

24

25

26

27

28

iii

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . vi

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . 1

I     INTRODUCTION . . . . . . . . . . . . . . . . . 1

II    FACTUAL BACKGROUND . . . . . . . . . . . . . . 2

      A.    Defendant and his co-conspirators . . . . . . . . 2

      B.    G&A cashed checks related to suspected health care fraud . . . . . . . . . . . . . . . . . . . . 4

      C.    Confidential Witness Transactions . . . . . . . . 4

           1.    CW1 . . . . . . . . . . . . 5

           2.    CW2 . . . . . . . . . . . . 6

      D.    Compliance Audits . . . . . . . . . . . . 8

      E.    CFTB Search and $24 million binder . . . . . . . . 9

      F.    Defendant's Interview . . . . . . . . . . . . 10

      G.    Agent's Analysis of the Binders and Inquires to FINCEN . . . . . . . . . . . . . . . . . . 11

III   THE GOVERNMENT'S ANALYSIS OF THE PSR AND GUIDELINES . . 13

      A.    The PSR Correctly Enhanced Defendant's Sentence By 22 Points Because The Value of the Funds Exceeded $20 Million . . . . . . . . . . . . . . 14

      B.    The PSR Correctly Enhanced Defendant's Sentence By 2 Points Because Defendant Knew The Checks Were The Proceeds of Illegal Conduct . . . . . . . 16

      C.    The PSR Correctly Enhanced Defendant's Sentence By 2 Points Because Defendant Was Convicted of a Title 31 Offense As Part of A Pattern of Unlawful Activity Involving More than $100,000 in a 12-month Period . . . . . . . . . . . . . . . . 17

      D.    The Government Objects to the PSR's Failure to Enhance Defendant's Sentence 2 Points Because He Was An Organizer, Leader, Manager and Supervisor in Criminal Activity . . . . . . . . . . . . . . 18

**TABLE OF CONTENTS (CONTINUED)**

PAGE(S)

IV   THE SECTION 3553A FACTORS SUPPORT A 120-MONTH
     SENTENCE . . . . . . . . . . . . . . . . . . . . . .   21

     A.   Nature and Circumstances of the Offense . . . . . .   21

     B.   History and Characteristics of Defendant . . . . .   22

     C.   General Deterrence and the Remaining 3553(a)
          Factors Support A 120-Month Sentence . . . . . . .   24

IV   CONCLUSION . . . . . . . . . . . . . . . . . . . . . .   25

# TABLE OF AUTHORITIES

**FEDERAL CASES:**                                                    **PAGE(S)**

<u>California Bankers Association v. Shultz,</u>
    416 U.S. 21 (1974)  . . . . . . . . . . . . . . 21

<u>United States v. Egge,</u>
    223 F.3d 1128 (9th Cir. 2000) . . . . . . . . . . 21

**STATUTES:**

18 U.S.C. § 3553(a)(1)  . . . . . . . . . . . . 21, 22, 25

**SENTENCING GUIDELINES:**

USSG § 2B1.1  . . . . . . . . . . . . . 13, 18, 18, 21

USSG § 2S1.3  . . . . . . . . . . . . 13, 14, 16, 17

USSG § 2x1.1(a) . . . . . . . . . . . . . . . 13

USSG § 3E1.1  . . . . . . . . . . . . . . . . 13

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Karen Gasparian ("defendant") was the leader of a check-cashing conspiracy that allowed hundreds of companies and 58 individuals to launder over $24 million by cashing checks without filing Currency Transaction Reports ("CTRs"). Defendant's conduct facilitated health care fraud and likely other crimes by providing untraceable cash to criminals allowing them to fund their criminal schemes, hide profits, and avoid detection by law enforcement. Additional aggravating factors include defendant's lies to federal agents regarding the criminal activity in this case, conviction for driving under the influence with a blood alcohol level of twice the legal limit, arrest for possession of 57 marijuana plants at his residence along with scales and packaging materials, and claims of a modest income and indebtedness while funding an immoderate lifestyle.

The United States charged defendant with conspiracy, numerous counts of failure to file a CTR, and willful failure to maintain an effective money laundering program. On September 20, 2012, defendant pled "open" to conspiracy and willful failure to maintain an effective money laundering program, admitting the elements of each offense. The United States Probation Office ("USPO") calculated an offense level of 29 and a criminal history category of II resulting in an advisory guidelines range of 97-120 months. The USPO recommended a 97-month sentence, two years of supervised release, and a $200 special assessment.

1

The United States concurs with the facts and guidelines included in the PSR but objects to the PSR's failure to include a two-point enhancement for defendant's aggravating role.  The government believes the offense level is 31 and the guidelines range is 120 months.  The United States recommends a sentence of 120 months incarceration, two years supervised release, and a $200 special assessment.[1]

## II.  FACTUAL BACKGROUND

### A.  Defendant and his co-conspirators

From at least 2006 through 2011, defendant worked at G&A Check Cashing, Inc. ("G&A"), a check-cashing store located in Los Angeles.  (PSR ¶ 13.)  Defendant's father, Gagik Gasparian, owned G&A, but had a minor role in operating it.  (Id.; see also PSR ¶ 15.)  Defendant, along with Humberto Sanchez, G&A's designated compliance officer, operated G&A on a day-to-day basis.  (Id. ¶ 15.)  This included working at G&A's front window cashing checks for customers.  (Id.)  Defendant cashed checks and also made withdrawals at banks from G&A's operating accounts.  (Id. ¶ 15.)  Defendant and Sanchez were G&A's only employees.  (Id.)  Defendant was G&A's first manager and also called himself the office manager and store manager.  (Ex. A (G&A Policy Letter); Ex. B (BSA Compliance Auditor's Report); PSR ¶ 24.)  Although he did not work for G&A, Aharon Krkysharian worked as an middleman for defendant, brokering transactions between defendant, a confidential witness ("CW1"), and others.

---

[1] The United States will seek forfeiture in a separate motion.

(PSR ¶ 28, 30-35, 44, 45; Ex. C ¶ 9 (Excerpts of Krkasharyan Plea); Ex. H p. 20 (sample Krkasharyan checks from other makers.)

As a check cashing store, G&A was a financial institution as defined by the Bank Secrecy Act ("BSA").  (PSR ¶¶ 11-13.) G&A was required to comply with provisions of the BSA designed to prevent the use of financial institutions to launder money and hide criminal activity.  (Id.)  Among those safeguards is the CTR, a report that requires financial institutions to report details – including the name, address, and other identifiers of the individual completing a transaction and the date and form of the transaction – for any transaction exceeding $10,000 currency in one day.  (Id.)

Both defendant and Sanchez knew the BSA required them to: file a CTR for any single transaction over $10,000 to an individual in a single day; aggregate multiple currency transactions and treat them as one transaction if they were by or on behalf of one person and resulted in cash out of over $10,000 in a single day; and develop, implement and maintain an effective anti-money laundering program reasonably designed to prevent G&A from being used to facilitate money laundering and which required them, at a minimum, to file the required reports such as CTRs and verify customer identification.  (PSR ¶¶ 16-17.)

3

**B.   G&A cashed checks related to suspected health care fraud**

The G&A investigation began after federal agents suspected G&A cashed checks related to health care fraud.  (PSR ¶ 22.) Specifically, agents observed that Intymak, a Nevada medical supply company suspected of defrauding the Nevada Medicaid system of over $1.6 million, deposited over $500,000 into G&A's operating accounts.  (Id.)  Many of the checks were consecutively numbered but were written out to different individual and business payees.  (Id.).  Nearly all the checks were less than $10,000 individually, but the sums of consecutively numbered checks deposited into G&A's operating accounts on consecutive days often exceeded $10,000.  G&A filed no CTRs with respect to these checks.  (Id.)  The Intymak transactions were suspicious because it was unlikely diverse individuals and corporate payees, including large corporations, would travel from Nevada to Los Angeles to cash consecutively numbered checks from a Nevada health care company.  (Id.)

**C.   Confidential Witness Transactions**

To corroborate their suspicions, from February through December of 2009, and then again from March 2011 to April 2012, federal agents directed two confidential witnesses to cash checks at G&A.  (Id. ¶ 23.)  In each of the transactions, a CW brought individual checks made out to various payees in amounts less than $10,000 but which, in aggregate, were over $10,000. (Id.)  Neither defendant nor Sanchez asked either confidential informant for identification or any other information regarding the individual who cashed the checks.  (Id.)  Despite giving

4

over $10,000 in cash to the two confidential informants on each occasion, neither defendant nor Sanchez filed a CTR.  (Id.) Rather, defendant structured the deposits to make it appear as if no CTR was required.  (Id. ¶ 25.)

### 1. CW1

CW1 brought checks to G&A from La Brea Health Diagnostic, a non-existent health care company created by the Federal Bureau of Investigation ("FBI").  (Id. ¶ 28.)  After being told that defendant was unavailable to discuss cashing these checks, CW1 cashed checks at G&A through Krkysharian, who brought checks to G&A.  (Id.)  Krkysharian negotiated an 8% fee with CW1: 5% to G&A and 3% to himself.  (Id. ¶ 29.)

Initially, Krkasharyan told CW1 that he would not introduce CW1 to defendant explaining that defendant did not want "new friends" or to "spread himself too thin."  (Id. ¶ 30.)  Later CW1 did meet defendant, who explained that CW1 should not make out checks to large companies such as AT&T, but rather to "small companies that don't exist."  (Id. ¶ 32.)

After CW1 completed four illegal transactions through Krkysharian, on December 7, 2012, CW1 brought structured checks directly to defendant.  (Id. ¶ 44.)  Defendant agreed to take those checks, but told CW1 that he wanted CW1 to continue to work through Krkasharyan.  (Id.)  Defendant also told CW1 that he would have Krkasharyan call CW1 to discuss pick up arrangements.  (Id.)  Due to Krkasharyan's illness on the arranged date of pick up, CW1 picked up $12,257 directly from defendant.  (Id. ¶ 45)

In total, CW1 completed the following transactions, each of which required a CTR but for which defendant and his coconspirators failed to file a CTR:

| APPROXIMATE TRANSACTION DATE | CHECK NUMBERS | CASH TOTAL |
|---|---|---|
| 02/23/09 | 1334, 1335, 1336 | $13,800 |
| 03/13/09 | 1463, 1464, 1465 | $12,000 |
| 03/31/09 | 1304, 1305, 1306 | $11,000 |
| 05/04/09 | 1307, 1308, 1309 | $10,999 |
| 12/15/09 | 1394, 1395, 1396 | $12,247 |

(Twedt Decl. ¶ 10; Docket #61 (Under Seal Letter); see also PSR ¶¶ 27-33, 44-45.)

### 2. CW2

On March 9, 2011, CW2 went to G&A and met with defendant. (PSR ¶ 48.)  CW2 sought to cash checks from "University Med Tech," a company CW2 told defendant was a "diagnostic testing company."  (Id.)  In fact, University Med Tech was an undercover FBI company.  (Id.)  Defendant asked CW2 whether he had been working with other check cashing companies and CW2 stated that he had used "Dina" but wanted to spread the checks around. (Id.)[2]  Defendant buzzed CW2 into the back room.  (Id.)

CW2 told defendant he wanted to cash $12,000.  (Id. ¶ 49.) Defendant told CW2 that he charged a 3% fee.  (Id.)  As the checks were blank, CW2 asked defendant how big the checks should be and whether they should be made out to individuals or companies.  (Id.)  Defendant responded that the checks should be

---

[2] Dina is Dina Bridgitt, a defendant in United States v. AAA Cash Advance, CR 12-559-DMG, who pled guilty to Bank Secrecy Act violations.

1  made out in amounts less than $10,000 and that it did not matter
2  who or what the checks were made out to.  (<u>Id.</u>)  CW2 made up
3  names for the payees on the checks and defendant helped him make
4  up the amounts so that the aggregate total would equal to
5  $12,000.  (<u>Id.</u>)  CW2 asked defendant if he should sign each
6  check with a different name, defendant said "yeah" and gave CW2
7  different color pens to disguise the fact that the signatures
8  were by one person.  (<u>Id.</u>)  At the end of the meeting, defendant
9  and CW2 exchanged contact information.  When defendant gave CW2
10 his number, he said "don't say anything over the phone."  (<u>Id.</u>)

11         On March 16, 2011, CW2 picked up $11,640 cash from
12 defendant.  (<u>Id.</u> ¶ 50.)  Defendant and CW2 also discussed the
13 need for individuals engaged in check cashing transactions to
14 spread transactions to numerous check cashing companies.  (<u>Id.</u>)
15 Defendant suggested to defendant that CW2 use "Dina."  (<u>Id.</u>)
16 Lastly, defendant told CW2 that he knew of other check cashers
17 that CW2 could use if the amounts involved got too large, but
18 that the amounts were not too large at that point.  (<u>Id.</u>)

19         On March 6, 2012, CW2 told defendant he had $50,000 to
20 spread around.  (Ex. D pp. 2-3.)  Defendant told CW2 he could do
21 it at a friend's place.  (<u>Id.</u>)  While talking with defendant,
22 CW2 asked defendant whether he had ties to the medical field.
23 (<u>Id.</u> p.4.)  Defendant stated his dad owned a medical company ten
24 years prior but now there is "this."  (<u>Id.</u>)  CW2 then told
25 defendant that he had another "new clinic," that it was hard
26 working "above board," and that while half of his patients were
27 actual patients, others came from kickbacks.  (<u>Id.</u> pp. 4-7.)
28 For his part in the conversation, defendant stated that the

7

"Armenians" ruined everything, answered "got it, got it" when CW2 was talking about his actual and illegal patients, and acknowledged that it is "basically impossible" to make money "above board." (Id. p. 6-7.)

From April 2011 to April 2012, CW2 conducted five additional transactions at G&A which required a CTR but for which no CTR was filed. (PSR ¶ 51.) In total, CW2 completed the following illegally structured transactions:

| 3/16/2011 | 1046, 1047, 1048, 1055 | $11,640 |
| 04/25/2011 | 1056, 1057, 1118, 1119, 1120 | $14,550 |
| 06/03/2011 | 1059, 1067, 1058, 1060 | $11,740 |
| 07/12/2011 | 1103, 1104, 1105, 1109 | $11,640 |
| 03/06/2012 | 1116, 1130, 1131, 1132 | $11,640 |
| 4/13/2012 | 1179 - 1183 | $16,422 |

(Twedt Decl. ¶ ; PSR 47-51.)

D.    Compliance Audits

Defendant's illegal check cashing activities were taking place against the backdrop of G&A having been subject to several IRS BSA compliance examination reviews ("compliance reviews"). (PSR ¶¶ 18-19.) By the time CW1 cashed checks at G&A in 2009, two separate compliance reviews had already taken place in 2007 and 2008, which found G&A's anti-money laundering policy deficient. (Id.) Another compliance review took place in 2010. (PSR ¶ 46.) These compliance reviews put G&A on notice of its shortcomings and established G&A's knowledge of the CTR and AML policy requirements. Finally, the compliance reviews established that defendant was identified as the "store manager" to auditors and G&A identified defendant as the "First Manager"

in an internal G&A document which followed a BSA Compliance Examination.  (Exs. A, B.)

E.    CFTB Search and $24 million binder

In 2009, the California Franchise Tax Board ("CFTB") was conducting its own investigation into G&A for tax fraud.  (PSR ¶ 36.)  In May of 2009, the CFTB, pursuant to a warrant, searched the premises of Gagik Gasparian and recovered binders of photocopied checks.  (Id.)  During the CFTB search of defendant's residence, two bedrooms of defendant's house had been converted into "grow rooms" containing 86 live marijuana plants, a scale, and growing equipment, and several thousand dollars in cash.  See Dkt# 74 (Supplemental PSR).[3]  Later, G&A provided SA Twedt a similar binder from G&A.  (Id. ¶ 37.)  The G&A binder contained the undercover La Brea Diagnostic checks and had the name "Aharon" written on the bottom of the page. (Id.)

During a 2009 interview regarding the binders, Sanchez stated that he had placed some of the checks in the binders but most were copied and organized by defendant.  (Id. ¶ 39.) Sanchez stated that when customers brought in envelopes containing checks to G&A, Sanchez would give the envelope to defendant and tell defendant who brought it.  (Ex. L p.2.) Defendant came up with the binder system to organize the checks. (Id. p. 1.)  Sanchez stated that he did not touch the binder with the checks much and that defendant copied most of the checks.  (Id.)  For the checks brought in by Krkasharyan for

_____

[3]  Four firearms were found as well but they were found in defendant's roommate's room.

9

1 | CW1, Sanchez stated that the name "Aharon" appeared to be
2 | defendant's handwriting.  (PSR ¶ 40.)

3 |       **F.   Defendant's Interview**

4 |      On October 4, 2011, HHS and FBI agents went to G&A and
5 | asked defendant if he would talk with them about checks related
6 | to certain medical companies that were being cashed at G&A,
7 | specifically referring to checks from La Brea Health Diagnostic
8 | (the 2009 transaction by CW1) and checks from a Dr. Ravindra
9 | Chandrasekhar (whose identity had been stolen).  (PSR ¶ 52; Ex.
10 | E pp. 1-3.)  Defendant agreed to speak with the agents and
11 | stated that he remembered the LaBrea Health Diagnostic checks.
12 | (Id. at 3-4)  Agents recorded this meeting using a concealed
13 | video recorder.

14 |      When asked about certain checks from La Brea Diagnostics
15 | brought to G&A by CW1, defendant stated that the checks were
16 | cashed by different individuals.  (Id.)  "No, no, it was
17 | definitely different individuals."  (Id.)  When asked if he knew
18 | "Aharon" [Krkasharyan], defendant stated, "He's kind of familiar
19 | . . . I don't know him . . . he looks a little familiar."  (Id.
20 | p.5.)  Defendant said more generally people did not bring in
21 | stacks of checks.  (Id. p. 10.)  Defendant similarly stated that
22 | the checks relating to Dr. Chandrasekhar checks were brought in
23 | by multiple people despite documentary evidence, including the
24 | binder pages containing those checks, suggesting that an
25 | individual by the name of Karen Sarkisian brought the checks in.
26 | (Id. pp 10-11; PSR ¶ 53.)  Defendant was shown a picture of
27 | Sarkisian and denied knowing him, though defendant said
28 | Sarkisian looked familiar.  (Id.)

The investigating agents told defendant about the nature of the healthcare-related checks being cashed at G&A during the interview on October 4, 2011. (Id. at 3-10, 12, 15-16.) The agent explained to the defendant that healthcare checks were being cashed at G&A, and that those checks were likely to be proceeds of healthcare fraud. (Id.) The agents explained how diagnostic testing fraud and durable medical equipment fraud works, and why those engaged in healthcare fraud were using check cashers such as G&A. (Id.) The agents also explained the significance of "patient recruiters" and how they fit into Medicare fraud schemes. (Id. p. 15-16.) The agents asked defendant to contact them if healthcare-related checks were cashed at G&A Check Cashing in the future. (Id. at 8, 15.) Defendant knew the schemes: "I heard about it before. So they pay, the clinics pay the patients" and knew that "like wheelchair[s]" were a type of fraud. (Id. at 6.) Despite the agents' requests, defendant never contacted the agents regarding health care checks being cashed at G&A. (Twedt Dec. ¶ 11)

Defendant also discussed his relationship to "Bert" (defendant Sanchez). (Id. p.15) Defendant acknowledged that he dealt with "larger amounts" of checks and that he told Sanchez not to cash anything over $2000 without his permission. (Id.)

## G. Agent's Analysis of the Binders and Inquires to FINCEN

SA Twedt conducted a financial analysis of the checks in the binders recovered at Gagik Gasparian's house and obtained from G&A. (Twedt Decl. ¶ 5; Exs. F, G.) A spreadsheet summarizing SA Twedt's analysis of the bundled transactions

11

exceeding $10,000 is attached as Exhibit F.  (<u>Id.</u> ¶ 5(a).)  A
spreadsheet documenting all transactions in the binders is
attached as Exhibit G.  (<u>Id.</u> ¶ 5(b).)  Illustrative excerpts
from the binders are attached as Exhibit H.  (<u>Id.</u> ¶ 5(c).)  A
full copy of the binders is submitted herewith on a compact disk
as Exhibit I.  (<u>Id.</u> ¶ 5(d).)

SA Twedt determined that during the period covered by the
binders, July 2006 through December 2007 and November 2008
through May 2009, there were 918 transactions in which there
were over $10,000 on the same date.  (Twedt Decl. ¶ 6(b); Ex.
F.)  The number of individual customers (unique names at the
bottoms of pages) on the structured sheets was 58 and the number
of makers (e.g., health care companies, other companies, and
individuals) was over 300.  (Twedt Decl. ¶ 6(e).)  Based on his
analysis, SA Twedt determined the structured funds equaled
<u>**$24,541,974.82.**</u>  (Twedt Decl. ¶ 6(g); Ex. F p. 17.)[4]

---

[4] The government also attempted to trace the binder checks
with deposits into G&A's operating accounts.  (Ex. J.)  The
government traced $11.5 million from the binders to deposits in
G&A's operating accounts.  (Decl. of SA Twedt ¶ 7; Ex. J.)
Nevertheless, the $24 million is the better measure of the
structured funds because it was based on the binders used by G&A
to track the money it owed its customers and not bank
information which only captured some of G&A's deposits.  One of
the banks which held a G&A operating account, First Federal Bank
of California, was unable to provide account details or checks
due to a merger with One West Bank.  (Decl. of SA Twedt ¶ 7.)
The bank was able to provide statements showing that the account
was open in December 2006 and closed in July 2007 and the total
deposits and withdrawals was $9,694,297.  For Mirae Bank, the
government did not have records covering the entire period of
the binders.  Finally, some funds could not be reconciled
because check cashers and Gasparian specifically often spread
out checks to other check cashers.  (<u>Id.</u>)

A review of FINCEN records determined that G&A only filed a total 9 CTRs on cash out transactions at G&A since 2003, the last of which was filed by Sanchez in 2009.  (Ex. M.)

## III. THE GOVERNMENT'S ANALYSIS OF THE SENTENCING GUIDELINES

The United States Probation Office prepared a Presentence Report ("PSR") in this case, which was disclosed on October 29, 2012.  The PSR calculated the total offense level as follows:

| DESCRIPTION | POINTS | USSG § | PSR ¶ |
|---|---|---|---|
| Base Offense Level | 6 | 2X1.1(a), 2S1.3(a)(2) | 68 |
| Value of Funds> 20M | 22 | 2S1.3(a)(2); 2B1.1(b)(1)(L) | 68-71 |
| Knew or believed funds were proceeds of unlawful activity | 2 | 2S1.3(b)(1)(A) | 72-76 |
| Title 31 offense and pattern of unlawful activity over $100,000 in 12 months | 2 | 2S1.3(b)(2) | 77 |
| Acceptance of Responsibility | -3 | 3E1.1 | 86-87 |
| Total | 29 | | |

The PSR calculated defendant's criminal history category as II based on three criminal history points - - one point for defendant's January 11, 2006 conviction for driving with a blood alcohol category above .08% and two points because defendant was on probation while he committed the instant offense.  (PSR ¶¶ 95-101).  A total offense level of 29 and criminal history category of II results in an advisory sentencing guidelines range of 97-120 months incarceration.  On October 29, 2012, the Probation Office also filed a letter to the Court containing its sentencing recommendation.  It recommended a 97-month period of

incarceration, two years of supervised release, and a $200 special assessment.

    For the reasons set forth below, the United States agrees with the PSR's application of the Guidelines it included in its calculation.  However, the United States objects to the PSR's failure to enhance defendant's sentence two points for his aggravating role pursuant to U.S.S.G. § 3B1.1(c).  Accordingly, the government believes that defendant's total offense level is 31 and the sentencing guidelines range under the guidelines is 121-151 months.  Defendant's guidelines range is limited by the 120-month statutory maximum.

    **A.    The PSR Correctly Enhanced Defendant's Sentence By 22 Points Because The Value of the Funds Exceeded $20 Million**

    USSG § 2S1.3(a)(2) directs the Court to increase the Guidelines range by the "number of offense levels from the table in § 2B1.1 corresponding to the value of the funds." The Commentary to USSG § 2S1.3 defines "value of the funds" as: "the amount of funds involved in the structuring or reporting conduct.  The relevant statutes require monetary reporting without regard to whether the funds were lawfully or unlawfully obtained."  USSG § 2S1.3 cmt. n.1 (2008).  CTR violations fall within the USSG § 2S1.3.  See Background to USSG § 2S1.3. Therefore, the "value of the funds" is the money that should have been reported on a CTR and filed with the Financial Crimes Enforcement Network ("FinCEN").

As set forth in SA Twedt's analysis of the binders, the value of the structured funds is $24,541,974.82. (Twedt. Decl. ¶ 6(g); Ex. F p. 17.) This figure underestimates the actual value of the laundered funds as it only includes a period covering half of the conspiracy. Proof of this loss amount includes:

- **The binders themselves.** On their face, the purpose of the binders was to keep track of who gets money from aggregated transactions. Only transactions exceeding $10,000 are included in the government's calculation. (Twedt Decl. ¶ 6(f).) Each page of the binders includes the name of the person who brought in multiple checks and the date they brought them in. (Twedt Decl. ¶ 6; Exs. F, H.)

- **The checks.** Single pages of the binders contain multiple checks from one maker to numerous individual payees, a highly unlikely scenario in the ordinary course of business. (See e.g., Ex. H p 7, 10-11, 12-14, 16.) Checks are often consecutively numbered making it even less likely they were brought in by the individual payees on the checks. (See e.g., Ex. H p 2, 7, 9, 15.)

- **The makers.** The checks are also disproportionately from health care companies, including many health care companies engaged in fraud. (Ex. F.) Legitimate health care busineeses would be issuing checks to vendors and employees who would have their own bank accounts and no reason to use G&A.

- **CW1.** CW1's checks, which were found in the binders, are proof of the scheme and how the binders worked. (Ex. H at 3-6.) One individual, in this case intermediary "Aharon," would bring in structured checks. That same individual would receive in excess of $10,000 on a single day which triggered the CTR requirement. The binders documented this.

- **Defendant's directions to CW1.** Defendant's instruction to CW1 telling him to make the checks to multiple payees and for amounts under $10,000 is consistent with the other checks found in the binders. (See PSR ¶ 32.)

- **Checks to international corporations.** Checks were made out to large companies such as Alpha Scientific, Fisher Healthcare, Johnson and Johnson, and Jons' Market. (See Ex. H pp. 18, 31, 36.) Such companies would have no use for a check casher such as G&A and would use their own bank accounts to conduct transactions.

**B.** **The PSR Correctly Enhanced Defendant's Sentence By 2 Points Because Defendant Knew The Checks Were The Proceeds Of Illegal Conduct**

USSG § 2S1.3(b)(1)(a) directs the Court to increase the Guidelines range by two levels if defendant knew or believed that the relevant funds were proceeds of unlawful activity. Defendant believed checks he cashed were proceeds of unlawful activity. First, on October 4, 2011, the agents explained how health care fraud works and why those engaged in healthcare fraud were using check cashers such as G&A (defendant also was seemingly familiar with health care fraud). (Ex. E at 3-8, 15-

16

16.)  The agents also explained the significance of "patient recruiters" and how they fit into health care fraud schemes. (Id. p. 15.)  Second, on March 6, 2012, CW2 directly told defendant his checks came from a diagnostic testing company, that it was hard to work "above board," and that while half of his patients were actual patients, the other half were recruited with kickbacks.  (Ex. D p. 4-7.)  Defendant acknowledged that its "basically impossible" to make any money above board.  (Id. at 7.)

Despite the information from the agents regarding health care fraud in October 2011 and information from CW2 on March 6, 2012 regarding the illegal nature of his business, defendant continued to cash health care-related checks for CW2 including transactions in March and April of 2012.

Circumstantial evidence further corroborates defendant's belief.  The nature of the checks as health care checks, defendant's knowledge of the health care industry though his father's prior ownership of a company, defendant's acknowledgement that Armenians ruined "everything" referring to health care companies, defendant's lies to law enforcement, and his instructions to CW2 not to use the telephone, all establish that defendant knew the source of the funds was criminal.

**C.    The PSR Correctly Enhanced Defendant's Sentence By 2 Points Because Defendant Was Convicted of a Title 31 Offense As Part of A Pattern of Unlawful Activity Involving More than $100,000 in a 12-month Period**

USSG § 2S1.3(b)(2) directs the Court to increase the Guidelines range by two levels if defendant was convicted of an offense under subchapter II of chapter 53 of Title 31 of the

1  United States Code and committed the offense as part of a

2  pattern of unlawful activity involving more than $100,000 in a

3  12-month period.

4       Defendant's crimes of conviction, conspiracy to fail to

5  file CTRs and a willful failure to maintain an effective AML

6  program, fall under subchapter II of chapter 53 of Title 31 of

7  the United States Code.  The binder evidence and spreadsheet

8  documenting the binder evidence easily establish that

9  defendant's crimes involved more than $100,000 in a 12-month

10  period.  See Ex. F.  Over a three year period, defendant

11  structured over $24 million.  In 2007, defendant structured

12  $13,288,922, well above the $100,000 threshold required to apply

13  the enhancement.  (See Twedt Dec. ¶ 8.)  Of the $13,288,922.69

14  in structured transactions contained in the binders, $5,164,989

15  in structured transactions was confirmed as deposited into G&A's

16  operating accounts.  (Id.)

17       **D.    The Government Objects to the PSR's Failure to Enhance
         Defendant's Sentence 2 Points Because He Was An
18       Organizer, Leader, Manager and Supervisor in Criminal
         Activity**

19

20       USSG § 3B1.1 enhances a defendant's sentence between two

21  and four levels based on an individual's role in the offense.

22  USSG § 3B1.1(a) enhances a defendants offense level by four

23  points if defendant was an organizer or leader of a criminal

24  activity that involved five or more participants or was

25  otherwise extensive.  USSG §3B1.1(c) enhances a defendant's

26  offense level by two levels if the defendant was an organizer,

27  leader, manager, or supervisor in any criminal activity.  The

28

Application Notes to § 3B1.1 define a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."

Defendant was an organizer, leader, manager, and supervisor in criminal activity. The PSR did not apply this enhancement because it concluded there was no indication that defendant exercised control over Sanchez or Krkasharyan. (PSR ¶ 80.) The PSR also notes that defendant gave instructions to the CWs, but noted that the CWs are not criminal participants. Id.; see also App. Note 1 (noting undercover law enforcement officer would not be criminal participant).

The PSR's conclusion that there was no indication defendant exercised control over Sanchez and Krkasharyan is incorrect and the PSR also discounts the import of defendant's instructions to the CWs. To begin with, defendant was a supervisor as a matter of record. IRS Bank Secrecy Audits and documents written by G&A establish defendant's role. An IRS auditor annotating a closing conference with G&A, noted that defendant was G&A's store manager. (Ex. B.) G&A policy even stated that defendant was the "First Manager" while Sanchez was a "Second Manager" who assisted the "First Manager" in various tasks including filing reports. (Ex. A.) Given the fact that G&A failed to file CTRs for a large part of the checks it received, defendant's role as manager is equivalent to managing a criminal organization.

The use of Aharon Krkasharyan to distance defendant from customers also establishes defendant's leadership. Using a middleman such as Krkasharyan instead of directly dealing with

19

customers is a hallmark of authority.   (See PSR ¶ 30.)
Krkasharyan's statements to CW1 that defendant didn't want to
have "new friends" and that defendant did not want to "spread
oneself [himself] thin" are the types of statements a middleman
would make on behalf of his boss.   (Id.)   Defendant himself
directed CW1 to conduct transactions through Krkasharyan, again
establishing his control not only over CW1, but also
Krkasharyan.   (Id. ¶ 44.)

     During the 2011 interview, defendant himself established
his leadership role.   Defendant acknowledged that he dealt with
"larger amounts" of checks and that he told Sanchez not to cash
anything over $2000 without defendant's permission.   (Ex. E p.
15.)   Sanchez's statements regarding defendant's
responsibilities also establish defendant's leadership.   For
example, when customers brought in envelopes containing checks
to G&A, Sanchez would give the envelope to defendant and tell
defendant who brought it.   (Ex. O p.1.)   Defendant came up with
the binder system to organize the checks.   (Id. pp. 1-2.)
Sanchez stated that he did not touch the binder with the checks
much and that defendant copied most of the checks.   (Id.)

     The government's request for a two-point enhancement is
further supported by the facts that customers who engaged in
structuring the checks were also criminal participants who took
direction from defendant.[5]   Like defendant, each of these

---

     [5] The government notes that it could seek a four-point
enhancement based on the customers but is only seeking a two
point enhancement here.

20

customers sought to cash checks without having a CTR filed and were therefore participants.  See App. Note 1 to 3B1.1. Defendant's statements to CW1 should not be considered for the purposes of determining the number of criminal participants, however, the statements are evidence of the types of instruction defendant gave to individuals who cashed checks at G&A, many of whom wrote checks in a manner consistent with defendant's instructions to the CWs (e.g., under $10,000 to various individuals and small companies that don't exist).[6]

## IV.   THE SECTION 3553A FACTORS SUPPORT A 120-MONTH SENTENCE

### A.   Nature and Circumstances of the Offense

The first Section 3553 factor directs the Court to consider the nature and circumstances of the offense.  See 18 U.S.C. § 3553(a)(1).  Defendant committed serious offenses.  He failed to file CTRs for over $24 million in structured currency transactions and willfully failed to maintain an effective anti-money laundering policy.  Congress enacted the currency transaction reporting requirement because it recognized "the importance of reports of large and unusual currency transactions in ferreting out criminal activity."  California Bankers Ass'n v. Shultz, 416 U.S. 21, 38 (1974).  As established in G&A's binders, defendant allowed at least 57 other individuals to

_____

[6] The fact that defendant's customers were participants in the same scheme distinguishes the instant case from drug cases where "customers" have not been counted under USSG § 3B1.1 because they are "end users" who have not conspired to commit the federal drug offense.  See e.g., United States v. Egge, 223 F.3d 1128 (9th Cir. 2000).

launder their cash and avoid detection by law enforcement. These fraud schemes included health care fraud and likely other criminal activity.  Finally, defendant's criminal activity was consistent and long term - - it occurred from at least 2006 to 2012 and would have continued had he not been arrested.

Defendant's role in laundering health care fraud proceeds allowed individuals who engage in health care fraud to fund and perpetuate their schemes.  Medicare is already short on money. Individuals like defendant who facilitate health care fraud allow others strain Medicare and jeopardize its ability to continue providing health care to the elderly and disabled.

Finally, defendant laundered more funds than were included in the sentencing guidelines calculation.  The $24 million was based on only a three-year period of a conspiracy six-year conspiracy.

B.    History and Characteristics of Defendant

The second Section 3553 factor the Courts must consider is the history and characteristics of defendant.  See 18 U.S.C. § 3553(a)(1).  This factor supports the government's recommended sentence.  This was not an isolated event.  Defendant engaged in the CTR conspiracy for over six years.  Since 2000, defendant has no history of legitimate employment.  (PSR ¶¶ 122-24.)

Defendant's other conduct illustrates a continuing and general disrespect for the law and disregard for public safety. Although not charged with any drug offense, during the CFTB search of defendant's residence in 2009, two bedrooms of

defendant's house had been converted into "grow rooms" containing 86 live marijuana plants, a scale, growing equipment, and several thousand dollars in cash.   See Dkt# 74 (Supplemental PSR).[7]   Consistent with drug dealing, vehicles would stop at defendant's residence for short periods.   (See PSR ¶ 21.)   In 2005, defendant was convicted of driving under the influence where his blood alcohol level was .16%, twice the legal limit. Defendant was on probation from the 2005 conviction while he committed the instant offense.   (PSR ¶ 99.)

Although the government does not seek an enhancement for obstruction of justice, it asks the Court to consider defendant's lies to law enforcement officers as an aggravating Section 3553(a) factor and further evidence of defendant's disrespect for the law and the institutions responsible for enforcing the law.   When asked about certain checks from La Brea Diagnostics brought to G&A by CW1, defendant stated "[n]o, no, it was definitely different individuals."   (Ex. E p. 4.)[8]   In fact, it was a single individual – Aharon – who cashed the checks.   When asked if he knew Aharon, defendant stated, "He's kind of familiar . . . I don't know him . . . he looks a little familiar."   (Id. p. 5.)

---

[7]   Four firearms were found as well but should not be attributed to defendant because they were found in the room of defendant's roommate.

[8]   Defendant told the same lie with respect to the Dr. Chakensandar checks.   (Ex. E p. 11.)

Finally, defendant's claims regarding his finances are questionable. Defendant claimed that he only earned $3,000 a month at G&A. For illegally cashed checks, however, defendant charged a 3-5% fee. Just based on the $24 million covering half of the conspiracy, this would amount to $720,000 to $1.2 million. Assuming the conspiracy operated the same from 2009-2012 as it had from 2006 to 2009, the fee from the illegally cashed checks would be $1.4 - $2.4 million. This does not include any lawful business conducted by G&A which would have also generated income. To date, there has been no accounting for these huge fees and, according to defendant, he received a modest $3,000 a month salary as if he was operating legally. This inconsistency is consistent with the other parts of defendant's finances where he has not paid his mortgage since 2009, declared bankruptcy in 2012, and has other unsecured debts including a $1,000 debt to the Internal Revenue Service, (PSR ¶ 129), all while living a lavish lifestyle including international travel to Mexico, Aruba, China, and Russia, (PSR ¶ 131); semi-annual trips to Las Vegas to gamble, (PSR ¶ 137); and leasing a 2011 BMW 335I.

C.   **General Deterrence and the Remaining 3553(a) Factors Support A 120-Month Sentence**

Because there are hundreds of check cashers in Los Angeles as well as an underlying health care fraud problem, it is important that the sentence here be sufficient to promote respect for the law and general deterrence for the types of

24

criminal activities defendant engaged in as well as the health care fraudsters.  A significant sentence is also necessary to reflect the serious of the offense, deter criminal conduct, and protect the public from defendant.  See 18 U.S.C. § 3553(a)(A)-(D).  Given the defendant's criminal history, a lengthy sentence is also necessary here to deter defendant from further criminal activity.

IV.  CONCLUSION

The government respectfully requests that the Court sentence defendant Karen Gasparian to an 120-month sentence, a two-year period of supervised release, and a $200 special assessment.

25