## DECLARATION OF SPECIAL AGENT DARRELL TWEDT

### INTRODUCTION

I, Darrell Twedt, having being duly sworn, hereby depose and state:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have served in that capacity for more than seven years. I am currently assigned to the Los Angeles Office, White Collar Division, Health Care Fraud Squad. Prior to starting with the FBI, I worked as a Mechanical Engineer in the aerospace industry. Since entering duty, I have participated in investigations, among others, involving fraud against health benefit programs, including Medicare and Medicaid, as well as private health insurance programs. I have also investigated multiple schemes to launder the proceeds of health care fraud. I have attended numerous training seminars on the investigation of health care fraud, schemes used to defraud health benefit insurance programs, and schemes to launder the proceeds of fraud. My current chief responsibility involves the investigation, among other things, of schemes to defraud health insurance programs.

2. I was the lead case agent in the investigation of G&A Check Cashing ("G&A"), Karen Gasparian ("GASPARIAN"), and Humberto Sanchez ("SANCHEZ"). Agents from the United States Department of Health and Human Services and Internal Revenue Service also participated in the investigation. I base this Declaration on my personal knowledge, dealings with two confidential witnesses ("CW1" and "CW2") and review of recorded conversations between the CWs and various individuals, discussions with other law enforcement agents, interviews with witnesses, and my review of financial records and documents, and review of public records.

1

3. This declaration is provided for the limited purposes of: (1) describing my financial analysis; and (2) discussing certain discrete facts for sentencing and forfeiture. I have not described all the facts and circumstances of which I am aware.

4. On September 20, 2012, I observed defendant GASPARIAN plead guilty to a violation of 18 U.S.C. § 371 (Conspiracy to fail to file Currency Transaction Reports) and 31 U.S.C. §§ 5318(h), 5322 (Willful failure to maintain an effective money laundering program).

**FINANCIAL ANALYSIS**

5. I conducted a financial analysis of the evidence recovered in this case to determine the amount of currency transactions conducted at G&A which required a Currency Transaction Report ("CTR") but for which G&A failed to file a CTR. Specifically, the evidence I analyzed includes binders recovered at Gagik Gasparian's house during a May 2009 search by the California Franchise Tax Board ("CFTB") as well as a binder I obtained directly from G&A with a subpoena. The analysis includes:

   a. Exhibit F: an Excel spreadsheet I created summarizing my analysis of the bundled transactions exceeding $10,000.

   b. Exhibit G: an Excel spreadsheet I created which documents all transactions in the binders, regardless of whether the aggregate value of the transaction was more or less than $10,000.

   c. Exhibit H: excerpts from two series of binders documenting transactions at G&A, both containing copies of checks. These excerpts illustrate certain portions of the pages in the binders, including names and dates written at the bottom of the pages; checks from CW1 with the name "Aharon" listed on the page and date of the check cashing transaction; checks from health care companies on one page, including some which are consecutively numbered

from the same company but which are made out to different payees; and checks made out to large corporate payees. "Aharon" refers to Aharon Krkasharyan, an intermediary who brokered check cashing transactions between CW1 and G&A and who was convicted of making a false statement related to his conduct at G&A.

        d.        Exhibit I: a compact disk containing full copies of the two G&A binders.

        e.        Exhibit J: a spreadsheet I created summarizing my analysis of the bundled transactions exceeding $10,000 and tracing checks into deposits from G&A's operating accounts. This spreadsheet was based in part on a spreadsheet completed by Anthony Brooks, a contract financial investigator working for the Criminal Division of the Department of Justice in Washington, D.C., in which Brooks attempted to reconcile the checks depicted in the binders with checks that bank records show were actually deposited into G&A's accounts.

        f.        Exhibit K: a spreadsheet I created documenting structured transactions completed in 2007, a twelve-month period.

6. Based on my review and analysis of the binders, I determined the following:

        a.        The binders document certain G&A check cashing transactions from July 2006 through December 2007 and November 2008 through May 2009. No binders were recovered during the 2012 search of G&A.

        b.        There were 918 transactions in which over $10,000 in cash was paid out to a single name on the same date. Many of these "bundled" transactions came from health care companies, some of which were under investigation by federal and local authorities.

        c.        The bottom of most pages in the binders contained a handwritten name or names and a date.

    d.  The checks CW1 cashed in a single transaction were on a single sheet, were negotiated on a single day, and the date in the binder corresponded to the day or business day after CW1 delivered the checks to Aharon. The name at the bottom of each page depicting one of CW1's transactions was "Aharon," which is Krkasharyan's first name.

    e.  Fifty-eight unique names are used on the bottom of the pages depicting bundled transactions, while the checks are drawn on accounts in the names of over 300 different individuals and entities.

    f.  When determining the structured transactions which required a CTR to be filed, I excluded all transactions involving less than $10,000 for a single name or group of names on the same sheet on the same date. I assumed based on CW1 transactions, the organization of the notebook, and information I received from another check casher, that checks depicted on a sheet or sheets with the same handwritten name and date at the bottom was a single transaction.

    g.  The binders document that G&A structured **$24,541,974.82** during the periods covered by the binders.

    7.  I also attempted to compare the checks in the binders to specific deposits in G&A's accounts. I determined that at least **$11,455,363** in structured checks contained in the binders were deposited into G&A's three operating accounts at Mirae Bank (Wilshire State Bank), Saehan Bank, and Pacific City Bank. The **$11,455,363** was the sum of the checks from 518 structured transactions that were known to have been deposited into G&A's accounts. Checks included in the binders but for which no corresponding deposit could be traced are excluded from the calculation. I based this analysis on a spreadsheet I completed documenting all structured transactions in the binders (Exhibit F) as well as two spreadsheets completed by DOJ Contract Investigator Anthony Brooks which attempted to trace checks in the binders to

deposits into G&A's operating accounts. I then traced only structured transactions to over $10,000 by one individual on one day to actual bank deposits to arrive at **$11,455,363 (Ex. J)**. This comparison could not be fully completed in a comprehensive way because:

    a.    One of G&A's four banks, First Federal Bank, was unable to provide account details which included specifically deposited checks due to a merger with One West Bank. One West Bank statements showed G&A opened an account in December 2006 and closed it in July 2007. The total amount of deposits and withdrawals by G&A were the same and equaled $9,694,297.

    b.    Although I did receive bank records form Mirae Bank from July 2006 through December 2007, I never received bank records from Mirae Bank from November 2008 to May 2009.

    c.    Based on my review of recordings between CW2 as well as interviews of another check casher, I know GASPARIAN used other check cashers to cash his checks to spread out deposits from any one maker.

    8.    To determine whether G&A structured over $100,000 in a twelve month period, I analyzed a period covering January 2007 to December 2007. During that period, the binders contain $13,288,922.69 in structured transactions. Of the $13,288,922.69 in structured transactions contained in the binders, $5,164,989 in structured transactions was confirmed as deposited into G&A's operating accounts.

    9.    Based on my interactions with CW1 and CW2, observation of the amount of fees taken out of checks brought to G&A by CW1 and CW2, and review of audio and video recordings of CW1 and CW2, I learned that G&A and GASPARIAN charged between 3% (CW2) and 5% (CW1) for illegally structured transactions. Applying 3%, the lowest fee charged

by G&A and GASPARIAN to the $24,541,974.82 in checks cashed without filing required CTRS, I calculated that G&A and GASPARIAN received at least $736,259.24 from illegal activities to which they have pled guilty. Additionally, the $736,259.24 in fees represents property traceable to the property involved in the conspiracy violation to which G&A and GASPARIAN have pled guilty. This is a conservative calculation because I applied the lowest fee charged by GASPARIAN (3%) and my calculation only includes checks included in the binders despite the fact fees ranged up to 5% and the conspiracy existed for roughly twice as long as the period covered by the binders.

## OTHER FACTS

10. As part of the undercover investigation in this case, CW1 and CW2 both cashed checks at G&A that were drawn on FBI undercover accounts in the names of two fictitious companies, La Brea Health Diagnostics and University Med Tech. In each transaction CW1 and CW2 conducted, they cashed multiple checks with an aggregate value of over $10,000.

11. CW1 cashed checks at G&A on multiple occasions using Aharon as an intermediary, with Aharon physically receiving the checks and cashing them on CW1's behalf at G&A. On at least two occasions, CW1 cashed his checks directly at G&A, with GASPARIAN handling or being present during the transaction.

12. CW2 personally met with GASPARIAN at G&A to cash checks as part of the undercover investigation. On one occasion, he arrived at G&A with several signed, blank checks which appeared to be drawn on an account in the name of University Med Tech. CW2 told GASPARIAN that he wanted to cash $12,000. GASPARIAN advised CW2 to make the checks out for less than $10,000 each and to sign the checks with different names.

GASPARIAN also told CW2 that he charges a fee of 3%. When CW2 received his cash from this transaction, he received $11,640, $12,000 minus 3%.

13. Based on my personal dealings with CW1 and CW2 in undercover transactions as well as my observation of the checks and currency related to those transactions, the following is a summary of all transactions completed by CW1 and CW2 at G&A:

| APPROXIMATE TRANSACTION DATE | CHECK NUMBERS | TOTAL CHECK VALUE | TOTAL CASH PAID |
|---|---|---|---|
| 02/23/2009 | 1334, 1335, 1336 | $15,000 | $13,800 |
| 03/13/2009 | 1463, 1464, 1465 | $12,903 | $12,000 |
| 03/31/2009 | 1304, 1305, 1306 | $11,828 | $11,000 |
| 05/04/2009 | 1307, 1308, 1309 | $11,828 | $10,999 |
| 12/15/2009 | 1394, 1395, 1396 | $12,903 | $12,247 |
| 3/16/2011 | 1046, 1047, 1048, 1055 | $12,000 | $11,640 |
| 04/25/2011 | 1056, 1057, 1118, 1119, 1120 | $15,000 | $14,550 |
| 06/03/2011 | 1059, 1067, 1058, 1060 | $12,000 | $11,740 |
| 07/12/2011 | 1103, 1104, 1105, 1109 | $12,000 | $11,640 |
| 03/06/2012 | 1116, 1130, 1131, 1132 | $12,000 | $11,640 |
| 4/13/2012 | 1179, 1180, 1181, 1182, 1183 | $17,000 | $16,422 |

14. After I interviewed defendant GASPARIAN on October 4, 2011, he never contacted me to report that health-care related checks were being cashed at G&A. Nor, to my knowledge, did GASPARIAN contact any other law enforcement agent.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this _17_ day of December, 2012 at _Los Angeles_, California

_____
SPECIAL AGENT DARRELL TWEDT
FEDERAL BUREAU OF INVESTIGATION