1  **ALAN EISNER, State Bar # 127119**
   **KESTENBAUM EISNER & GORIN LLP**
2  **14401 Sylvan Street, Suite 112**
   **Van Nuys, CA 91401**
3  **Phone:      (818) 781-1570**
   **Fax:        (818) 781-5033**
4  **E-mail:     ae@keglawyers.com**

5  Attorney for Defendant
   KAREN GASPARIAN
6

7                    UNITED STATES DISTRICT COURT

8            FOR THE CENTRAL DISTRICT OF CALIFORNIA

9
   UNITED STATES OF AMERICA,          )  CR No. 12-00560-JFW
10                                     )
                        Plaintiff,     )  **DEFENDANT'S SENTENCING**
11                                     )  **POSITION; MEMORANDUM OF**
             v.                        )  **POINTS AND AUTHORITIES IN**
12                                     )  **SUPPORT THEREOF; EXHIBITS**
   KAREN GASPARIAN,                    )
13                                     )  Sentencing Date: January 7, 2012
                                       )  Time:  1:15 p.m.
14                        Defendant.   )
                                       )  Before the Honorable John F. Walter
15                                     )
                                       )
16 _____)

17 **TO UNITED STATES ATTORNEY ANDRÉ BIROTTE JR. AND ASSISTANT**
   **UNITED STATES ATTORNEY DAVID KIRMAN:**
18
19        Defendant Karen Gasparian, by and through his attorney, Alan Eisner, hereby

20 files his sentencing position and memorandum of points and authorities.

21
22                              Respectfully submitted

23                              KESTENBAUM EISNER & GORIN LLP

24
   Dated: December 17, 2012          _/S/ ALAN EISNER_____
25
                                     ALAN EISNER
26                                   Attorney for Defendant
                                     KAREN GASPARIAN
27
28

                                       1

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**
**INTRODUCTION**

"I take full responsibility for my actions.  I'm very sorry for what I have done, and for not being more responsible and taking my job more serious….

"Life is full of lessons, and this one was a good one for me.  I did learn this lesson a hard way, but it was a good lesson and I learned a lot from it.  I will look at everything I do from this point on in a different way.  I will take more responsibility in everything else that I do from this point on, and make sure I don't end up in this situation again."  (**Exhibit A**.)

These are Karen Gasparian's own words.  He has taken full responsibility for his conduct and acknowledged his wrongdoing.  He has plead guilty in this case to Count One of the Indictment, a violation of 18 U.S.C. § 371 (Conspiring to cause a financial institution to fail to file a Currency Transaction Report ("CTR") and to Count Twelve of the Indictment, a violation of 31 U.S.C. § 5318(h), § 5322, 31 CFR § 1022.210 and 18 U.S.C. § 2 (Failure to maintain an effective anti-money laundering program.)

At the same time, Mr. Gasparian strongly disputes the Government's characterization of the extent of his offense.  The Government has used Mr. Gasparian's conduct in his dealings with two confidential informants, (which represent a very small portion of the $24 million worth of transactions at issue), and has projected that conduct onto a $24 million dollar loss amount, despite a lack of evidence that Mr. Gasparian committed the same CTR violations in those dealings.  Stated simply, there is insufficient evidence that CTRs were required to be filed for the deposits at issue.  There was no identification or interview of the "customer", to determine if in fact they received more than $10,000 in cash, the triggering event for a CTR filing.  There was also no investigation into the policies of the banks Mr. Gasparian dealt with, which actually prohibited Mr. Gasparian from depositing more than $10,000 worth of checks from a single client on a single business day.  It is even uncertain how many checks were actually deposited, or if deposited, whether they cleared.

An even greater problem with the Government's seeking a sentence of incarceration in this case is the disparity when compared to other instances of the same offense, or instances involving even more egregious conduct, such as much larger financial institutions conducting business with drug trafficking organizations and terroristic regimes like Iran. Time and time again, the United States Government has offered deferred prosecution agreements (and fines) to financial institutions whose conduct was exponentially more egregious than the conduct at issue here. Mr. Gasparian's offense, while serious, was still far short of the conduct committed by these other institutions. Any sentence of incarceration in this case would be a loud proclamation that the rich and powerful receive one type of justice, while those less powerful receive another type.

And finally, the fraud guidelines are not empirically based, and, particularly in this case, a 22-level enhancement for an alleged "loss" amount does not fairly reflect Mr. Gasparian's culpability, where no customer or victim lost money, and where Mr. Gasparian did not obtain a windfall profit. For these reasons, Mr. Gasparian respectfully requests a sentence of probation.

**II.**
**SENTENCING GUIDELINES**

**A.     OFFENSE LEVEL**

No plea agreement was reached between Mr. Gasparian and the Government in this case. As a result, the evaluation of the sentencing factors is based on the offense committed, and in response to the Pre-Sentence Report ("PSR") and the allegations of the Government.

**1.     The 22 Level Enhancement In the PSR Based on U.S.S.G. § 2B1.1(b) Is Founded on Speculation And Fails To Satisfy The Clear And Convincing Standard For Allegations That Have A Disproportionate Impact on Sentencing**

"Sentencing enhancements that have a 'disproportionate impact' on the length of a sentence must be proven by clear and convincing evidence." *United States v.*

*McLaughlin,* 203 Fed. Appx. 891, 892 (9th Cir. 2006), citing *United Sates v. Jordan*, 256 F.3d 922, 927-28 (9th Cir. 2001).  In this case, given that the Government's allegations raises the increase in offense level for total value of funds from an 8 level increase to a 22 level increase, the clear and convincing standard certainly applies.

Here, Count One of the Indictment, charging a violation of 31 U.S.C. § 5313(a), for causing a financial institution to file to file the required Currency Transaction Report ("CTR") as required under 31 U.S.C. § 5324(a)(1), states, in part, as follows:

> "From at least in or about July 2006, though in or about March 2012, defendant G&A would engage in a pattern of cashing bundles of checks from a single payor that together exceeded $10,000, without filing a CTR. In this vein, between in or about July 2006, and in or about March 2012, defendant G&A conducted approximately 800 transactions involving checks that were bundled in this fashion and paid out over $20 million cash."

Although Mr. Gasparian has admitted the violation in Count One for failing to properly file the CTR's in specific instances, he strongly disputes the Government's allegations and PSR's characterizations regarding the extent of his offense.

The prosecution has determined a loss amount that totals approximately $24 million based on Mr. Gasparian's failure to file CTR's.  The recommendation for substantial prison time is based on this calculation due to the conclusion that the informant transactions are in the binder "in a certain format" and the additional transactions appear in the same format[1] (PSR, ¶ 69).  These check transactions allegedly originated from the check copies kept in the seized "binders" that purports to be cashed checks on which CTR's were required and not filed.

## THE BINDERS:

---

[1] The same fee charged in the transactions with the informants was not charged to the additional transactions, indicating they were treated differently.
[2] Alleging Medicare/Medicaid fraud
[3] In *Kimbrough*, the Supreme Court effectively acknowledged that not all guidelines are equal. While some "exemplify the Commission's exercise of its characteristic institutional role," others do not.  At issue in *Kimbrough* was the crack cocaine guidelines, of which the Court said:

The binders contained copies of checks and were seized at two different locations by the California Franchise Tax Board in May 2009 (PSR, ¶ 36 and 37).  These binders appear to contain copies of checks presented to G & A prior to negotiating, whether cashed, deposited or returned but not necessarily "<u>cashed checks</u>".  The prosecution refers to the binders as containing "structured check cashing transactions" and "cancelled checks" (PSR, ¶ 36), neither characterization is correct.  The prosecution further states that the binder's pages had a handwritten note indicating the name and date of the person "cashing the checks" (PSR, ¶ 36).  Humberto Sanchez was shown the binders with the check copies and he identified several pages.  He stated he placed copies in the binders but normally used a date stamp on them while Mr. Gasparian did not but did organize the binder.  He continued that G & A did not cash checks over $10,000.00 (PSR, ¶ 39).  If the government is relying on Mr. Sanchez' statement about the binders then they should rely on the statement that there are no cashed checks exceeding $10,000.00.

Despite a recommendation in the PSR for a 22 level enhancement, the Government has provided no substantive evidence to support its allegations regarding the total value of transactions involved in the offense.  *At a minimum* the government should have identified the "customer" and interviewed them to determine if in fact they received more than $10,000 in cash, the triggering event for a CTR filing requirement, and also interviewed the check maker(s) to confirm the authenticity and purpose of the check, and whether it was actually negotiated, especially since the prosecution is recommending enhancement based on knowledge of illegal activity[2] relating to these checks.

Again, the law requires a filing of a CTR when more than $10,000 in cash is provided to a single payee on a single business day.  The law *does not* require the filing of a CTR when an individual drops off more than $10,000 in checks, even when those

---

[2] Alleging Medicare/Medicaid fraud

checks are made out to the same payee.  Mr. Gasparian has acknowledged he committed an offense when he paid out more than $10,000 in cash to the confidential informants within a single business day.  Beyond the instances involving the confidential informants, the Government has not provided actual evidence of other instances in which Mr. Gasparian provided a customer with more than $10,000 of cash.

The Government alleges, in the Indictment, that "Defendant Gasparian or defendant Sanchez would receive bundles of checks and cause them to be deposited into defendant G&A's operating accounts over several days, thus inhibiting the bank's ability to detect the fact that the checks had been presented as a group by a single individual on behalf of the payor rather than by multiple, different payees on the checks."  What the Government fails to account for in this allegation is that *banks have their own policy prohibiting the depositing of more than a certain amount in a single day from a particular payor or to a particular payee.*  Accordingly, Mr. Gasparian *had no choice* but to spread out the deposits over several days.

Moreover, Mr. Gasparian's customers wanted to pick up their cash as soon at it was ready, but since the deposits had to be made over more than one business day, the customers would also come by to pick up their cash over more than one business day.  As a result, even though the Government has provided a list of approximately 918 transactions in which a single customer dropped off more than $10,000 worth of checks on a single business day, that customer *did not* typically pick up more than $10,000 worth of *cash* on a single business day.  Since the law only required Mr. Gasparian to file a CTR when a single individual *picked up* (not dropped off) over $10,000 worth of cash, Mr. Gasparian typically did not need to file a CTR.

Again, as discussed before, this was not part of some plot to evade the CTR requirements, as alleged by the Government, but rather as a response to the policies of the banks Mr. Gasparian dealt with that prohibited transactions over $10,000 per day from a single payor/payee.

The Government has not presented sufficient evidence that Mr. Gasparian

actually paid out more than $10,000 a day in cash, which would have triggered the requirement to file the CTR's, beyond the instances involving the confidential informants. Yet the government has pressed forward with its speculation that $24 million worth of transactions should have had CTR's and has used that speculation to justify an offense level increase of *22* levels (as opposed to 8 levels for the $71,686 worth of transactions that Mr. Gasparian did fail to file the CTR's for). This jump in offense level transforms this case from a "probation range" or minimal incarceration sentence, to a case involving substantial incarceration time. As the government has not satisfied the clear and convincing evidence standard that the total value of transactions for which Mr. Gasparian was required to file a CTR but failed to do so equaled $24 million, the Court should find that the 8 level increase in offense level, rather than the 22 level increase in offense level, is appropriate.

**2.     There Is Insufficient Evidence To Justify The 2 Level Increase Under U.S.S.G. § 2S1.3(b)(1)(a) For Knowledge About Unlawful Activity Associated With The Funds**

There is no evidence presented by the Government to indicate that Mr. Gasparian actually knew about any of the activity, lawful or unlawful, that his clients engaged in to generate their checks. No third party witnesses were interviewed and no documents or records were provided indicating that Mr. Gasprian had any knowledge regarding the sources of money. Even factors that are not considered to have a disproportionate impact on sentencing must still satisfy the preponderance of evidence standard. *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008).

The PSR alleges that "Gasparian charged a higher fee for the [Confidential Informants'] checks" (PSR, ¶ 73), but in fact there is nothing but the PSR's assertion to suggest that the commission fee charged by Mr. Gasparian was outside of the industry standard.

The PSR alleges that "[t]he binders contain documentation of the unusually large/disproportionate amount of business Gasparian conducted with medical companies

7

and further indicates Gasparian's knowledge/belief the funds were the proceeds of unlawful activity or intended to promote unlawful activity in other ways."  (PSR, ¶ 75.) A cursory review of the checks, however, demonstrates the opposite: a substantial number of the checks came from *non*-medical companies.

The PSR points to checks being cashed by the medical companies Intymak and Palm Springs Medical Supplies, yet relies on *no* interviews with or investigations into those companies to determine whether any unlawful activity actually occurred with those companies.  (PSR, ¶ 75.)  Even is such unlawful activity is established, the record here fails to establish that Mr. Gasparian knew of any illegal activity of this company, a finding that is required before the imposition of this enhancement.  Further, a review by the IRS from December 1, 2007 to May 31, 2008, noted the checks by Palm Spring Medical Supplies but concluded that "[a]lthough the check cashing is unusual and has indication of structuring there is no evidence to confirm such activity took place." (**Exhibit B**, p. 2.)

The Government has relied on speculation to support this enhancement and has fallen far short of the preponderance of evidence standard for this factor to be appropriately applied in the instant action.

**3.     There is Insufficient Evidence to Justify The 2 Level Increase Under U.S.S.G. § 2S1.3(b)(2) For Committing The Offense As Part Of A Pattern Of Unlawful Activity Involving More Than $100,000 in a 12-Month Period**

Again, even factors that are not considered to have a disproportionate impact on sentencing must still satisfy the preponderance of evidence standard. *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008).  And again, the Government has not provided evidence that the transactions listed in their spreadsheet were part of any criminal offense.  No interviews were done as to whether clients received more than $10,000 in cash on a single business day, the triggering event for the filing of a CTR. Without evidence that Mr. Gasparian actually failed to file a CTR *when required*, the Government can not speculate and lump these other transactions in with the conduct for

which Mr. Gasparian has plead guilty.  Since the government has not met the preponderance of evidence standard, and since Mr. Gasparian has only plead guilty to $71,686 worth of unlawful conduct, this two level increase cannot be applied.

Accordingly, Mr. Gasparian's total offense level should be calculated as follows:

| | | |
|---|---|---|
| Base Offense Level: | +6 | [U.S.S.G. § 2S1.3(a)] |
| Specific Offense Characteristics | | |
| Loss Amount | +8 | [U.S.S.G. § 2B1.1(b)(1)(E)] |
| Adjustment for Acceptance | | |
| of Responsibility (See | | |
| PSR, ¶ 86-87) | -3 | [U.S.S.G. § 3E1.1(a)-(b)] |

**Total Offense Level        11**

## B.     CRIMINAL HISTORY CATEGORY

Probation has calculated Mr. Gasparian's criminal history category as II, based on one point for a driving under the influence conviction from 2005 and two additional points for committing the instant offense while on probation for that conviction. (PSR, ¶ 98-99.)  U.S.S.G. § 4A1.3(b)(1), however, provides that "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."  U.S.S.G. § 4A1.3(b)(1).

In the instant action, in which Mr. Gasparian's only prior conviction was a misdemeanor violation, a criminal history category of II overstates his criminal history. His prior conviction was of a very different nature than the current offense and was non-violent.  As his criminal history has been limited to this driving under the influence conviction, this Court should exercise its authority under U.S.S.G. § 4A1.3(b)(1) and determine that Category I more accurately reflects Mr. Gasparian's criminal history.

## C.     THE APPROPRIATE GUIDELINE RANGE FOR MR. GASPARIAN IS 8-14 MONTHS

Based on a total offense level of 11 and a Criminal History Category of I, Mr.

Gasparian's sentencing guideline range is 8-14 months.

### III.
### SENTENCE CALCULATION

**A.  THE UNITED STATE SUPREME COURT HAS HELD THAT, IN ALL CASES, THE SENTENCNG COURT CAN DISREGARD THE GUIDELINES CALCULATION**

### 1.    The Court Should Exercise Its Authority Under *Kimbrough*

Section 3553(a)(2)(A) requires judges to consider "the need for the sentence imposed...to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense."  In considering an appropriate sentence, a court may choose to disagree with the Guidelines where the Sentencing Commission did not act in the "exercise of its characteristic institutional role" when promulgating the Guidelines in question.[3] *United States v. Kimbrough*, 552 U.S. 85, 109 (2007).  The Commission's institutional role has two components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision of the Guidelines in light of judicial decisions, sentencing data, and comments from participants in the field.[4] *Rita v. United States*, 551 U.S. 338, 349-50 (2007).  Thus, post-*Kimbrough*, if a Guideline was not developed based on "empirical data and national experience," or was not revised based on problems which arise after its implementation, the district court

---

[3] In *Kimbrough*, the Supreme Court effectively acknowledged that not all guidelines are equal. While some "exemplify the Commission's exercise of its characteristic institutional role," others do not.  At issue in *Kimbrough* was the crack cocaine guidelines, of which the Court said: "The crack Guidelines, however, present no occasion for elaborative discussion of this matter because those Guidelines *do not* exemplify the Commission's exercise of its characteristic institutional role.  In formulating Guideline ranges for crack offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109.

[4]  The Sentencing Commission's institutional role allows the Commission to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."  *Kimbrough*, 552 U.S. at 109 (citing *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).

may disregard that Guideline. *Kimbrough*, 552 U.S. at 109; *see also United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010) ("As the Supreme Court through *Booker*, *Kimbrough*, and *Spears* has instructed, and as other circuits that have confronted the crack/powder variance in the sentence of a career offender have accepted and clarified in their circuit law, sentencing judges can reject *any* Sentencing Guideline, provided that the sentence imposed is reasonable"); *see also United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject *any* Guideline on policy grounds – though they must act reasonably when using that power.").

     a.     ***The Fraud Guidelines Were Not Based On Empirical Evidence And National Experience***

     In developing most of the Guidelines, the Sentencing Commission used "an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports." *Kimbrough*, 552 U.S. at 96, citing U.S.S.G. § 1A.1 intro. Comment, pt. A, ¶ 3. However, when enacting the Fraud Guidelines,[5] the Commission chose "to depart from past practices." *See* U.S. Sentencing Commission, Fifteen years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform (hereinafter Fifteen Year Report) (Nov. 2004), www.ussc.gov/Research/Research_projects/ Miscellaneous/15_Year_Study/index.cfm. The chief consideration for department from the standard practice in enacting the Fraud Guidelines was a belief that too many white-collar offenders were receiving probationary sentences. *Id.* at 56. Thus, as the court in

---

[5]   When the United States Sentencing Guidelines were originally promulgated by the United States Sentencing Commission in 1987, the Fraud Guidelines were enumerated in § 2F1.1, and titled "Offenses Involving Fraud or Deceit." In 2001, the Guidelines were amended, and § 2F1.1 was deleted. The amendment consolidated the guidelines for theft, § 2B1.1, property destruction, § 2B1.3, and fraud, § 2F1.1, into one guideline - § 2B1.1. *See* U.S. Sentencing Guidelines Manual app.C n. 617 (2001).

*United States v. Lenagh*, No. 8:07CR346, 2009 WL 296999 (D. Neb. Feb. 6, 2009) recognized, "[f]or policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes." *Id.* at *3, citing <u>Fifteen Year Report</u>, Executive Summary at vii, 15, 56.  As stated in the <u>Fifteen Year Report</u>, "[t]he appearance early in the guidelines era of these mandated sentence increases for economic crimes, and the perceived absence of empirical research establishing the need for them, led one former Commissioner to warn that the SRA's promise of policy development through expert research was being supplanted by symbolic 'signal sending' by Congress (Parker & Block, 1989)." <u>Fifteen Year Report</u>, p. 56.  As former federal judge Paul Cassell and former federal prosecutor Brett Tolman noted, "Rather than resting on evidence of past, national sentencing practices, the white collar Guidelines are a product of the political environment in which they were promulgated, the Commission's desire that the Guidelines reflect perceived congressional policy, and the Commission's own independent policy determination concerning the severity of a particular class of conduct."  Letter from Brett Tolman, Esq. & Hon. Paul G. Cassell to Chief U.S. District Judge Linda Reade (April 19, 2010), *available at* http://justiceforsholom.org/Cassell_Tolman.pdf.

Thus, the Fraud Guidelines, initially set forth in U.S.S.G. § 2F1.1 and consolidated in U.S.S.G. § 2B1.1 in 2001, were not based on empirical evidence of past practices.  As such, under *Kimbrough*, they may be disregarded by this court in determining the appropriate sentence in this instance.

### b. *In Particular, The Loss Table In the Fraud Guidelines Overstates Culpability*

The most conspicuous example of problems in the Fraud Guidelines is the loss table, which is the single most criticized aspect of the Fraud Guidelines.  The loss table under §2B1.1 is one of the very few Specific Offense Characteristics allowing for double digit level increases.  Most of the six other Guidelines that allow for double digit level

increases concern terrorism related activities.  The Guidelines provide for a 12 level

enhancement for obstruction of justice related to terrorism (2J1.2(b)(1)(C)); 12 levels for

a felony involving or intending to promote terrorism (3A1.3(a)); 15 levels for willfully

boarding an aircraft with a dangerous weapon or material without regard for the safety of

human life (2K1.5(b)(1)); 15 levels of trafficking, receiving or possessing a portable

rocket, missile, or launcher (2K2.1(b)(3)(A)); 16 levels for unlawfully entering or

remaining in the United States after being convicted of certain major felonies

(2L1.2(b)(1)(A)); and 16 levels for bid-rigging or price fixing, if commerce volume

exceeds $1.5 billion (2R1.1(b)(2)(H)).

These significant increases for loss amount occur regardless of the role of the

particular defendant; thus, this substantial increase is often not a true reflection of a

defendant's culpability.  As one court noted, the Guidelines, "because of their arithmetic

approach also in an effort to appear 'objective,' tend to place great weight on putatively

measurable quantities, such as weight of drugs in narcotics cases or the amount of

financial loss in fraud cases, without, however, explaining why it is appropriate to

accord such huge weight to such factors."  *United States v. Adelson*, 441 F. Supp. 2d

506, 509 (S.D.N.Y. 2006), citing Kate Stith & José A. Cabranes, <u>Fear of Judging:</u>

<u>Sentencing Guidelines in the Federal Courts</u> (1998).

Even before *Kimbrough*, one court noted:

> **The Guidelines place undue weight on the amount of loss involved in the fraud**.  This is certainly a relevant sentencing factor:  All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment.  But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts.  In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.  To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on [the defendant's] cupidity.  Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more….The rough magnitude of the theft is relevant to sentencing, but the particular amount stolen is not

as significant…Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-428 (S.D.N.Y. 2004). (**emphasis added**)

This criticism of the loss table is especially relevant in the instant action in which Mr. Gasparian did not personally receive any of the amount of the monetary value involved; Mr. Gasparian typically only took a small commission on each transaction consistent with industry standards.  As a result, the 22 level increase is simply not an accurate reflection of Mr. Gasparian's culpability, especially considering the rarity of a double digit increase in the sentencing guidelines.  For these reasons, a sentence in accord with the advisory guideline range in this case would be disproportionately punitive.

**B.    AN APPLICATION OF TITLE 18 U.S.C. § 3553(A) FACTORS WARRANTS A SENTENCE OF PROBATION**

The overriding principle and basic mandate of Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in § 3553(a)(2) which are:

> (a) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
> (b) deterrence;
> (c) incapacitation ("to protect the public from further crimes"); and
> (d) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.)

The factors which this Court must consider pursuant to Title 18 U.S.C. § 3553(a) are the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed;
> (3) the kind of sentences available;
> (4) the sentencing range established for the applicable category of offense committed, including the (now non-mandatory) guideline range;
> (5) any pertinent policy statement issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentencing disparity; and

(7) the need to provide restitution where applicable.  18 U.S.C. § 3553(a)(1)-(7).

## 1.    The Nature and Circumstances of the Offense

Mr. Gasparian has acknowledged the seriousness of his offense and has expressed his deepest regret and remorse for his choices that led to the instant offense.  (**Exhibit A**.)  Mr. Gasparian has admitted that in several transactions with confidential informants, he failed to file CTR's when the transacted amounts exceeded $10,000.  The total value of these transactions was $71,686.  (**Exhibit C** (Plea Letter), p. 4.)

In this case, the loss amount is determined by the amount of the transacted funds. It is clear that while this is a serious reporting requirement, there was no loss to a particular entity and there was no windfall, or inflated profit, for Mr. Gasparian.  The commissions that Mr. Gasparian charged were consistent with industry standard commissions.

Additionally, a review by the IRS from December 1, 2007, to May 31, 2008, found that while G&A lacked an effective anti-money laundering program, "no [Bank Secrecy Act] violations were found."  (**Exhibit B**, p. 1.)

As discussed previously, the PSR takes Mr. Gasparian's conduct with two informants, and paints the entire $24 million with that same brush, an inference based substantially on speculation, will little corroboration.  There is no confirmation that the checks at issue were deposited or cleared by the banks.

## 2.    The History and Characteristics of the Defendant

Mr. Gasparian is 32 years old.  His only prior criminal conviction was for driving under the influence in 2005.  (PSR, ¶ 95.)  He was born in Moscow, Russia, and lived there until moving to the United States when he was eleven years old, two years after the fall of the Soviet Union.  (PSR, ¶ 107.)  Mr. Gasparian did not speak any English when he moved from Russia, but has since learned to speak fluently.  (**Exhibit A**, p. 1.)  He obtained a high school diploma from Bowman High School in 2000.  (PSR, ¶ 120.)

15

Prior to being hired by his father to work for G&A Check Cashing in 2000, Mr.
Gaspaian worked at McDonalds and at Magic Mountain.   (PSR, ¶ 123-124.)  Mr.
Gasparian used his earnings from G&A to support his brother's education and his
mother's living expenses.  (**Exhibit A**, p. 2.)

Several people have written to the Court to express their support for Mr.
Gasparian and attest to his character.  These letters are attached as **Exhibit D**.  Below are
some excerpts that highlight his altruistic and compassionate nature:

Mr. Gasparian's mother, Ludmila Gasparian, writes:

"From his early childhood he has had a great appreciation, love, and
respect towards his family.  He made it a point to constantly surround
himself with family and fiends even as a little boy….He was also very
courageous as a young man.  I remember a time in Russia when he would
often come home filthy….Then, one day I finally found out the cause for
his soiled clothing.  It turns out that him and his best friend Anton had
become accustom to helping the fire department put out fires in the grass
fields.  He was eventually *deputized* as a junior fireman and even given a
badge….He always felt that everything he had should be shared between
his friends and family….Growing up, Karen had a best friend in school,
Tim, who had unfortunately developed a very serious drug problem over
the years.  Karen tried to help him with his addiction; he offered to pay for
his treatment, his classes and so on….

"And of course, at the center of his heart, he always saved space for
his little brother, Armen….He would always do everything in his power to
help Armen as much as he could.  He would even help him with his studies
from elementary school all the way through high school….

"Now, as his mother, I will admit that Karen is not perfect, and at
this point in time of his life, he is in fact on house arrest for his
actions….During his time on house arrest he has had a chance to reflect on
his situation and it has given him an opportunity to plan a way to get his life
back on track after this is all over."  (Exhibit D.)

Karen's brother, Armen Gasparian, writes:

"Ever since I was a kid he was a source of inspiration for me.  He
always surrounded himself with good friends, and was always dedicated to
helping his family….Karen is a very kind and gracious person and I of
course reaped the benefits of his character.  When I was being bullied in
school, he was always the first one to offer me advice – some days he
would walk with me to the bus stop.  When I was falling behind in my
studies he printed out study guides for me he found online and would not
let me go outside until I finished the work….

"However, the fact does remain that Karen has gotten himself into
this unfortunate situation.  I am aware that he broke the law and I know that
he has had a lot of time to reflect on his mistakes in the past months that he
has been on house arrest.  And although a law was broken, I sincerely
believe that he did not do this for any sort of financial or personal gain.  He

16

has the full support of his friends and family in this matter." (Exhibit D.)

Jorge Guzman, who has been friends with Mr. Gasparian since high school, writes:

> Mr. Gasparian "is a family oriented individual who hardly ever misses dinner at his mom's house every night. He is a true friend who at one point, when a mutual friend fell on hard times and almost became homeless, Karen opened up his home and allowed him to live there until he was able to get back on his feet....
> "In my opinion, these charges strike me as completely uncharacteristic for Karen I have come to know over 17 years. The Karen I know has always been an upstanding individual who always goes above and beyond for his friends and family, he is not an individual that poses any threat to society whatsoever. I have noticed a big change in him since these charges were brought against him, he is despondent and I know this is something that he is ready to take responsibility for and move on form." (Exhibit D.)

Valerie Steadman, who has know Mr. Gasparian for 15 years, writes:

> Mr. Gasparian "is one of the most caring, compassionate and honest people I have had the honor of knowing. He is an exceptional person. I can honestly say that over the last 15 years there is not one thing that I can say that is not positive about him. He fits the mold of the saying 'would give a shirt off his back' spot on. There is not anything that he wouldn't do for his friends and family." (Exhibit D.)

### 3.    The Need to Protect The Public

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant. As noted above, Mr. Gasparian's entire history, and his acceptance of responsibility since the commencement of this case, show that society needs no protection from Mr. Gasparian.

In *United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993), the court considered whether a defendant's conviction would, itself, preclude similar crimes from the defendant. In *Gaind*, the defendant was convicted of making false statements in connection with contracts for testing materials for the Environmental Protection Agency. As a result of the conviction, the defendant lost his business and was precluded from engaging in similar activities. The *Gaind* court noted that "the

destruction of the defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process.  Elimination of the defendant's ability to engage in similar or related activities…and the substantial loss of assets and income result from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence." *Id.* at 671.  The court further noted that "[o]thers engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved in an obvious consequence of such illegal behavior." *Id.*  Thus, the court found that because the defendant could no longer participate in similar crimes due to the loss of the business, the objective "to protect the public from further crimes" set forth in 3553(a)92)(c) and to "deter crime" under § 3553(a)(2)(B) were sufficiently fulfilled to warrant a lesser sentence.  *Id.* at 670.

In this case, Mr. Gasparian no longer has his business and has agreed to a forfeiture of funds in the full amount of the government's request.  He poses no future threat to public safety.

### 4.      There Is A Low Likelihood Of Recidivism

Further, in determining whether the length of the sentence is adequate to protect the general public from further crimes of the defendant, it is also relevant to determine a defendant's likelihood of recidivism.  In November, 1996, the Sentencing Commission staff authored a paper titled Sentencing Options Under the Guidelines ("Paper"), which acknowledged that the Guidelines were leading to over-incarceration and exacerbating the risk of recidivism.  See U.S. Sentencing Commission, Sentencing Options Under the Guidelines (1996), available at http://www.ussc.gov/Research/Working_Group_Reports/Simplification/SENTOPT.P DF.  The Paper indicates that the Guidelines produce too many prison sentences.  The

contents of the Paper acknowledged that non-prison sentences are associated with less recidivism than prison offenses. (*Id.* at 18.)

Given Mr. Gasparian's minimal criminal history and his willingness to comply with all conditions of probation, he is unlikely to re-offend.

### 5.     The Need to Avoid Unwarranted Sentencing Disparity

From a review of numerous similar cases over the last several years, and the published penalties for those cases, Mr. Gasparian is facing disparate treatment for his conduct, even if held responsible for the full relevant conduct, when compared to other, much larger violators.  Many of the banking violators in published cases dealt with drug trafficking organizations, and even countries considered enemies of the United States and were treated more charitably by prosecutors (and the Department of Justice) as shown below:

*1. AMERICAN EXPRESS INTERNATIONAL BANK (AEIB)*: AEIB was first examined in 1994 as a result of the laundering of $25 million in laundered drug money in South Texas for Mexico's largest drug cartel and having a compliance program that "existed only on paper" (**Exhibit E** – Deferred Prosecution Agreement).  AEIB refused to cooperate in the beginning of the investigation.  The Department of Justice (DOJ) dismissed even its civil money laundering complaint and did not file any criminal accusation against AEIB after they forfeited $47 million dollars including $37 million in forfeitures, a $7 million fine to settle the case and $3 million in upgrades to their compliance program (**Exhibit E** – Deferred Prosecution Agreement, Factual Statement – p. 10).

From 2003 to 2005, AEIB had multiple regulatory examinations with numerous adverse findings (**Exhibit E** – Assessment of Civil Money Penalty, page 3).  In a 2007 Enforcement Action the DOJ alleged that AEIB allowed high net worth clients to

process transactions through the Black Market Peso Exchange (BMPE)[6] often through the use of bearer share corporations in offshore jurisdictions (**Exhibit E-** Lexology, page 2). AEIB entered into a Deferred Prosecution agreement in the Southern District of Florida where a one-count information was filed for violation of Title 31 USC Section 5318 (a)(2), for willfully failing to establish an anti-money laundering program. AEIB was fined and forfeited $55 million pursuant to the Deferred Prosecution Agreement and was allowed to remediate their business activity (**Exhibit E** – Lexology, page 1). The resulting sanction was a 12-month deferred prosecution agreement.

*2. BANK ATLANTIC (BANK ATLANTIC)*: In 2006, BANK ATLANTIC entered into a deferred prosecution agreement and a one-count information was filed in the Southern District of Florida for failing to maintain an effective anti-money laundering program in violation of Title 31 USC Section 5318 (h)(1) and 5322(b). The case was settled by forfeiting $10 Million dollars in drug proceeds laundered through accounts in the bank (**Exhibit F**).

*3. UNION BANK OF CALIFORNIA (UBC)*: In 2007, a one-count criminal information was filed in the Southern District of California charging UBC with failing to maintain an effective Anti Money Laundering program (**Exhibit G**). The government agreed to dismiss the information in one year if UBC implemented significant anti money laundering measures, paid $21.6 million in forfeiture claims, and paid an additional $10 million in civil penalties by the Office of the Comptroller of the Currency (OCC) and FinCEN totaling $31.6 million. These filings arose from conduct that included UBC accounts held for Mexican Casa de Cambio's which held drug proceeds

---

[6] According to FinCEN, the BMPE is a large scale, complex money laundering system that is used extensively by Colombian drug cartels to launder the proceeds of United States narcotics sales. The system is called the Black Market Peso Exchange (BMPE) because its purpose is to facilitate "swaps" of dollars owned by the cartels in the United States for pesos already in Colombia, by selling the dollars to Colombian businessmen who are seeking to buy United States goods for export.

from multi-ton cocaine operations originating in Colombia (**Exhibit G**, p. 2).  The resulting sanction was a 12 month deferred prosecution agreement.

*4. LLOYDS TSB BANK (LLOYDS)*:  In 2009, LLOYDS entered into a deferred prosecution agreement and a one-count information was filed in the U.S. District Court in the District of Columbia (**Exhibit H**).  Lloyds agreed that approximately $300 million was involved in transactions with Iranian banks and $21 million with Sudanese banks, which both countries were sanctioned by the Office of Foreign Asset Control (OFAC) (**Exhibit H**, page 24, item 27).  Part of the activity included stripping pertinent information from wire transfers that identified the transaction activity (**Exhibit H**, page 15, item 2).  Lloyds agreed to pay $350 million in January 2009, to settle the deferred prosecution (**Exhibit H**, page 2) and in December 2009, an additional $217 million in settling the OFAC violations of the International Emergency Economic Powers Act (**Exhibit H**).  The deferred prosecution agreement was 24 months in duration.

*5. WACHOVIA BANK NA (WACHOVIA)*:  In 2010, a one-count criminal information was filed against WACHOVIA for failing to maintain an effective anti-money laundering program (**Exhibit I**, item 3).  WACHOVIA entered into a deferred prosecution agreement forfeiting $110,000,000.00, which they acknowledged was laundered through certain accounts they held (**Exhibit I**, item 5).  WACHOVIA also agreed to pay a fine of $50,000,000.00 in addition to the forfeiture of $110,000,000.00 (**Exhibit I**, page 3, item 5-6).  WACHOVIA allowed $13 million to be laundered through the bank originating from the narcotics trade (**Exhibit I**, page 16, item 10).  The deferred prosecution agreement was 12 months in duration.

*6. ABN AMRO (now ROYAL BANK OF* **SCOTLAND)**:  On May 10, 2010, the U.S. Department of Justice announced that the former ABN AMRO Bank, N.V. (now the Royal Bank of Scotland, N.V.) agreed to forfeit $500 million to the U.S. Treasury in connection with a criminal information filing in U.S. District Court of the District of Columbia (**Exhibit J**, item 3). The bank was charged with one count of violating the Bank Secrecy Act by failing to establish an adequate anti-money laundering program

and one count of conspiring to defraud the U.S. by violating the International Emergency Economic Power Act (IEEPA)[7] and the Trading with the Enemy Act (TWEA)[8] (**Exhibit J,** page 2, item 1).  The IEEPA and TWEA are two of several laws underlying the sanctions administered by the U.S. Treasury's Office of Foreign Assets Control (OFAC). The forfeiture of $500 million was part of a deferred prosecution agreement, also filed on May 10, 2010 (**Exhibit J**, page 3 item 3).

ABN AMRO conducted transactions with Iran, Libya, the Sudan and Cuba (Exhibit 15 page 23, item 4).  According to the criminal information filing, the bank removed information from funds transfer instructions and other transactions to disguise involvement of OFAC-sanctioned parties or to facilitate OFAC-prohibited transactions, and deliberately ignored its [OFAC and BSA] compliance obligations (**Exhibit J**, page 23, item 5-7).  The deferred prosecution agreement was 12 months in duration.

*7. BARCLAYS BANK PLC (BARCLAYS)*:  In 2010, BARCLAYS agreed to forfeit $298 million for violations of the International Emergency Economic Powers Act (IEEPA) and the Trading with the Enemy Act (TWEA) and a two-count criminal information was filed in the U.S. District Court for the District of Columbia (**Exhibit K**).  The violations relate to transactions BARCLAYS illegally conducted on behalf of customers from Cuba, Iran, Sudan, Libya, and Burma, countries sanctioned by OFAC. BARCLAYS stripped vital information from the wire messages that would have identified the illegal funds (**Exhibit K**, page 21, item 3).  The Manhattan District

---

[7] The **IEEPA** authorizes the president to declare the existence of an "unusual and extraordinary threat... to the national security, foreign policy, or economy of the United States" that originates "in whole or substantial part outside the United States." It further authorizes the president, after such a declaration, to block transactions and freeze assets to deal with the threat. In the event of an actual attack on the United States, the president can also confiscate property connected with a country, group, or person that aided in the attack.

[8] The **TWEA** makes it illegal to trade, or attempt to trade, either directly or indirectly, with, to, or from, or for, or on account of, or on behalf of, or for the benefit of, any other person, with knowledge or reasonable cause to believe that such other person is an enemy or ally of enemy, or is conducting or taking part in such trade, directly or indirectly, for, or on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy.

Attorney described their behavior as "Criminal activity of the type we found at Barclays does more than deceive our financial institutions; ***it threatens the security of our country***" (**Exhibit K**, page 1).  The deferred prosecution was 24 months in duration.

***8. OCEAN BANK (OCEAN)***: During 2011, OCEAN entered into a deferred prosecution agreement to resolve charges that it willfully failed to establish an anti-money laundering program (**Exhibit L**).  A one count criminal information was filed in the Southern District of Florida that charged them with violation of Title 31, USC Section 5318 (h)(1) and 5322 (b) for failing to establish an anti-money laundering program as required (**Exhibit L**, page 3, item 2).  OCEAN forfeited $10.9 million that were involved in violations of Title 18 USC 1956 and 1957 (Money Laundering), and they admitted they laundered millions of dollars of narcotics proceeds while those accounts were being investigated by the Department of Justice (**Exhibit L**, page 3 item 4 and page 15, item 5).

The transactions consisted of currency and wire transfers from Mexico and some accounts were used strictly as exchange accounts for the BMPE.  Some of the accounts were owned by international drug trafficking organizations and the cash was structured into the accounts designed to circumvent the currency reporting requirements.  Further the accounts contained deposits of  "thousands of money orders and travelers checks" of which numerous ones were sequentially numbered and not consistent with normal business practices (**Exhibit L**, page 15-17).  The deferred prosecution was 24 months in duration.

***9. ING BANK, N.V. (ING)***: In June 2012, ING agreed to forfeit $619 million for conspiring to violate the IEEPA and TWEA by illegally moving more than $2 billion on behalf of sanctioned Cuban and Iranian entities.  A one-count criminal information was filed in the District of Columbia charging ING for conspiring to violate the IEEPA and TWEA (**Exhibit M**).   For years ING blatantly violated U.S. law governing transactions involving Cuba and Iran and used shell companies and other deceptive measures to cover up its criminal conduct (**Exhibit M**, page 2).  ING moved $2 billion through more

than 20,000 transactions to OFAC sanctioned countries. ING eliminated payment data from the wires, which would have revealed the sanctioned countries and entities (**Exhibit M**, page 1 and 2).  The deferred prosecution was 18 months in duration.

   ***10. HSBC BANK***: Just recently, in December of 2012, HSBC agreed to forfeit $1.9 billion for "allow[ing] more than $881 million in dirty money – much of it from the Sinaloa Cartel in Mexico and the Norte del Valle Cartel in Colombia – to find its way into the U.S. financial system….Much of that cash allegedly came from drug-trafficking proceeds laundered in the so-called Black Market Peso Exchange." (Tangel, Andrew. "HSBC to pay $1.9 billion to settle case. <u>L.A. Times</u> 11 Dec. 2012 (**Exhibit N**); see also Plea Agreement (**Exhibit N**).)

   Further, "HSBC also violated U.S. sanctions against hostile regimes by conducting financial transactions in Cuba, Iran, Libya, Sudan, and Burma….From the mid-19990s until 2006, HSBC allowed the processing of about $660 million in prohibited transactions." (*Id.*)  As the L.A. Times article notes, however, "[a]lthough the U.S. Justice Department portrayed HSBC as an effective accomplice to violent drug lords and hostile regimes, authorities chose not to prosecute the bank" and "[n]o bank executives were charged as part of the investigation." (*Id.*)  The $1.9 billion fine was only "worth about 11% of the bank's profit last year." (*Id.*)  The deferred prosecution agreement was 60 months in duration.

   Individuals who committed the same offenses as Mr. Gasparian, yet with the offenses empowered institutions to transact hundreds of millions of dollars with violent drug cartels and violent political regimes, have not only escaped jail time and any personal financial penalty, but have managed to avoid even being charged with the offense, instead letting the institutions (and shareholders) shoulder the blame.  Yet with Mr. Gasparian, whose offense was much more limited both in terms of the financial amount involved and the nature of the clients served by the conspiracy, the United States Government is seeking substantial jail time.

1       A clearer picture could not be painted of the disparate treatment of powerful

2   people working for powerful institutions and an individual working for what was

3   essentially a mom and pop bank.  The Government has let off the big fish with a slap on

4   the wrist while seeking aggressive punishments against the smaller fish.  The

5   responsibility lies with the Court to correct this glaring disparity and reinforce the notion

6   of equal justice.

7

8                                    **IV.**
                              **CONCLUSION**

9       As someone who has dedicated his life to being there for his friends and family,

10  and in light of all the individuals involved with financial institutions who committed

11  the same offense, on a much larger scale, but received *no* incarceration time, Mr.

12  Gasparian respectfully requests that he be sentenced to probation.

13

14

15                              Respectfully submitted,

16                              KESTENBAUM EISNER & GORIN LLP

17

18  Dated: December 17, 2012          */S/ ALAN EISNER*

19                              ALAN EISNER
                              Attorney for Defendant
20                              KAREN GASPARIAN

21

22

23

24

25

26

27

28

1

TABLE OF EXHIBITS

2  Exhibit A          Letter from Karen Gasparian

3  Exhibit B          IRS Review

4  Exhibit C          Plea Letter

5  Exhibit D          Letters of Support

6  Exhibit E          American Express International Bank

7  Exhibit F          Bank Atlantic

8  Exhibit G          Union Bank of California

9  Exhibit H          Lloyds TSB Bank

10 Exhibit I          Wachovia Bank Na

11 Exhibit J          ABN AMRO

12 Exhibit K          Barclays

13 Exhibit L          Ocean Bank

14 Exhibit M          ING Bank

15 Exhibit N          HSBC Bank

16

17

18

19

20

21

22

23

24

25

26

27

28