EXHIBIT N

**3** | **EURO** $1.3003 ▲ +.0065 | **U.S. T-NOTE** (10-yr.) 1.66% ▲ 0.04

GOVERNMENT

# HSBC to pay $1.9 billion to settle case

The U.S. had accused the bank of helping drug lords and hostile regimes launder cash.

BY ANDREW TANGEL

NEW YORK — The drug cartels' boxes of cash fit precisely into tellers' windows at their bank in Mexico.

When Iran needed to transfer $55 million in gold bullion, the country, like others on the United States' rogues list, found the same bank willing to assist: HSBC, the British financial giant.

Although the U.S. Justice Department portrayed HSBC as an effective accomplice to violent drug lords and hostile regimes, authorities chose not to prosecute the bank. HSBC instead will pay $1.9 billion, a financial penalty worth about 11% of the bank's profit last year.

The massive penalty still was not enough to appease some critics. No bank executives were charged as part of the investigation, leading some analysts to question the government's willingness to hold powerful Wall Street firms accountable.

"It's mind-boggling how they think you can have a financial system and allow this kind of impunity," said William Black, a former banking regulator who aided federal prosecutors during the savings and loan crisis of the 1980s and 1990s. HSBC "put the world at enormous risk."

The federal government's settlement with HSBC, announced Tuesday, allows the bank to avoid criminal penalties in what's known as a deferred prosecution agreement. The bank will be required to get five years of independent monitoring of new controls put in place to prevent illicit money transfers.

The HSBC settlement comes on the heels of a case brought against another British bank, Standard Chartered, which agreed to [See **HSBC**, B5]

# HSBC settles money-laundering case



RAMIN TALAIE Getty Images

**LANNY BREUER**, an assistant attorney general who oversees the Justice Department's criminal division, announces the HSBC settlement in Brooklyn, N.Y.

**[HSBC,** from B1]

pay a total of about $670 million to state and federal authorities for similar banking violations involving concealed transactions with Iran.

U.S. laws tightly restrict transfers with countries under sanctions, such as Iran and Sudan. Banking regulations, which were tightened after the Sept. 11, 2001, terrorist attacks, also require strict safeguards to keep dirty money out of the U.S. financial system — and potentially out of terrorists' hands.

Four other banks have reached similar agreements with the Justice Department in the last four years, but HSBC's nearly $2-billion settlement sets a record.

Lanny Breuer, an assistant attorney general who oversees the Justice Department's criminal division, called the settlement historic and criticized the bank's "stunning failures of oversight."

"The record of dysfunction that prevailed at HSBC for many years was simply astonishing," Breuer told reporters at the U.S. attorney's office in Brooklyn.

Breuer defended the settlement, saying HSBC did not get a pass and will pay a heavy price. The bank has clawed back bonuses awarded to its compliance officials and agreed to partially defer senior executives' bonuses, Breuer noted.

The deferred prosecution agreement could allow the Justice Department to charge HSBC should the bank fail to abide by the government's demands.

Justice Department officials also considered potential collateral damage were they to prosecute HSBC, said Breuer, who praised the bank's cooperation with authorities. The HSBC settlement involved banking regulators as well as the Manhattan district attorney's office.

"Our goal is not to bring HSBC down," Breuer said. "It's not to cause a systemic effect on the economy."

HSBC allowed more than $881 million in dirty money — much of it from the Sinaloa Cartel in Mexico and the Norte del Valle Cartel in Colombia — to find its way into the U.S. financial system, according to court documents. Much of that cash allegedly came from drug-trafficking proceeds laundered in the so-called Black Market Peso Exchange.

The cartels needed to convert U.S. dollars from drug sales into Colombian pesos, according to court documents. The cartels smuggled American cash across the border and deposited it at banks in Mexico. The peso exchange then acted as a currency broker for Colombian businessmen in need of dollars for purchasing legitimate goods in the United States.

HSBC also violated U.S. sanctions against hostile regimes by conducting financial transactions in Cuba, Iran, Libya, Sudan and Burma, according to court documents. From the mid-1990s until 2006, HSBC allowed the processing of about $660 million in prohibited transactions, the documents say.

Founded as Hongkong and Shanghai Banking Corp. in 1865 to help foster trade between Europe and Asia, HSBC has grown into one of the world's largest banks, serving 60 million customers through some 6,900 offices in 84 countries and territories, according to its website.

For its part, HSBC noted that the bank had "provided valuable assistance to law enforcement" by supplying information and employees for interviews.

"We accept responsibility for our past mistakes," Stuart Gulliver, HSBC's chief executive, said in a statement.

> 'The HSBC settlement sends a powerful wake-up call to ... banks about the consequences of disregarding their anti-money-laundering obligations.'
>
> —SEN. CARL LEVIN

ment.

"We have said we are profoundly sorry for them, and we do so again. The HSBC of today is a fundamentally different organization from the one that made those mistakes," Gulliver said.

In Washington, Sen. Carl Levin, a Michigan Democrat whose subcommittee also investigated HSBC, praised the settlement.

"Global banks have global responsibilities to prevent participation in illicit or suspect transactions," Levin said in a statement.

"The HSBC settlement sends a powerful wake-up call to multinational banks about the consequences of disregarding their anti-money-laundering obligations."

Zachary Goldman, a former Treasury official who is executive director of the Center on Law and Security at New York University's law school, said HSBC's nearly $2-billion fine and the negative publicity is likely to spur other banks to make sure they have proper controls in place.

The banking controls will make moving large sums of money much more difficult for cartels, terrorists and rogue countries, he said. Couriers and exchange houses are riskier and less efficient.

"By making it harder for them to use their most effective means of transfer, you make life a lot harder for them," Goldman said. "That's a victory of sorts."

andrew.tangel@latimes.com

ATTACHMENT A

## <u>STATEMENT OF FACTS</u>

1.   The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, the United States Attorney's Office for the Eastern District of New York, and the United States Attorney's Office for the Northern District of West Virginia (collectively, the "Department") and HSBC Bank USA, N.A. ("HSBC Bank USA") and HSBC Holdings plc ("HSBC Holdings"); and as part of a separate Deferred Prosecution Agreement between the New York County District Attorney's Office ("DANY") and HSBC Holdings.

2.   HSBC Bank USA and HSBC Holdings hereby agree and stipulate that the following information is true and accurate.  HSBC Bank USA and HSBC Holdings accept and acknowledge that they are responsible for the acts of their respective officers, directors, employees, and agents as set forth below.  If this matter were to proceed to trial, the Department would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to this Agreement.

<u>Bank Structure</u>

3.   HSBC Bank USA is a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc. ("HSBC North America").  HSBC North America is an indirect subsidiary of HSBC Holdings.  HSBC Holdings is the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,900 offices in over 80 countries (collectively, HSBC Holdings and its subsidiaries are the "HSBC Group").  HSBC Group is comprised of  financial institutions throughout the world ("HSBC Group Affiliates") that are owned by various intermediate holding companies and ultimately, but indirectly, by HSBC Holdings, which is incorporated and headquartered in England.  The Department of the Treasury, Office of the Comptroller of the Currency ("OCC") is HSBC Bank USA's primary regulator.

1

Applicable Law

4.    Congress enacted the Bank Secrecy Act, Title 31, United
States Code, Section 5311 et seq. (the "BSA"), and its
implementing regulations to address an increase in criminal
money laundering activity through financial institutions.  Among
other things, the BSA requires domestic banks, insured banks,
and other financial institutions to maintain programs designed
to detect and report suspicious activity that might be
indicative of money laundering, terrorist financing, and other
financial crimes, and to maintain certain records and file
reports related thereto that are especially useful in criminal,
tax, or regulatory investigations or proceedings.

5.    Pursuant to Title 31, United States Code, Section
5318(h)(1) and Title 12, Code of Federal Regulations, Section
21.21, HSBC Bank USA was required to establish and maintain an
anti-money laundering ("AML") compliance program that, at a
minimum, provides for: (a) internal policies, procedures, and
controls designed to guard against money laundering; (b) an
individual or individuals to coordinate and monitor day-to-day
compliance with the BSA and AML requirements; (c) an ongoing
employee training program; and (d) an independent audit function
to test compliance programs.

6.    Pursuant to Title 31, United States Code, Section
5318(i)(1), banks that manage private banking or correspondent
accounts in the United States for non-U.S. persons must
establish due diligence, and, in some cases, enhanced due
diligence, policies, procedures, and controls that are designed
to detect and report suspicious activity related to certain
specified accounts.  For foreign correspondent accounts, the
implementing regulations require that the due diligence
requirements set forth in Section 5318(i)(1) include an
assessment of the money laundering risk presented by the account
based on all relevant factors, including, as appropriate: (i)
the nature of the foreign financial institutions' business and
the market it serves; (ii) the type, purpose, and anticipated
activity of the account; (iii) the nature and duration of the
bank's relationship with the account holder; (iv) the AML and
supervisory regime of the jurisdiction issuing the license for
the account holder; and (v) information reasonably available
about the account holder's AML record.

<u>Department of Justice Charges</u>

7.    The Department alleges, and HSBC Bank USA admits, that HSBC Bank USA's conduct, as described herein, violated the BSA. Specifically, HSBC Bank USA violated Title 31, United States Code, Section 5318(h)(1), which makes it a crime to willfully fail to establish and maintain an effective AML program, and Title 31, United States Code, Section 5318(i)(1), which makes it a crime to willfully fail to establish due diligence for foreign correspondent accounts.

<u>Conduct in Violation of the BSA</u>

8.    From 2003 to 2006, HSBC Bank USA operated under a written agreement issued by its regulators.  A written agreement is a formal supervisory action that requires a financial institution to correct operational deficiencies.  The written agreement in this instance required HSBC Bank USA to enhance its AML compliance with the BSA, and specifically required HSBC Bank USA to enhance its customer due diligence or "know your customer" ("KYC") profiles and the monitoring of funds transfers for suspicious or unusual activity.

9.    From 2006 to 2010, HSBC Bank USA violated the BSA and its implementing regulations.  Specifically, HSBC Bank USA ignored the money laundering risks associated with doing business with certain Mexican customers and failed to implement a BSA/AML program that was adequate to monitor suspicious transactions from Mexico.  At the same time, Grupo Financiero HSBC, S.A. de C.V. ("HSBC Mexico"), one of HSBC Bank USA's largest Mexican customers, had its own significant AML problems.  As a result of these concurrent AML failures, at least $881 million in drug trafficking proceeds, including proceeds of drug trafficking by the Sinaloa Cartel in Mexico and the Norte del Valle Cartel in Colombia, were laundered through HSBC Bank USA without being detected.  HSBC Group was aware of the significant AML compliance problems at HSBC Mexico, yet did not inform HSBC Bank USA of these problems and their potential impact on HSBC Bank USA's AML program.

10.  There were at least four significant failures in HSBC Bank USA's AML program that allowed the laundering of drug trafficking proceeds through HSBC Bank USA:

a. Failure to obtain or maintain due diligence or KYC information on HSBC Group Affiliates, including HSBC Mexico;

b. Failure to adequately monitor over $200 trillion in wire transfers between 2006 and 2009 from customers located in countries that HSBC Bank USA classified as "standard" or "medium" risk, including over $670 billion in wire transfers from HSBC Mexico;

c. Failure to adequately monitor billions of dollars in purchases of physical U.S. dollars ("banknotes") between July 2006 and July 2009 from HSBC Group Affiliates, including over $9.4 billion from HSBC Mexico; and

d. Failure to provide adequate staffing and other resources to maintain an effective AML program.

11.  On October 6, 2010, both the OCC and the Board of Governors of the Federal Reserve Board issued Cease and Desist Orders to HSBC Bank USA and HSBC North America based on these BSA/AML deficiencies and others.

<u>HSBC Bank USA</u>

12.  HSBC Bank USA, headquartered in McLean, Virginia, with its principal office in New York City, operates throughout the United States and has customers and offers services to customers around the world.  It offers customers a full range of commercial and consumer banking products and related financial services.  Its customers include individuals, small businesses, corporations, financial institutions and foreign governments. Some of the products HSBC Bank USA offered during the period in question are considered high risk by the financial services industry and require stringent AML monitoring and oversight.  In addition, HSBC Group Affiliates conducted business in many high risk international locations, including regions of the world presenting a high vulnerability to the laundering of drug trafficking proceeds.

<u>HSBC Bank USA Failed to Conduct Due Diligence on HSBC Group Affiliates</u>

13.  One of HSBC Bank USA's high risk products was its correspondent banking practices and services.  Correspondent accounts are established at banks to receive deposits from, make

payments on behalf of, or handle other financial transactions for foreign financial institutions. In essence, correspondent banking involves the facilitation of wire transfers between foreign financial institutions and their customers, and other financial institutions with which the foreign financial institution does not have a direct relationship. Such correspondent accounts are generally considered high risk because the U.S. bank does not have a direct relationship with, and therefore has no diligence information on, the foreign financial institution's customers who initiated the wire transfers. To mitigate this risk, the BSA requires financial institutions to conduct due diligence on all non-U.S. entities (i.e., the foreign financial institution) for which it maintains correspondent accounts. There is no exception for foreign financial institutions with the same parent company.

14. HSBC Bank USA maintained correspondent accounts for a number of foreign financial institutions, including HSBC Group Affiliates, within its Payments and Cash Management ("PCM") business. HSBC Bank USA was required under the BSA to conduct due diligence on all foreign financial institutions with correspondent accounts, including HSBC Group Affiliates.

15. Despite this requirement, from at least 2006 to 2010, HSBC Bank USA did not conduct due diligence on HSBC Group Affiliates for which it maintained correspondent accounts, including HSBC Mexico. The decision not to conduct due diligence was guided by a formal policy memorialized in HSBC Bank USA's AML Procedures Manuals.

<u>HSBC Bank USA Failed to Adequately Monitor Wire Transfers</u>

16. Another way for financial institutions to mitigate the risks associated with correspondent banking is monitoring the wire transfers to and from these accounts. From 2006 to 2009, HSBC Bank USA monitored wire transfers using an automated system called the Customer Account Monitoring Program ("CAMP"). The CAMP system would detect suspicious wire transfers based on parameters set by HSBC Bank USA. Under the CAMP system, various factors triggered review, in particular, the amount of the transaction and the type and location of the customer. During this period, HSBC Bank USA assigned each customer a risk category based primarily on the country in which it was located. Countries were placed into one of four categories based on the perceived AML risk of doing business in that country (from lowest to highest risk): standard, medium, cautionary, and high.

Transactions that met the thresholds for review and the parameters for suspicious activity were flagged for additional review by HSBC Bank USA's AML department.  These were referred to as "alerts."

17.  From 2006 to 2009, HSBC Bank USA knowingly set the thresholds in CAMP so that wire transfers by customers located in countries categorized as standard or medium risk, including foreign financial institutions with correspondent accounts, would not be subject to automated monitoring unless the customers were otherwise classified as high risk.  During this period, HSBC Bank USA processed over 100 million wire transfers totaling over $300 trillion.  Over two-thirds of these transactions involved customers in standard or medium risk countries.  Therefore, in this four-year period alone, over $200 trillion in wire transfers were not reviewed in CAMP.

18.  Between 2000 and 2009, HSBC Bank USA, and its executives and officers, were aware of numerous publicly available and industry-wide advisories about the money laundering risks inherent to Mexican financial institutions.  These included:

> a. The U.S. State Department's designation of Mexico as a "jurisdiction of primary concern" for money laundering as early as March 2000;

> b. The U.S. State Department's International Narcotics Control Strategy Reports from as early as 2002 stating with regard to Mexico that "the illicit drug trade continues to be the principal source of funds laundered through the Mexican financial system. . . . The smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers, armored vehicles, and wire transfers, remain favored methods for laundering drug proceeds. Mexico's financial institutions are vulnerable to currency transactions involving international narcotics-trafficking proceeds that include significant amounts of U.S. currency or currency derived from illegal drug sales in the United States. . . . According to U.S. law enforcement officials, Mexico remains one of the most challenging money laundering jurisdictions for the United States.";

    c. The April 2006 Financial Crimes Enforcement Network ("FinCEN")[1] Advisory concerning bulk cash being smuggled into Mexico and deposited with Mexican financial institutions (discussed in paragraph 22 below);

    d. The federal money laundering investigations that became public in 2007-08, involving Casa de Cambio Puebla, a Mexican-based money services business that had accounts at HSBC Mexico, and Sigue, a U.S.-based money services business, that had accounts at HSBC Mexico; and

    e. The federal money laundering investigation into Wachovia for its failure to monitor wire transactions originating from the correspondent accounts of certain Mexican money services businesses, known as casas de cambio ("CDCs"), which became public in April 2008.[2]

_____

[1]    FinCEN is a bureau of the U.S. Department of Treasury. FinCEN's mission is to enhance the integrity of financial systems by facilitating the detection and deterrence of financial crime.  FinCEN carries out its mission by receiving and maintaining financial transactions data, analyzing and disseminating that data for law enforcement purposes, and building global cooperation with counterpart organizations in other countries and with international bodies.

[2]    CDCs are licensed non-bank currency exchange businesses located in a number of countries, including Mexico.  CDCs allow persons in Mexico to exchange one type of currency for other currency, e.g., exchange a value of pesos for an equal value of U.S. dollars or a value of U.S. dollars for an equal value of pesos.  Through CDCs, persons in Mexico can use hard currency, such as pesos or U.S. dollars, and wire transfer the value of that currency to U.S. bank accounts to purchase items in the United States or other countries.  CDCs do not operate in the same manner as banks operate in the United States.  CDCs do not hold deposits or maintain checking accounts, savings accounts, or issue lines of credit.  Nor do CDCs provide personal and/or commercial banking services.  A central function of CDCs is to allow persons or businesses in Mexico to exchange or wire transfer the value of hard currency from Mexico to bank accounts in the United States or other countries to conduct commerce.

All of these advisories or events were known to numerous HSBC Bank USA AML officers and business executives at or near the time they occurred.

19.  Despite this evidence of the serious money laundering risks associated with doing business in Mexico, from at least 2006 to 2009, HSBC Bank USA rated Mexico as standard risk, its lowest AML risk category.  As a result, wire transfers originating from Mexico, including transactions from HSBC Mexico, were generally not reviewed in the CAMP system.  From 2006 until May 2009, when HSBC Bank USA raised Mexico's risk rating to high, over 316,000 transactions worth over $670 billion from HSBC Mexico alone were excluded from monitoring in the CAMP system.

<u>HSBC Bank USA Failed to Monitor Banknotes' Transactions with HSBC Group Affiliates</u>

20.  HSBC Bank USA's Banknotes business ("Banknotes") involved the wholesale buying and selling of physical currencies (<u>i.e.</u>, bulk cash) throughout the world.  The business was based in New York with operations centers in London, Hong Kong and Singapore. These operations centers reported to the Head of Global Banknotes in New York.  Banknotes was the largest volume trader of physical currency in the world, controlling approximately 60 percent of the global market.  Banknotes customers included central banks, global financial institutions and non-bank entities such as CDCs and other money services businesses. Banknotes sold customers physical currency to be utilized in daily operations and/or purchased excess physical currency the customers did not need to have on hand.  Banknotes' largest volume currency was the U.S. dollar.  Purchased U.S. dollars were transported by Banknotes into the United States and deposited with the Federal Reserve.  Banknotes derived its revenue from commissions earned in connection with trading, transporting, and storing the physical currency.

21.  Banknotes was a high risk business because of the high risk of money laundering associated with transactions involving physical currency and the high risk of money laundering in countries where some of its customers were located.  In an attempt to mitigate these risks, Banknotes' AML Compliance monitored customer transactions.  The purpose of transaction monitoring was to identify the volume of currency going to or coming from each customer and to determine whether there was a legitimate business explanation for buying or selling that amount of physical currency.

22. Despite the high risk of money laundering associated with the Banknotes business, from 2006 to 2009, Banknotes' AML compliance consisted of one, or at times two, compliance officers. Unlike the CAMP system for wire transfers, Banknotes did not have an automated monitoring system. As a result, there were times when one, or at times two, Banknotes' compliance officers were responsible for personally reviewing the transactions of approximately 500 to 600 Banknotes customers.

23. On April 28, 2006, FinCEN issued Advisory FIN-2006-A003, "Guidance to Financial Institutions on the Repatriation of Currency Smuggled into Mexico from the United States," which reported:

> U.S. law enforcement has observed a dramatic increase in the smuggling of bulk cash proceeds from the sale of narcotics and other criminal activities from the United States into Mexico. Once the U.S. currency is in Mexico, numerous layered transactions may be used to disguise its origins, after which it may be returned directly to the United States or further transshipped to or through other jurisdictions.

The Advisory was circulated to all Banknotes personnel involved with Mexico and to those responsible for AML compliance within HSBC Bank USA.

24. Despite the Advisory from FinCEN issued several weeks earlier, Banknotes stopped regular monthly monitoring of transactions for HSBC Group Affiliates, including HSBC Mexico, in July 2006, leaving only targeted and quarterly reviews of HSBC Group Affiliates' Banknotes volumes that did not trigger automatic monitoring. As a result, discrepancies and suspicious activity in HSBC Group Affiliates' transactions were not monitored and/or reported from July 2006 to July 2009. At the time this decision was made, Banknotes purchased approximately $7 billion in U.S. currency from Mexico each year, with nearly half of that amount supplied by HSBC Mexico. From July 2006 to December 2008, Banknotes purchased over $9.4 billion in physical U.S. dollars from HSBC Mexico, including over $4.1 billion in 2008 alone.

<u>HSBC Bank USA Failed to Provide Adequate Staffing and</u>
<u>Other Resources to Maintain an Effective AML Program</u>

25.  In the face of known AML deficiencies and high risk lines
of business, HSBC Bank USA further reduced the resources
available to its AML program in order to cut costs and increase
its profits.  By 2007, only a year after the written agreement
had been lifted, HSBC Bank USA had fewer AML employees than
required by its own internal plans.  Moreover, beginning in
2007, senior business executives instructed the AML department
to "freeze" staffing levels as part of a bank-wide initiative to
cut costs and increase the bank's return on equity.  This goal
was accomplished by not replacing departing employees, combining
the functions of multiple positions into one, and not creating
new positions.

26.  Even senior compliance officers were not replaced after
they left HSBC Bank USA.  In 2007, HSBC Bank USA's AML Director,
the bank's top AML officer in the United States, left the bank
and was not replaced.  Instead, HSBC Bank USA's Head of
Compliance assumed the role while maintaining all of her other
responsibilities.  A short time later, HSBC North America's
Regional Compliance Officer, the top compliance officer in North
America who oversaw Compliance and AML at HSBC Bank USA, left
and was not replaced.  Instead, over objections from HSBC
Group's Head of Compliance, HSBC North America's COO and HSBC
Group's Head of Legal asked HSBC North America's General Counsel
to assume the role of top compliance officer, in addition to all
of her other responsibilities.  HSBC Group's Head of Legal and
HSBC Group's Head of Compliance have confirmed that the desire
to save costs was the primary justification for merging the two
roles.

27.  In March 2008, HSBC Bank USA's Chief Operating Officer for
Compliance conducted an internal review of the Bank's AML
program ("March 2008 AML Review").  The March 2008 AML Review,
which was presented to senior business executives and compliance
officers, found that the AML program in PCM was "behind the
times" and needed to be fundamentally changed to meet
regulators' expectations and to achieve parity with other banks.
Specifically, the March 2008 AML Review noted that AML
monitoring in PCM was significantly under-resourced.  At the
time, only four employees reviewed the 13,000 to 15,000
suspicious wire alerts generated per month.  In contrast,
following remedial measures undertaken by HSBC, HSBC Bank USA

10

currently has approximately 430 employees reviewing suspicious wire alerts.

28.   Despite the findings in the March 2008 AML Review, HSBC Bank USA failed to address the lack of AML resources.  In April 2008, an AML employee told a senior executive in Compliance, "[HSBC Bank USA] Compliance was in the midst of a staffing crisis."  During this time, a number of AML employees noted that requests for additional resources were discouraged and, ultimately, these employees stopped making staffing requests. By October 2009, a senior executive in Compliance remarked, "AML has gone down the hole in the past 18 months."  HSBC Bank USA did not begin to address the resource problem until late 2009.

### HSBC Mexico

29.   In 2002, HSBC Group acquired Grupo Financiero Bital ("Bital").  Bital was the fifth-largest bank in Mexico with approximately 1,400 branches and six million customers.  In early 2004, Bital was rebranded as HSBC Mexico.  HSBC Mexico offered accounts denominated in Mexican pesos or U.S. dollars. From at least 2004 through 2008, physical U.S. dollars deposited at HSBC Mexico branches that were not needed for daily operations were sold to HSBC Bank USA through Banknotes.

30.   At the time of the acquisition, HSBC Group's Head of Compliance acknowledged there was "no recognizable compliance or money laundering function in Bital at present."  HSBC Group Compliance believed it would take one to four years to achieve its required AML standards at HSBC Mexico.  However, until at least 2010, HSBC Mexico's AML program was not fully up to HSBC Group's required AML standards for HSBC Group Affiliates.  As described below, before 2009, many of the AML problems at HSBC Mexico involved U.S. dollar accounts, which ultimately affected HSBC Bank USA.

### HSBC Mexico Did Not Maintain Sufficient KYC Information On U.S. Dollar Customers

31.   From 2002 until at least 2009, HSBC Mexico did not maintain sufficient KYC information on many of its customers, including those with U.S. dollar accounts.  A financial institution's KYC information should include customer information such as address, the reason for maintaining the account, expected activity and the source of U.S. dollars.  The lack of sufficient KYC information at HSBC Mexico was repeatedly raised in internal

11

audits and by HSBC Mexico's regulator, the Comision Nacional Bancaria y Valores (the "CNBV").  These concerns were elevated to the CEOs of HSBC Mexico and HSBC Group.

32.  One area in which KYC was particularly poor was HSBC Mexico's Cayman Island U.S. dollar accounts.  Mexican law prohibited most individuals from maintaining U.S. dollar denominated deposit accounts in Mexico unless they lived near the U.S.-Mexico border or were a corporation.  However, Mexican law permitted almost any Mexican citizen to maintain offshore U.S. dollar accounts.  These HSBC Mexico accounts were based in the Cayman Islands, but were essentially offshore in name only, because HSBC Mexico had no physical presence in the Cayman Islands and provided the front and back office services for these accounts at its branches in Mexico.  Customers holding these accounts did all of their banking, including depositing physical U.S. dollars, at branches in Mexico.  Nevertheless, the accounts were legal under Mexican and Cayman law.

33.  In January 2006, HSBC Mexico conducted an internal audit of the Cayman Islands U.S. dollar accounts.  At that time, there were only approximately 1,500 such accounts.  Over 50 percent of the audited accounts lacked the proper KYC information, while 15 percent of audited accounts did not contain any KYC documentation.  Over the next two years, nothing was done to address the KYC issues with these accounts.  By 2008, there were 35,000 Cayman Island U.S. dollar accounts.  At least 2,200 of these accounts were designated high risk due to suspicious activity within the accounts and/or negative information regarding the account owners.  In July 2008, the total outstanding balance of these high risk Cayman accounts was approximately $205 million.  Without adequate KYC information, HSBC Mexico knew very little about who these high risk customers were or why they had such large amounts of U.S. dollars.  However, even without the benefit of adequate KYC information, the risks were obvious.  Indeed, one HSBC Mexico compliance officer noted "the massive misuse of [the HSBC Mexico Cayman Islands U.S. dollar accounts] by organized crime."  One example, identified by HSBC Group's Head of Compliance in July 2008, involved "significant USD [U.S. dollar] remittances being made by a number of [HSBC Mexico's Cayman Islands U.S. dollar] customers to a US company alleged to be involved in the supply of aircraft to drug cartels."

### HSBC Mexico Failed to Terminate Suspicious Accounts

34.  When suspicious activity was identified, HSBC Mexico repeatedly failed to take action to close the accounts.  Senior business executives at HSBC Mexico repeatedly overruled recommendations from its own AML committee to close accounts with documented suspicious activity.  In July 2007, a senior compliance officer at HSBC Group told HSBC Mexico's Chief Compliance Officer that "[t]he AML committee just can't keep rubber-stamping unacceptable risks merely because someone on the business side writes a nice letter.  It needs to take a firmer stand.  It needs some cojones.  We have seen this movie before, and it ends badly."

35.  Even when HSBC Mexico determined a relationship should be terminated, it often took years for the account to actually be closed.  In December 2008, there were approximately 675 accounts pending closure based on suspicions of money laundering activity.  Closure had been approved for 16 of those accounts in 2005, 130 in 2006, 172 in 2007, and 309 in 2008.  All 675 of these accounts remained open into at least 2009, with transactions being actively conducted through them despite facing pending closure based on suspicion of money laundering activity.

### HSBC Mexico's High Volume of U.S. Dollar Exports

36.  Between 2004 and 2007, HSBC Mexico exported over $3 billion U.S. dollars per year to the United States through Banknotes. In November 2007, Banco de Mexico, the central bank of Mexico, expressed concerns about the volume of U.S. dollars exported by HSBC Mexico back to the United States.  Specifically, Banco de Mexico wanted an explanation as to why HSBC Mexico's U.S. dollar exports were significantly larger than its market share would suggest.

37.  In February 2008, HSBC Mexico's CEO met with the head of the CNBV and the head of Mexico's financial intelligence unit, Unidad de Inteligencia Financiera ("UIF").  Again, the volume of HSBC Mexico's U.S. dollar exports was raised as a concern. Specifically, HSBC Mexico's CEO was told that law enforcement in Mexico and the United States were seriously concerned that the U.S. dollars being deposited at HSBC Mexico might represent drug trafficking proceeds.  HSBC Mexico's CEO was also told that Mexican law enforcement possessed a recording of a Mexican drug lord saying that HSBC Mexico was the place to launder money.

HSBC Mexico's CEO immediately elevated these issues up to HSBC Group's CEO, Head of Legal, Head of Audit, and Head of Compliance.

38.  An HSBC Mexico internal investigation following the February 2008 meeting with the CNBV and UIF revealed that a very small number of customers accounted for a very large percentage of physical U.S. dollar deposits.  For example, in January 2008, 312 customers accounted for approximately 32 percent of total physical U.S. dollar deposits.

39.  Moreover, a significant amount of the physical U.S. dollar exports came from Culiacan, in the Mexican state of Sinaloa. Culiacan is home to the Sinaloa drug cartel.  HSBC Group and HSBC Mexico were both aware of the money laundering risks in doing U.S. dollar business in Sinaloa state.  In 2007, HSBC Group learned of what was referred to in its employees' emails as a "massive money-laundering scheme" executed by HSBC Mexico employees and managers at multiple branches in Sinaloa state. HSBC Mexico closed all of the accounts involved in this scheme and terminated employees.  However, HSBC Mexico branches continued to accept U.S. dollar deposits in Sinaloa state.  From 2006 to 2008, HSBC Mexico exported over $1.1 billion in physical U.S. dollars from Sinaloa state to HSBC Bank USA.

40.  Despite the warnings from Mexican officials in late 2007 and early 2008, HSBC Mexico exported more physical U.S. dollars in 2008 than in any previous year, over $4.1 billion.  Finally, after the CNBV raised concerns directly with the HSBC Group's CEO in November 2008, HSBC Mexico stopped accepting physical U.S. dollar deposits at its branches.  HSBC Mexico was the first bank in Mexico to adopt such a measure, after which Mexican regulators issued new regulations consistent with this practice.

<u>HSBC Group</u>

41.  HSBC Group failed to have a formal mechanism for sharing information horizontally among HSBC Group Affiliates.  While informal communication between HSBC Group Affiliates did occur, information generally was reported up through the formal channels to HSBC Group.  HSBC Group then decided what information needed to be distributed back down the reporting lines to HSBC Group Affiliates in other parts of the world.

42.  As discussed above, from 2002 to 2010, HSBC Mexico reported the AML problems it was having up through the formal reporting

lines to HSBC Group.  During this time, HSBC Mexico did not communicate – formally or informally – with HSBC Bank USA about its AML problems.  Instead, executives at HSBC Mexico believed that by reporting the problems to HSBC Group, they had fulfilled their reporting obligations.

43.  Limited information regarding the AML problems at HSBC Mexico was presented at HSBC Group level management meetings at which the CEO of HSBC North America attended.  These were multi-hour, high-level meetings that covered issues throughout the world.  The information presented at these meetings regarding HSBC Mexico's AML problems was not discussed in detail and did not indicate that the problems affected HSBC Bank USA or involved the potential laundering of U.S. dollar drug trafficking proceeds.

44.  Notwithstanding the above, HSBC Group failed to adequately inform HSBC Bank USA about the problems at HSBC Mexico.  Senior HSBC Group executives, including the CEO, Head of Compliance, Head of Audit, and Head of Legal, were all aware that the problems at HSBC Mexico involved U.S. dollars and U.S. dollar accounts, but did not contact their counterparts at HSBC Bank USA to explain the significance of the problems or the potential effect on HSBC Bank USA's business.

45.  As a result of HSBC Group's failure to communicate, until 2010, HSBC Bank USA was not aware of the significant AML problems at HSBC Mexico.  HSBC North America's General Counsel/Regional Compliance Officer first learned of the problems at HSBC Mexico and their potential impact on HSBC Bank USA in 2010 as a result of this investigation.  Upon learning about potential problems involving HSBC Mexico, she immediately contacted HSBC Group Compliance.  Only then did she learn the full story of what happened at HSBC Mexico.  When she asked why she had not been informed earlier, she was told by HSBC Group's Head of Compliance that HSBC does not "air the dirty linen of one affiliate with another . . . we go in and fix the problems."

Drug Trafficking Proceeds Laundered Through HSBC Bank USA

46.  HSBC Bank USA's AML violations resulted in at least $881 million being laundered through the U.S. financial system.  A significant amount of the laundered funds were drug trafficking proceeds involved in the Black Market Peso Exchange ("BMPE").  The BMPE is a complex trade-based money laundering system that is designed to move the proceeds from the sale of illegal drugs

in the United States to the drug cartels outside of the United States, often in Colombia, often through the use of bank accounts.  As set forth below, the use of HSBC Bank USA for BMPE transactions was discovered through a narcotics and money laundering investigation conducted by U.S. Immigration and Customs Enforcement's Homeland Security Investigations ("HSI") El Dorado Task Force in New York, in conjunction with the U.S. Attorney's Office for the Eastern District of New York.

47.  The cartels, many of which operate in Colombia, need to convert U.S. dollars to Colombian pesos.  There are two major obstacles to the conversion of bulk U.S. currency into Colombian pesos: (1) because of U.S. AML laws and regulations, it is difficult to deposit large volumes of bulk cash at banks in the United States; and (2) Colombia has very strict currency controls and tax laws making it difficult and expensive to convert U.S. dollars to Colombian pesos in Colombia.

48.  To solve the first problem, Colombian drug cartels smuggle U.S. currency across the U.S. border into Mexico.  The U.S. currency is smuggled out of the United States because drug traffickers perceive that Mexico had less stringent AML laws, making it easier for the cartels to deposit large amounts of physical U.S. dollars at Mexican banks and CDCs.

49.  To solve the second problem, Colombia's strict currency controls and tax laws, the Colombian cartels use the BMPE.  In the BMPE, middlemen, often referred to as peso brokers, transform bulk cash from the sale of illegal drugs into revenue from the sale of legitimate goods.  In this process, the peso brokers purchase bulk cash in United States dollars from drug cartels at a discounted rate, in return for Colombian pesos that belong to Colombian businessmen.  The peso brokers then use the U.S. dollars to purchase legitimate goods from businesses in the United States and other foreign countries, on behalf of the Colombian businessmen.  These goods are then sent to the Colombian businessmen, who sell the goods for Colombian pesos to recoup their original investment. In the end, the Colombian businessmen obtain U.S. dollars at a lower exchange rate than otherwise available in Colombia, the Colombian cartel leaders receive Colombian pesos while avoiding the costs associated with depositing U.S. dollars directly into Colombian financial institutions, and the peso brokers receive fees for their services as middlemen.

16

50.   The Department alleges, and HSBC Bank USA and HSBC Holdings do not contest, that, beginning in 2008, an investigation conducted by HSI's El Dorado Task Force, in conjunction with the U.S. Attorney's Office for the Eastern District of New York, identified multiple HSBC Mexico accounts associated with BMPE activity.   The investigation further revealed that drug traffickers were depositing hundreds of thousands of dollars in bulk U.S. currency each day into HSBC Mexico accounts.   In order to efficiently move this volume of cash through the teller windows at HSBC Mexico branches, drug traffickers designed specially shaped boxes that fit the precise dimensions of the teller windows.   The drug traffickers would send numerous boxes filled with cash through the teller windows for deposit into HSBC Mexico accounts.   After the cash was deposited in the accounts, peso brokers then wire transferred the U.S. dollars to various exporters located in New York City and other locations throughout the United States to purchase goods for Colombian businesses.   The U.S. exporters then sent the goods directly to the businesses in Colombia.

51.   The Department alleges, and HSBC Bank USA and HSBC Holdings do not contest, that accounts at HSBC Mexico were identified by tracking wire transfers originating from HSBC Mexico into HSI undercover accounts in the United States and through seizures and analysis of U.S.-based business accounts that were funded by wire transfers from accounts targeted for illegal BMPE activity. Since 2009, the investigation has resulted in the arrest, extradition, and conviction in the United States District Court for the Eastern District of New York of numerous individuals illegally using HSBC Mexico accounts in furtherance of BMPE activity.   The investigation further revealed that, because of its lax AML controls, HSBC Mexico was the preferred financial institution for drug cartels and money launderers.   The drug trafficking proceeds (in physical U.S. dollars) deposited at HSBC Mexico as part of the BMPE were sold to HSBC Bank USA through Banknotes.   In addition, many of the BMPE wire transfers to exporters in the United States passed through HSBC Mexico's correspondent account with HSBC Bank USA.   As discussed above, from 2006 to 2009, HSBC Bank USA did not monitor Banknotes transactions or wire transfers from HSBC Mexico and did not detect the drug trafficking proceeds as they flowed into the United States.

### Evasion of U.S. Sanctions

52.  From the mid-1990s through at least September 2006, HSBC
Group Affiliates violated both U.S. and New York State criminal
laws by knowingly and willfully moving or permitting to be moved
illegally hundreds of millions of dollars through the U.S.
financial system on behalf of banks located in Cuba, Iran,
Libya, Sudan, and Burma, and persons listed as parties or
jurisdictions sanctioned by the Office of Foreign Assets Control
of the United States Department of the Treasury ("OFAC")
(collectively, the "Sanctioned Entities") in violation of U.S.
economic sanctions.

53.  HSBC Group Affiliates engaged in this criminal conduct by:
(a) following instructions from the Sanctioned Entities not to
mention their names in U.S. dollar payment messages sent to HSBC
Bank USA and other financial institutions located in the United
States; (b) amending and reformatting U.S. dollar payment
messages to remove information identifying the Sanctioned
Entities; (c) using a less transparent method of payment
messages, known as cover payments; and (d) instructing at least
one Sanctioned Entity how to format payment messages in order to
avoid bank sanctions filters that could have caused payments to
be blocked or rejected at HSBC Group or HSBC Bank USA.

54.  HSBC Group's conduct, which occurred outside the United
States, caused HSBC Bank USA and other financial institutions
located in the United States to process payments that otherwise
should have been held for investigation, rejected, or blocked
pursuant to U.S. sanctions regulations administered by OFAC.
Additionally, by its conduct, HSBC Group: (a) prevented HSBC
Bank USA and other financial institutions in the United States
from filing required BSA and OFAC-related reports with the U.S.
Government; (b) caused false information to be recorded in the
records of U.S. financial institutions located in New York, New
York; and (c) caused U.S. financial institutions not to make
records that they otherwise would have been required by law to
make.

### Applicable Law

55.  At all times relevant to this matter, various U.S. economic
sanctions laws regulated and/or criminalized financial and other
transactions involving sanctioned countries, entities, and
persons.  Those laws applied to transactions occurring within
U.S. territorial jurisdiction and to transactions involving U.S.

persons, including U.S. corporations, anywhere in the world.
OFAC promulgated regulations to administer and enforce the
economic sanctions laws, including regulations for economic
sanctions against specific countries, as well as sanctions
against Specially Designated Nationals ("SDNs").  SDNs are
individuals, groups, and entities that have been designated by
OFAC as terrorists, financial supporters of terrorism,
proliferators of weapons of mass destruction, and narcotics
traffickers.

<u>Cuba Sanctions</u>

56.  Beginning with Executive Orders and regulations issued at
the direction of President John F. Kennedy, the United States
has maintained an economic embargo against Cuba through the
enactment of various laws and regulations.  These laws,
restricting U.S. trade and economic transactions with Cuba, were
promulgated under the Trading With the Enemy Act ("TWEA"), 50
U.S.C. app. §§ 1-44.  These laws are administered by OFAC, and
prohibit virtually all financial and commercial dealings with
Cuba, Cuban businesses, and Cuban assets.

<u>Iran Sanctions</u>

57.  In 1987, President Ronald W. Reagan issued Executive Order
No. 12613, which imposed a broad embargo on imports of Iranian-
origin goods and services.  United States sanctions against Iran
were strengthened in 1995 and 1997 when President William J.
Clinton issued Executive Order Nos. 12957, 12959, and 13059.
These Executive Orders prohibit virtually all trade and
investment activities between the United States and Iran.  With
the exception of certain exempt or authorized transactions, OFAC
regulations implementing the Iranian sanctions generally
prohibit the export of services to Iran from the United States.
Until 2008, OFAC regulations permitted U.S. depository
institutions to handle certain "U-Turn" transactions, in which
the U.S. depository institution acts only as an intermediary
bank in clearing a U.S. dollar payment between two non-U.S.,
non-Iranian banks.

<u>Libya Sanctions</u>

58.  On January 7, 1986, President Reagan issued Executive Order
No. 12543 imposing broad economic sanctions against Libya.
Subsequently, President Reagan issued Executive Order No. 12544
on January 8, 1986, ordering the blocking of all property and

19

interests in property of the Government of Libya.  President George H. W. Bush strengthened those sanctions in 1992, pursuant to Executive Order No. 12801.  On September 20, 2004, President George W. Bush issued Executive Order No. 13357, terminating the national emergency with regard to Libya and revoking the sanction measures imposed by the prior Executive Orders.

Sudan Sanctions

59.  On November 3, 1997, President Clinton issued Executive Order No. 13067 imposing a trade embargo against Sudan and blocking all property, and interests in property, of the Government of Sudan.  President George W. Bush strengthened those sanctions in 2006, pursuant to Executive Order No. 13412. Under these Executive Orders, virtually all trade and investment activities between the United States and Sudan are prohibited. With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese sanctions generally prohibit the export of services to Sudan from the United States.

Burma Sanctions

60.  On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.  On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta.  To implement the BFDA and to take additional steps, President Bush issued Executive Order No. 13310 on July 28, 2003, which blocked all property and interests in property of certain listed Burmese entities[3] and provided for the blocking of property and interest in property of other individuals and entities meeting the criteria set forth in Executive Order No. 13310.  Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located.  On July 11, 2012, President Barack Obama signed an executive order easing restrictions to allow U.S. companies to do business in Burma.

---

[3]    President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked.

20

<u>Department of Justice Charges</u>

61.  The Department alleges, and HSBC Holdings admits, that its conduct, as described herein, violated TWEA.  Specifically, HSBC Group violated Title 50, United States Code, Appendix Sections 5 and 16, which makes it a crime to willfully violate or attempt to violate any regulation issued under TWEA, including regulations restricting transactions with Cuba.  The Department further alleges, and HSBC Holdings admits, that its conduct, as described herein, violated the International Emergency Economic Powers Act ("IEEPA").  Specifically, HSBC Group violated Title 50, United States Code, Section 1705, which makes it a crime to willfully violate or attempt to violate any regulation issued under IEEPA, including regulations restricting transactions with Iran, Libya, Sudan, and Burma.

<u>New York State Penal Law Charge</u>

62.  DANY alleges, and HSBC Holdings admits, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . (i) make[ ] or cause[ ] a false entry in the business records of an enterprise [defined as any company or corporation] . . . or (iv) prevent[ ] the making of a true entry or cause the omission thereof in the business records of an enterprise."  It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

<u>Conduct in Violation of U.S. Sanctions Laws</u>

63.  From at least 2000 through 2006, HSBC Group knowingly and willfully engaged in conduct and practices outside the United States that caused HSBC Bank USA and other financial institutions located in the United States to process payments in violation of U.S. sanctions.  To hide these transactions, HSBC Group Affiliates altered and routed payment messages in a manner that ensured that payments involving sanctioned countries and entities cleared without difficulty through HSBC Bank USA and other U.S. financial institutions in New York County and elsewhere.  The total value of OFAC-prohibited transactions for the period of HSBC Group's review, from 2000 through 2006, was approximately $660 million.  This includes approximately $250 million involving Sanctioned Entities in Burma; $183 million on

behalf of Sanctioned Entities in Iran; $169 million on behalf of
Sanctioned Entities in Sudan; $30 million on behalf of
Sanctioned Entities in Cuba; and $28 million on behalf of
Sanctioned Entities in Libya.

64.  Financial institutions in the United States are obligated
to screen financial transactions, including wire payment
processing, to make certain they do not execute transactions
that violate U.S. sanctions.  OFAC regularly publishes a
comprehensive list of Sanctioned Entities that includes names of
individuals, entities, their variations, and, if known,
addresses, dates of birth, passport numbers, and other
identifying information.  Because of the vast volume of wire
payments processed by financial institutions, most financial
institutions employ sophisticated computer software, known as
OFAC filters, to automatically screen all wire payments against
the official OFAC list (as well as similar lists containing
names of individuals and entities sanctioned by the United
Nations and the European Union).  When the filters detect a
possible match to a Sanctioned Entity, the payment is stopped
and held for further review.  When a financial institution
detects a funds transfer that violates sanctions, the
institution must refuse to process or execute that payment.
This is termed a "rejection."  If a party to the payment is an
SDN, then the payment must be frozen (or "blocked") and the bank
must notify OFAC.  The sending bank must then demonstrate to
OFAC that the payment does not violate sanctions before the
funds can be released and the payment processed.  Thus, foreign
banks seeking to send payments involving sanctioned countries or
entities through U.S. banks must by-pass or subvert the OFAC
filters to make sure the payments pass through the U.S. clearing
banks.  HSBC Group accomplished this using a number of methods.

<u>Amending Payment Messages</u>

65.  Specifically, beginning in the 1990s, HSBC Bank plc ("HSBC
Europe"), a wholly owned subsidiary of HSBC Group, devised a
procedure whereby the Sanctioned Entities put a cautionary note
in their SWIFT payment messages including, among others, "care
sanctioned country," "do not mention our name in NY," or "do not
mention Iran.[4]  Payments with these cautionary notes

---

[4]    HSBC Group is a member of the Society for Worldwide
Interbank Financial Telecommunications ("SWIFT") and
historically has used the SWIFT system to transmit international

22

automatically fell into what HSBC Europe termed a "repair queue" where HSBC Europe employees manually removed all references to the Sanctioned Entities.  The payments were then sent to HSBC Bank USA and other financial institutions in the United States without reference to the Sanctioned Entities, ensuring that the payments would be processed without delay and not be blocked or rejected and referred to OFAC.

66.  HSBC Group was aware of this practice as early as 2000.  In 2003, HSBC Group's Head of Compliance acknowledged that amending payment messages "could provide the basis for an action against [HSBC] Group for breach of sanctions."  At that time, HSBC Group Compliance instructed HSBC Europe to stop the practice.  However, HSBC Europe appealed, and due to the "significant business opportunities" offered by the Sanctioned Entities, HSBC Group's Head of Compliance granted HSBC Europe an extension to continue processing payments in the same manner.  HSBC Europe was also concerned about some other factors, including technical and logistical issues with SWIFT, payments, and HSBC Europe's payment processing system.  Over the next several years, HSBC Europe and HSBC Middle East Limited ("HSBC Middle East") sought and obtained numerous extensions, allowing the amendment of payment messages from the Sanctioned Entities to continue until 2006.

67.  HSBC Bank USA had express policies requiring full transparency in processing payments involving Sanctioned Entities.  In 2001, a senior compliance officer at HSBC Group told HSBC Bank USA that HSBC Group would not permit HSBC Group Affiliates to amend payment messages to avoid detection by sanctions filters in the United States.  Yet, contrary to this assurance, HSBC Group Affiliates intentionally hid the practice of amending payments involving Sanctioned Entities from HSBC Bank USA.  As a result, during the relevant time period, HSBC Bank USA and other financial institutions in the United States processed hundreds of millions of dollars in transactions involving Sanctioned Entities in violation of U.S. sanctions.

<u>Cover Payments</u>

68.  Historically, HSBC Group processed U.S. dollar payment messages from and through numerous global locations.  During the relevant time period, HSBC Group consolidated its U.S. dollar

payment messages with financial institutions around the world, including its U.S. affiliate, HSBC Bank USA.

payment processing so that the payments were predominately processed at HSBC Europe's Multi-Currency Payment Processing Center in England and, later, at HSBC Middle East in Dubai.

69.   International wire payments generally are executed via the secured communications services provided by SWIFT, and the communications underlying the actual payments are commonly referred to as SWIFT messages.  When a bank customer sends an international wire payment, the de facto standard to execute such a payment is the MT 103 SWIFT message (also called a serial payment, or a serial MT 103 payment).  When a financial institution sends a bank-to-bank credit transfer, the de facto standard is the MT 202 SWIFT message.  The crucial difference, during the relevant time period, was that MT 202 payments typically did not require the bank to identify the originating party to the transactions, and banks typically did not include that information in MT 202 messages.[5]  A "cover payment" typically involves both types of messages: an MT 103 message identifying all parties to the transaction is sent from the originating bank to the beneficiary, but the funds are transferred through the United States via an MT 202 message that lacks that detail.  Instead of using MT 103 payment messages for transactions involving the Sanctioned Entities, which would have revealed the identity of the ordering customer and beneficiary, HSBC Group used MT 202 "cover payment" messages for these bank-to-bank credit transfers, which did not.  Consequently, U.S. financial institutions were unable to detect when payments were made to or from a Sanctioned Entity.

70.   HSBC Group employees understood that cover payments hid the identity of the ordering customer and beneficiary, and therefore allowed for straight-through processing of transactions that would have otherwise been stopped for review in the United States.  They also knew that using MT 103 payments would likely result in the payment being delayed, rejected, or blocked.

71.   Although HSBC Europe instituted nominal processes to screen for SDNs when processing transactions from Sanctioned Entities, and make determinations as to whether or not payments fit within certain exceptions such as the U-Turn exemption, they employed inadequately trained payment clerks and untested automated

_____

[5]    Subsequent changes to MT 202 messaging formats now generally require the inclusion of originating party information when an MT 202 message is utilized to execute a customer payment.

filters in the process.  As a result, HSBC Europe could not
verify with a sufficient degree of accuracy or reliability
whether payments it processed from Sanctioned Entities complied
with OFAC restrictions.  In processing these payments and
sending them to HSBC Bank USA, HSBC Europe provided HSBC Bank
USA with no information that the payments involved Sanctioned
Entities, and thus prevented HSBC Bank USA from exercising its
own due diligence and OFAC screening.[6]

72.  As early as July 2001, HSBC Bank USA told HSBC Group's Head
of Compliance that it was concerned that the use of cover
payments prevented HSBC Bank USA from confirming whether the
underlying transactions met OFAC requirements.  From 2001
through 2006, HSBC Bank USA repeatedly told senior compliance
officers at HSBC Group that it would not be able to properly
screen Sanctioned Entity payments if payments were being sent
utilizing the cover method.  These protests were ignored.

73.  HSBC Europe resisted sending serial payments to HSBC Bank
USA because it was concerned that payments would be blocked or
rejected, and that Sanctioned Entity banks, specifically those
from Iran, would discontinue their relationships with HSBC
Europe, due to the increased costs associated with serial
payments.  These Iranian relationships resulted in revenue of
millions of dollars per year for HSBC Group Affiliates outside
of the United States.  It was not until 2006 that HSBC Group
ordered all HSBC Group Affiliates to use serial payments for
U.S. dollar transactions.

### Straight-Through Processing Instructions

74.  In April 2001, HSBC Europe instructed an Iranian bank how
to evade detection by OFAC filters and ensure its payments would
be processed without delay or interference.  The HSBC Europe

---

[6]     Until 2008, OFAC regulations included an exception to the
prohibition on Iranian transactions that permitted certain
transactions known as "U-Turns."  While HSBC Europe and HSBC
Middle East processed approximately $20 billion in otherwise
permissible Iranian U-Turn payments during the period, employees
amended payment messages and used cover payments to conceal the
nature of the transactions from HSBC Bank USA and other
financial institutions in the United States, which deprived the
U.S. banks of their ability to filter and review the
transactions to determine whether they were legal under OFAC
regulations.

employee wrote, "we have found a solution to processing your payments with minimal manual intervention . . . . the key is to always populate field 52 - if you do not have an ordering party then quote 'One of our Clients' . . . outgoing payment instruction from HSBC will not quote [Iranian bank] as sender - just HSBC London. . . . This then negates the need to quote 'do not mention our name in New York.'"[7]   Thus, according to the instructions sent by HSBC Europe, if the Iranian bank entered the term "One of our Clients" into Field 52, there would be no interference with the processing of the wire payment, whether it was OFAC-compliant or not.  Ultimately, this business was never taken on, due to protests from HSBC Bank USA.

75.  In July 2001, HSBC Bank USA's Chief Compliance Officer confronted HSBC Group's Head of Compliance on this issue and was assured that "Group Compliance would not support blatant attempts to avoid sanctions, or actions which would place [HSBC Bank USA] in a potentially compromising position."

76.  HSBC Europe issued guidelines to deal with transactions that came from the Sanctioned Entities.  One of these was to refer flagged payments back to the Sanctioned Entity for "clarification."  In doing so, HSBC Europe was alerting the Sanctioned Entity that the payment message as sent was prohibited by OFAC sanctions.  The Sanctioned Entities responded by reformatting the payment so that it would be processed through the U.S. clearing banks, including HSBC Bank USA, without being subject to U.S. filters.

<u>HSBC Bank USA's and HSBC Group's Cooperation and Remedial Actions</u>

77.  From early in this investigation, HSBC Bank USA and HSBC Group have fully cooperated and have provided valuable assistance to law enforcement.  With the assistance of outside counsel, HSBC Bank USA has made numerous, detailed, periodic reports to the Department and DANY concerning those findings.

---

[7]   Field 52 is a data code field in a SWIFT payment message that identifies the bank of the ordering customer, or the "originating bank." When the originating bank was Iranian, its inclusion in a payment message could trigger review by the clearing bank in New York.  For payments using MT 103 messages, Field 52 was mandatory.  For MT 202 cover payments, it was optional.

78.  To date, HSBC Bank USA has produced more than 9 million pages of documents.  HSBC Bank USA has also made past and present employees, including HSBC Group employees throughout the world, available to be interviewed by the Department and DANY as requested.

79.  In addition to the cooperative steps listed above, HSBC Bank USA has assisted the Government in investigations of certain individuals suspected of money laundering and terrorist financing.

80.  HSBC Group discontinued its use of the U-Turn exemption in October 2006, over two years before it was abolished by OFAC. HSBC Group implemented a policy voluntarily discontinuing all business with Iranian banks, persons, and entities, regardless of currency, in 2007.

81.  HSBC Bank USA and HSBC Group have invested hundreds of millions of dollars to remediate the shortcomings in their BSA/AML programs.  Management has made significant strides in improving "tone from the top" and ensuring that a culture of compliance permeates the institution.  The efforts of management have dramatically improved HSBC Bank USA's and HSBC Group's BSA/AML and OFAC compliance programs.  The steps taken evidence HSBC Bank USA's and HSBC Group's current commitment to ensuring the past failures do not recur:

<u>HSBC Bank USA's Remedial Measures</u>

a.   HSBC North America has a new leadership team, including a new Chief Executive Officer, General Counsel, Chief Compliance Officer, AML Director, Deputy Chief Compliance Officer and Deputy Director of its Global Sanctions program.

b.   As a result of its AML violations and program deficiencies, HSBC North America and HSBC Bank USA "clawed back" deferred compensation (bonuses) for a number of their most senior AML and compliance officers, to include the Chief Compliance Officer, AML Director and Chief Executive Officer.

c.   In 2011, HSBC Bank USA spent $244 million on AML, approximately nine times more than what it spent in 2009.

d.   In particular, HSBC Bank USA has increased its AML staffing from 92 full time employees and 25 consultants as of

27

January 2010 to approximately 880 full time employees and 267 consultants as of May 2012.

e.   HSBC Bank USA has reorganized its AML department to strengthen its reporting lines and elevate its status within the institution as a whole by (i) separating the Legal and Compliance departments; (ii) requiring that the AML Director report directly to the Chief Compliance Officer; and (iii) providing that the AML Director regularly report directly to the Board and senior management about HSBC Bank USA's BSA/AML program.

f.   HSBC Bank USA has revamped its KYC program and now treats HSBC Group Affiliates as third parties that are subject to the same due diligence as all other customers.

g.   HSBC Bank USA has implemented a new customer risk-rating methodology based on a multifaceted approach that weighs the following factors: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type.

h.   HSBC Bank USA has exited 109 correspondent relationships for risk reasons.

i.   HSBC Bank USA has a new automated monitoring system.  The new system monitors every wire transaction that moves through HSBC Bank USA.  The system also tracks the originator, sender and beneficiary of a wire transfer, allowing HSBC Bank USA to look at its customer's customer.

j.   HSBC Bank USA has made significant progress in remediating all customer KYC files in order to ensure they adhere to the new AML policies discussed above and plans to have completed remediation of 155,554 customers by December 2012.

k.   HSBC Bank USA has exited the Banknotes business.

l.   HSBC Bank USA has spent over $290 million on remedial measures.

<u>HSBC Group's Remedial Measures</u>

a.   HSBC Group also has a new leadership team, including a new CEO, Chairman, Chief Legal Officer, and Head of Global Standards Assurance.

b.   HSBC Group has simplified its control structure so that the entire organization is aligned around four global businesses, five regional geographies, and ten global functions.  This allows HSBC Group to better manage its business and communication, and better understand and address risks worldwide.

c.   Since January 2011, HSBC Group has begun to apply a more consistent global risk appetite and, as a result, has sold 42 businesses and withdrawn from 9 countries.

d.   HSBC Group has undertaken to implement single global standards shaped by the highest or most effective anti-money laundering standards available in any location where the HSBC Group operates.  This new policy will require that all HSBC Group Affiliates will, at a minimum, adhere to U.S. anti-money laundering standards.

e.   HSBC Group has elevated the Head of HSBC Group Compliance position to a Group General Manager, which is one of the 50 most senior employees at HSBC globally.  HSBC Group has also replaced the individual serving as Head of HSBC Group Compliance.

f.   The Head of HSBC Group Compliance has been given direct oversight over every compliance officer globally, so that both accountability and escalation now flow directly to and from HSBC Group Compliance.

g.   Eighteen of the top twenty-one most senior officers at HSBC Group are new in post since the beginning of 2011.

h.   Material or systemic AML control weaknesses at any affiliate that are reported by the Regional and Global Business Compliance heads are now shared with all other Regional and Global Business Compliance heads facilitating horizontal information sharing.

i.   The senior leadership team that attends HSBC Group Management Board meetings is collectively and individually

responsible for reviewing all of the information presented at the meeting, as well as all written documentation provided in advance of the meeting, and determining whether it affects their respective entity or region.  In addition, if an executive believes that something occurring within his or her area of responsibility affects another business or affiliate within HSBC Group, it is that executive's responsibility to seek out the executives from that business or affiliate and work to address the issue.

j.   HSBC Group has restructured its senior executive bonus system so that the extent to which the senior executive meets compliance standards and values has a significant impact on the amount of the senior executive's bonus, and failure to meet those compliance standards and values could result in the voiding of the senior executive's entire year-end bonus.

k.   HSBC Group has commenced a review of all customer KYC files across the entire Group.  The first phase of this remediation will cost an estimated $700 million to complete over five years.

l.   HSBC Group will defer a portion of the bonus compensation for its most senior officers, namely its Group General Managers and Group Managing Directors, during the pendency of the deferred prosecution agreement, subject to EU and UK legal and regulatory requirements.

m.   HSBC Group has adopted a set of guidelines to be taken into account when considering whether HSBC Group should do business in countries posing a particularly high corruption/rule of law risk as well as limiting business in those countries that pose a high financial crime risk.

n.   Under HSBC Group's new global sanctions policy, HSBC Group will be utilizing key OFAC and other sanctions lists to conduct screening in all jurisdictions, in all currencies.