ALAN EISNER, State Bar # 127119
KESTENBAUM EISNER & GORIN LLP
14401 Sylvan Street, Suite 112
Van Nuys, CA 91401
Phone:      (818) 781-1570
Fax:         (818) 781-5033
E-mail:     ae@keglawyers.com

Attorney for Defendant
KAREN GASPARIAN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br> v.<br><br>KAREN GASPARIAN,<br><br>      Defendant. | CR No. 12-00560-JFW<br><br>**DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING POSITION; MEMORANDUM OF POINTS; Declaration; Exhibits**<br><br>Sentencing Date: January 14, 2013<br>Time:  10:00 a.m.<br><br>Before the Honorable John F. Walter |

# I

# INTRODUCTION

  The government, in its Sentencing Position ("Gov't Sentencing"), has recommended a sentence of ten years of incarceration for Mr. Gasparian.  (Gov't Sentencing, p. 2.)  In seeking this ten year sentence, the government argues for four sentencing enhancements, one of which enhances the sentence by 22 levels.  While the defense respects the justification of the CTR regulations that were violated, the defense emphasizes that this is not a case where funds were taken, where a customer or investor was specifically defrauded, or where the government was specifically defrauded.  As discussed in Mr. Gasparian's Sentencing Position, the fraud guidelines, and specifically the loss table component (which in this case is used to increase the offense by 22 levels), are not based on empirical evidence or national experience.  Rather, as former federal

1

Judge Paul Cassell and former federal prosecutor Brett Tolman noted, "Rather than resting on evidence of past, national sentencing practices, the white collar Guidelines are a product of the political environment in which they were promulgated, the Commission's desire that the Guidelines reflect perceived congressional policy, and the Commission's own independent policy determination concerning the severity of a particular class of conduct." Letter from Brett Tolman, Esq. & Hon. Paul G. Cassell to Chief U.S. District Judge Linda Reade (April 19, 2010), *available at* http://justiceforsholom.org/Cassell_Tolman.pdf.

In fact, the loss table is only one of seven guidelines that allow for a double-digit level increase, and most of those other guidelines involve terrorist-related activity. As a result, these severe offense level increases in the loss table do not accurately reflect culpability, especially in a case such as the instant action where Mr. Gasparian only received a small commission percentage of the value of the funds involved. Accordingly, although both defense counsel and the government have spent a great amount of energy arguing over the applicable sentencing guidelines, in light of the problematic policies behind these specific guidelines and the unjustified severity of the loss table, the weight given to the guidelines should be minimal.

Further, and more importantly, as previously addressed in Mr. Gasparian's Sentencing Position, the disparity in treatment by the government of Mr. Gasparian compared to larger financial institutions truly undermines the ethics of our justice system. Larger financial institutions, engaged in much larger schemes, with much more dangerous players, have received nothing but fines and deferred prosecution agreements, while the government seeks a ten year sentence for Mr. Gasparian. Even worse, despite the fact that it is the owners and employees of those institutions committed the offense (not some robotic institution acting independently of human decisions), *not a single one of the individuals associated with those larger financial institutions was even charged.* Without any justification as to why incarceration was not given individuals who, through their institutions, were engaging in hundreds of millions of dollars worth of transactions

with drug trafficking organizations and terrorist political regimes, the government's seeking a ten year sentence for Mr. Gasparian in this case is an affront to our justice system.  Accordingly, while acknowledging the wrongfulness of his conduct, Mr. Gasparian respectfully requests that, in light of these other, more severe cases, in which defendant corporations received deferred prosecution agreements, that he be granted probation

## II

### SENTENCING GUIDELINES

Much of the disagreement over the applicable sentencing guidelines between the government and defense counsel relates to the government's speculation that $24 million worth of transactions occurred in the same manner that the transactions with the two confidential informants occurred, thereby triggering a CTR reporting requirement.  A CTR report is required when a financial institution gives out more than $10,000 in cash to a particular person, not when more than $10,000 is deposited.  Since the government failed to determine on what occasions, beyond those involving confidential informants, more than $10,000 in cash was given out to a particular person, the government has instead relied on occasions that more than $10,000 was deposited involving a single payer or payee.

Besides the plain speculative nature of the assumption that if more than $10,000 was deposited on a single day, then more than $10,000 must have been given out on a single day, there are numerous holes in the analysis put together by the government regarding G&A's transactions.  Defense counsel retained David M. Landrum, Jr. ("Mr. Landrum"), a retired IRS Special Agent after 28 years with the IRS Criminal Investigation Division, to review the documents and analysis provided by the government in this case.  (See Declaration of David M. Landrum ("Decl. Landrum")[1];

---

[1] Mr. Landrum, in his Declaration, refers to Def. Exhibits A, B, and C.  In order to avoid confusion with Exhibits A, B, and C from Mr. Gasparian's Sentencing Position, these exhibits

3

*Exhibit 2* – C.V. of David M. Landrum.)  Mr. Landrum also received assistance from another retired IRS Special Agent, Robin Rager.  (Decl. Landrum, ¶ 8; *Exhibit 3* – C.V. of Robin Rager.)

As Mr. Landrum notes in his declaration, the government's "appl[ying] the way checks were negotiated with the informants to all the other transactions….[is] similar to a fisherman catching a shark in the ocean and  saying the ocean contains only sharks." (Decl. Landrum, ¶ 17.)  The evidence does not exist to support such a conclusion.  Mr. Landrum also discovered several problem areas in the government's review of the financial documents that speak to the evidentiary problems with the government's sought after enhancements, and in particular the government's insistence of a 22 level increase for value of the funds.  These problems are detailed below.

### A.  THE GOVERNMENT ERRONEOUSLY ARGUES THAT MR. GASPARIAN'S OFFENSE LEVEL SHOULD BE INCREASED BY 22 POINTS BASED ON THE VALUE OF THE FUNDS EXCEEDING $20 MILLION

The government argues for a 22 level increase under U.S.S.G. §§ 2S1.3(a)(2) and 2B1.1.  (Gov't Sentencing, p. 14.)  This 22 level increase is based on an alleged $24,541,974.82 value of the funds, a number derived from Special Agent Darrell Twedt's ("SA Twedt") analysis.  (Gov't Sentencing, p. 15.)

The government states in its Sentencing Position that the value of the funds used to determine the increase in offense level "is the money that should have been reported on a CTR and filed with the Financial Crimes Enforcement Network ('FinCEN')." (Gov't Sentencing, p. 14.)  The Government then refers to SA Twedt's calculations to justify a "value of the structured funds [as] $24,541,974.82." (*Id,* at p. 15, citing Twedt. Decl. ¶ 6(g); Gov't Ex. F p. 17.)  A closer review of SA Twedt's analysis, however, reveals that much of his calculations and conclusions are based on speculation.

---

have been re-labeled as 1-A, 1-B, and 1-C, and attached to this opposition.

4

1. **The Government Attempted To Verify The $24 Million Figure And, By Its Own Acknowledgment, Could Only Account For $11.5 Million Worth Of Deposits**

The government, in its Sentencing Position, states in a footnote as follows:

"The government also attempted to trace the binder checks with deposits into G&A's operating accounts. ([Gov't] Ex. J.)  The government traced $11.5 million from the binders to deposits in G&A's operating accounts. (Decl. of SA Twedt ¶ 7; [Gov't] Ex. J.)"  (Gov't Sentencing, p. 12.)

Yet the Government nevertheless continues to argue that the $24 million figure should be used, *even without any evidence* of over half that value actually making it into G&A's accounts.  Right away, *at mimimum*, the loss amount should be reduced to the $11.5 million value.

2. **There Is No Evidence of Structuring**

The government argues that the $24 million figure represents "the value of the *structured* funds."  (Gov't Sentencing, p. 15, emphasis added.)  SA Twedt states that "[t]he binders document that G&A structured $24,541,974.82 during the periods covered by the binders."  (Twedt Decl., p. 4, item 6g).  The binders cover the period July 2006 to December 2007 and November 2008 to May 2009.  (Twedt Decl., p. 3, item 6a).

There is no evidence, however, of structuring transactions into or out of the accounts of G&A or with G&A.  Structuring is the breaking down of cash to amounts below the $10,000 reporting threshold via a deposit, withdrawal, or expenditure in some manner to avoid the CTR.  SA Twedt's assertion that the binders reveal structuring taking place is unfounded.  Not only did this not occur in the transactions with the confidential informants, but there is no evidence that monetary amounts were intentionally broken down by G&A to avoid CTR reporting requirements for any of the other transactions.  (See Decl. Landrum, ¶ 12.)  SA Twedt could have conducted further investigation, including interviews with third-party witnesses, to determine whether structuring was occurring at G&A, but SA Twedt chose to instead rely on speculation.  With the only evidence of structuring being SA Twedt's assertion, the $24 million amount of structured

transactions cited by the Government is unfounded and does not satisfy the "clear and convincing" standard to justify a 22 level increase.

### 3. There Is No Evidence That Any Transactions Beyond Those With The Confidential Informants Involved Cash-Outs Over $10,000 On A Single Day

In order for a transaction to trigger a CTR reporting requirement, the *cash-out*, rather than the deposit, must be over $10,000 on a single day. Knowing this, SA Twedt declares that "[t]here were 918 transactions in which over $10,000 in <u>cash was paid out</u> [emphasis added] to a single name on the same date" (Decl. Twedt, p. 3, item 6b). There is absolutely no evidence, however, in this case of any "cash out" with the exception of the informant transactions. Since it is the cashing out of over $10,000 that triggers the CTR reporting requirement, as opposed to the deposit, without any evidence that a cashing out of over $10,000 occurred in these 918 transactions, these transactions cannot be used justify a 22 level increase.

Mr. Landrum, after reviewing the materials provided by the government, noted all of the following missing evidence that would have been necessary to support the government's conclusions:

> "In order to prove which "bundled" checks were cashed I would have expected the government to: 1) subpoena the bank records of the check casher for all "deposited and withdrawn items" to determine which checks were in fact negotiated at that bank; 2) obtain all "returned items" to see if any of the checks were not cashed for a variety of reasons; 3) obtain any cash withdrawals from the bank by the check casher to show the ability to cash; 4) interview the maker of the check for authenticity purposes and determine the purpose; 5) interview the payee of the check to determine when and where cashed and if a CTR was required; and, 6) obtain through subpoena, search warrant or request, the "cash receipts" of the check casher showing cashed checks (cash out). The casher of checks would certainly have some receipts to show they provided cash, just to protect themselves. And if most of these checks were from fraud, more would have bounced or would have stop payments placed on them, thereby helping the government find potential witnesses." (Decl. Landrum, ¶ 19.)

Mr. Landrum also pointed out another issue with the government's theory that these deposited amounts were cashed out in a single day:

"An example of the problem with the government's theory that the checks were cashed on a single day as shown on their spreadsheet ([Gov't] Exhibit F) can be shown by Bundle 222 on that spreadsheet. Robin Rager reviewed this and advised me her review of SA Twedt's Exhibit F on this transaction (and the original spreadsheet) showed that Bundle 222 was comprised of three separate checks totaling $14,260.00. It also shows that the "date at the bottom of the sheet" is January 5, 2007 and the transaction is one of the 918 bundles that SA Twedt states is "over $10,000.00 in cash was paid out to a single name on the same date" ([Twedt] Declaration page 3, item 6b). Robin's review of the bank records from the discovery showed that one of these checks ($4,960.00) was deposited on January 6, 2007 at Mirae Bank and two ($4,700.00 and $4,600.00) were deposited on January 8, 2007 at Mirae Bank. This is in contrary to the government's theory that cash was paid out "on the same day" shown on the spreadsheet since these were deposited after that date. If they are relying on their spreadsheet dates for determining when a CTR was due it does not appear to be accurate." (Decl. Landrum, ¶ 21.)

As the above example indicates, SA Twedt has used the date of deposit to demonstrate which transactions triggered the CTR reporting requirement, *despite the fact* that it is the date of the "cash out" that determines whether or not a CTR report was required. Without knowing whether or not the cash from those deposits was paid out over several days, SA Twedt cannot assert that those deposits triggered a CTR report. Given that banks often limit deposits from a single payor/payee to under $10,000, and that deposits of more than $10,000 would therefore be made over several days, it is reasonable to assume that the cash-outs would also occur over several days. Since the CTR reporting requirement is only triggered when the cash-out amount exceeds $10,000 in a single day, amounts that were paid out over several days cannot be included in the Government's calculations.

**4.     The Government Did Not Account For What Was At Minimum $783,949.48 Worth Of Checks Returned By Banks In Its Calculations**

A review by Mr. Landrum of the period just from January 2007 to December 2007 revealed that at least $783,949.48 worth of transactions included by the Government in the list of structured transactions involved checks that were returned by banks to G&A. ((Decl. Landrum, ¶ 24; See *Exhibit 1-C* - List of Returned Items.) Not only does this review demonstrate that the total calculation should be reduced by this

7

amount, but it demonstrates the Government's lack of thoroughness in investigating the involved amounts. It is another example of the Government basing their calculation on speculation rather than evidence.

### 5. The Government Included $521,632 Transactions Involving Unknown Persons In Its Calculations

Additionally, a review of the transactions provided by the Government shows approximately $521,632.06 in transactions that had "no name." (Decl. Landrum, ¶ 22; see *Exhibit 1-A* – List of Transactions With "no name.") The Government's suggestion that these transactions be included in the total amount without any evidence of who received the money, without any evidence of "cashing out," without any evidence of "structured transactions," and, as a result, without any evidence of a law actually being violated, illustrates the Government's approach in the instant action. The Government has used scant evidence to pile $24 million worth of transactions on top of the transactions involving the confidential informants. Certainly, the $521,632 worth of transactions without a name attached should be excluded from the Government's total calculation, but more importantly, any calculation that relies on such unsubstantiated claims should not be received credibly by this Court.

### 6. The Government Included $1,816,728.27 Worth Of Transactions That Involved Multiplee Payees Such That No CTR Filing Was Required

As Mr. Landrum explains in his declaration, the Government included transactions in which, even if more than $10,000 of that transaction was paid out in a single day, it was paid out to multiple payees. (Decl. Landrum, ¶ 23.) Since each payee could have received less than $10,000 of cash, no CTR filing would have been required. (*Id.*) Mr. Landrum calculated the total value of these transactions to be $1,816,728.27. (*Id.*) Mr. Landrum writes:

> There were some bundles that contained multiple names and therefore, may not require a CTR depending on the transaction, i.e. if each person received less than the reporting amount from a bundle. Those that

fit this category should not be included because it is unknown how the transaction(s) occurred and who received what, thereby affecting the filing of an accurate CTR if required. One example of this would be Bundle 591 dated September 19, 2007 in the amount of $10,100.00 with the customer names "Armen and Artur". It is unknown how much was due to each person but a CTR may not have been required. Our review showed $1,816,728.27 in Bundles with multiple names that could be affected in this manner." (Decl. Landrum, ¶ 23, citing *Exhibit 1-B* – List of Bundles With Multiple Names.)

### 7. The Government Does Not Account For Mr. Gasparian's Commission Percentage In Determining Whether A CTR Filing Was Required

As Mr. Landrum writes:

Also if each of the transactions paid a fee of 3% as alleged by the government then some transactions may be reduced below the reporting threshold after deduction of the fee and therefore should not be in the total amount. For example Bundle 9 [Exhibit F] dated July 18, 2006 in the amount of $10,017.93 with the Customer name of Gog, is included in the overall total. But if a fee of 3% or $300.53, was paid then the cash out amount would be $9,717.40 and no CTR would be required. These transactions close to the threshold should be excluded and were not. (Decl. Landrum, ¶ 25.)

### 8. The Appropriate Value of the Funds For Mr. Gasparian' Offense Is $137,678, Which Corresponds To A 10 Level Increase

The appropriate value of the funds for Mr. Gasparian's offense should be calculated from combining the sum of Mr. Gasparian's transactions with CW1 and CW2. Mr. Gasparian completed $60,046 worth of transactions with CW1. (Gov't Sentencing, p. 6.) Mr. Gasparian completed $77,632 worth of transactions with CW2. (Gov't Sentencing, p. 8.) Accordingly, the total value of the offending transactions was $137,678, which corresponds to an offense level increase of 10 under U.S.S.G. § 2B1.1(b)(1)(F).

In Mr. Gasparian's Sentencing Position, defense counsel calculated the offending transacted amount to be $71,686, and therefore an 8 level increase, based on the stipulated facts. However, after reviewing the government's sentencing position, defense counsel believes the correct calculation should be the $137,768 amount that accounts for all of the transactions with the confidential informants. Accordingly, Mr. Gasparian's total offense level should be calculated as follows:

| | | |
|---|---|---|
| Base Offense Level: | +6 | [U.S.S.G. § 2S1.3(a)] |
| Specific Offense Characteristics | | |
| Value of the Funds | +10 | [U.S.S.G. § 2B1.1(b)(1)(E)] |
| Adjustment for Acceptance of Responsibility (See PSR, ¶ 86-87.) | -3 | [U.S.S.G. §§ 3E1.1(a)-(b).] |
| **Total Offense Level** | **13** | |

A total offense level of 13, with a Criminal History Category of I (as argued for in Mr. Gasparian's Sentencing Position), has a sentencing range 12-18 months.

### B. THE GOVERNMENT ERRONEOUSLY ARGUES THAT MR. GASPARIAN KNEW THE CHECKS WERE THE PROCEEDS OF ILLEGAL CONDUCT

The government argues for a two level increase under U.S.S.G. § 2S1.3(b)(1)(a). (Gov't Sentencing, p. 16.) U.S.S.G. § 2S1.3(b)(1)(a) applies when "the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." (U.S.S.G. § 2S1.3(b)(1)(a).)

The government contends that Mr. Gasparian knew the checks were from healthcare fraud because "First, on October 4, 2011, the agents explained how health care fraud works and why those engaged in healthcare fraud were using check cashers." (Gov't Sentencing, p. 16.) At best, this is a description of the interview with agents where they taught him healthcare fraud, and he replied to the affirmative response to their examples as many people do during a conversation, especially with an authority figure.

The government contends that Mr. Gasparian stated he remembered the La Brea Health Diagnostic checks from the informant CW1 were cashed by different individuals (Government's Sentencing, p. 10) when he responded to a question stating "No, no, it was definitely different individuals." (Gov't Exhibit E, p. 4). It appears this has been mischaracterized by the Government as a lie. (Gov't Sentencing, p. 23). Taking a closer look, however, the interview of Mr. Gasparian referred to checks cashed years prior and he did not have the benefit of his records for review to accurately answer the questions

since they were in the possession of the Government at that time.  It appears that Mr. Gasparian was referring to the number of checks payable to different entities/individuals and it did appear to be different individuals.   He had probably cashed thousands of checks since that time and could not be expected to remember the details of a few years earlier.  In fact, as the agent [Rameriz] says, "I'm not so much asking you to look up these individuals as I want to see if you remember like who, if it was one individual that cashed these checks," and Mr. Gaspaian responded, "No, no, it was definitely different individuals" (Exhibit E, p. 4).  The agents then respond that they believe one person cashed the checks and Mr. Gasparian says "OK." (Exhibit E, p. 4) thereby negating any possible lie.  He does not argue with them, but rather takes their word over his own memory.

        Lastly, there is no independent evidence of knowledge of healthcare fraud on Mr. Gasparian's part.  Even the Government's Sentencing states that informant CW2 advised Mr. Gasparian that <u>he has diagnostic laboratories</u> and "half of his patients were actual patients." (Gov't Sentencing, p. 7; Exhibit D, p. 6). .  This infers some of his business is legitimate.  Mr. Gaspairan is not in the healthcare industry, and he cannot properly assess which businesses are engaging in fraudulent activity and which are not.  As ddressed in Mr. Gasparian's Sentencing Position, the PSR points to checks being cashed by the medical companies Intymak and Palm Springs Medical Supplies, yet relies on *no* interviews with or investigations into those companies to determine whether any unlawful activity actually occurred with those companies. (PSR, ¶ 75.)   Even is such unlawful activity is established, the record here fails to establish that Mr. Gasparian knew of any illegal activity of this company, a finding that is required before the imposition of this enhancement.

        Although Mr. Gasparian has acknowledged with his plea he could have done a better job at fulfilling the CTR reporting requirements which are in place to prevent fraud, his failure to do so cannot be taken as proof that he had knowledge about the nature of the activity engaged in by each company that deposited with G&A.  It was Mr.

Gasparian's duty to file the CTR reports, but it was not his duty to conduct an investigation into each company he conducted business with. Additionally, the Government has not presented sufficient evidence that the companies that deposited with G&A *actually were* involved in any illegal activity. The Government has only offered speculative conclusions based on banking patterns.

As the evidence presented by the Government does not sufficiently demonstrate Mr. Gasparian had actual knowledge or belief of illegal activity of any of the companies he conducted business with, the two level increase under U.S.S.G. § 2S1.3(b)(1)(a) cannot apply.

**C. THE GOVERNMENT ERRONEOUSLY ARGUES THAT MR. GASPARIAN COMMITED A PATTERN OF UNLAWFUL ACTIVITY INVOLVING MORE THAN $100,000 IN A 12-MONTH PERIOD**

The government argues for a two level increase under U.S.S.G. § 2S1.3(b)(2). (Gov't Sentencing, p. 17.) U.S.S.G. § 2S1.3(b)(2) applies when "the defendant (A) was convicted of an offense under subchapter II of chapter 53 of title 31, United States Code; and (B) committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period." (U.S.S.G. § 2S1.3(b)(2).) Although defense counsel agrees that Mr. Gasparian's conviction falls under subchapter II of chapter 53 of title 31, United States Code, the evidence does not support a finding that Mr. Gasparian failed to file CTR reports for $100,000 worth of transactions in a 12-month period.

In his declaration, SA Twedt states that "[t]o determine whether G&A structured over $100,000 in a twelve month period, I analyzed a period covering January 2007 to December 2007. During that period the binder contain $13,288,922.69 in structured transactions. Of the $13,288,922.69 in structured transactions contained in the binders, $5,164,989 in structured transactions was confirmed as deposited into G&A's operating accounts." (Decl. Twedt, p. 5, item 8).

As discussed previously, a review by Mr. Landrum just of the period from January 2007 to December 2007 revealed that at least $783,949.48 worth of transactions

included by the Government in the list of structured transactions involved checks that were returned by banks to G&A. (Decl. Landlum ¶ 24; *Exhibit 1-C*.) Not only does this review demonstrate that the total calculation should be reduced by this amount, but it demonstrates the Government's lack of thoroughness in investigating the involved amounts. It is another example of the Government basing their calculation on speculation rather than evidence. Mr. Landrum also points out the following:

> "SA Twedt refers to [Gov't] Exhibit K in his declaration as a "spreadsheet I created documenting structured transactions completed in 2007, a twelve month period". We again disagree with his mischaracterization of the transactions as "structured" since his spreadsheet is of checks in some form of a "bundle".... [Gov't] Exhibit K appears to be created from SA Twedt's primary spreadsheet, and just extracted for the year 2007. However, both spreadsheets list the "Bundle Number" which purports to represent specific "bundled checks" the government alleges were cashed. However, upon review of many of these the bundle number on [Gov't] Exhibit F does not match the bundle number on [Gov't] Exhibit K for the same transaction. We are perplexed at this discrepancy and cannot rely on the spreadsheets. As I understand it, [Gov't] Exhibit K is a spreadsheet of the bundled transactions for the year 2007 only and appears to have been extracted from [Gov't] Exhibit F which is the spreadsheet originally provided in discovery that totals $24,541,974.82 and is the basis for the sentencing of Mr. Gasparian. [Gov't] Exhibit K appears to total $5,164,988.97 for the year 2007 but by way of example the first item is for Bundle Number 204 with a transaction date of January 3, 2007, a customer name of Stepan and the sum of checks in the bundle $29,060.00. [Gov't] Exhibit F shows Bundle Number 204 with a transaction date of December 20, 2006, a customer name of Stepan and the sum of checks in the bundle $10,205.00. There are several like this that do not match and we cannot reconcile the reason, therefore neither should be utilized as being unreliable." Decl. Landlum ¶ 26.)

More importantly, however, as also discussed previously, is the fact that the government has not provided any evidence of the "cash-out" date on any of the transactions beyond those involving the confidential informants. Instead, the government has relied on deposit dates, despite the fact that it is the cash-out date that triggers the CTR filing requirement. The government has speculated that if more than $10,000 was deposited on a single date, then $10,000 was likely cashed-out on a single date. This speculation, however, is not sufficient to justify an additional enhancement under U.S.S.G. § 2S1.3(b)(2). Without evidence that these transactions involved the *cashing-out* of more than $10,000 on a single day, the enhancement cannot apply.

### D. THE GOVERNMENT ERRONEOUSLY ARGUES THAT MR. GASPARIAN WAS AN ORGANIZER, LEADER, MANAGER, AND SUPERVISOR IN CRIMINAL ACTIVITY

The government argues for a two level increase under U.S.S.G. § 3B1.1. (Gov't Sentencing, p. 18.) U.S.S.G. § 3B1.1(c) applies when "the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)."[2] (U.S.S.G. § 3B1.1.)

The applicability of this enhancement was assessed in the PSR and determined to not apply. (PSR, ¶ 79-80.) The PSR first noted the case *United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012), which held that "even if the defendant held an important role in the offense, this increase is not warranted unless he exercised control over others involved in the commission of the offense or was responsible for organizing others for the purpose of carrying out the offense." (PSR, ¶ 79, citing *Whitney*, 673 F.3d 965.)

The why this enhancement does not apply are explained in the PSR as follows:

> "Gasparian worked at G&A with another criminal participant, Sanchez. Although Gasparian was G&A's manager, there is no indication he exercised control over Sanchez in committing the offense or was responsible for organizing Sanchez and others for the purpose of carrying out the offense. There were other criminal participants, including Krkasharyan, who brokered transactions between CI#1 and Gasparian, but again it is not clear that Gasparian exercised control over them or was responsible for organizing them for the purpose of carrying out the offense. Gasparian did clearly give instructions to the CIs, but they are not criminal participants. As a result, no adjustment for role is recognized.

The government's argument for the application of this enhancement confuses Mr. Gasparian's supervisory role in the business with a supervisory role in the offense. In fact, CW1's first interaction with Krkysharian G&A demonstrated that each individual acted independently to a large degree. As the government states, "CW1 cashed checks at G&A through Krkysharian, who brought checks to G&A. [Citation.] Krkysharian negotiated an 8% fee with CW1: 5% to G&A and 3% to himself. [Citation.]" (Gov't

---

[2] U.S.S.G. §§ 3B1.1(a)-(b) apply to "criminal activity that involved five or more participants or was otherwise extensive."

14

Sentencing, p. 5, citing PSR, ¶ 28-29.)  Although CW1 did eventually transact with Mr. Gasparian, CW1's interaction with Krkysharian demonstrates that Krkysharian operated independently, to the point of even negotiating a fee for himself.

As Mr. Gasparian's supervisory role in the business should not be mistaken for a supervisory role in the offense, and as the enhancement was assessed in the PSR and found not to apply, the two level increase under U.S.S.G. § 3B1.1(c) should not be applied in the instant action.

### III
### CONCLUSION

For the foregoing reasons, and the reasons set forth in Mr. Gasparian's Sentencing Position, Mr. Gasparian's total offense level should be calculated as 13, with a Criminal History Category of I, which has a sentencing range 12-18 months.  Given all of all the individuals who perpetrated the same offense with much larger financial institutions on a much larger scale but received *no* incarceration time, and given Mr. Gasparian's minimal criminal history, Mr. Gasparian respectfully requests that he be sentenced to probation.

Respectfully submitted
KESTENBAUM EISNER & GORIN LLP

Dated: January 5, 2013         /S/ ALAN EISNER
                               ALAN EISNER
                               Attorney for Defendant
                               KAREN GASPARIAN