DECLARATION OF DAVID M. LANDRUM, JR.

I, David M. Landrum, Jr., having been duly sworn, hereby depose and state:

1. I am a retired IRS Special Agent after almost 28 years with the IRS Criminal Investigation Division. I have conducted numerous financial investigations of individuals, corporations, partnerships and other related entities and organizations during that period. My investigative experience also includes gambling, narcotics, money laundering, fraud and tax crimes and I have testified on numerous occasions. I was also an undercover agent for the IRS for almost ten years working on numerous money laundering and other crime investigations. My experience includes being assigned to the Organized Crime Drug Enforcement Task Force and the FBI Violent Crimes Task Force for many years, conducting financial investigations that included money laundering, of drug trafficking and gang related organizations, including working with the Los Angeles County Sheriff's Homicide Division.

2. I was also an "on the job instructor" for new IRS Special Agents training them in various aspects of field work and evaluating that work for management. I was selected as an instructor at the IRS Training Academy located at the Federal Law Enforcement Training Center in Glynco, Georgia to train new agent hires at the Academy. During that assignment I taught many of the basic training courses required for new agents that included money laundering. IRS selected me to conduct advanced training for Senior Special Agents that included updates in various aspects of the job designed to sharpen their investigative skills. This also included money laundering investigative techniques. I also was selected to instruct at the IRS' International Training Academy teaching financial crime investigative techniques to law enforcement officers from numerous countries.

3. I have received recognition for my investigative work from the Director of the FBI, U.S. Attorney's Offices, the IRS, the Kansas City Strike Force and police departments.

4. Since retirement in 2001, I have been self-employed as a Financial Crimes Consultant, assisting both the legal and financial community. As part of that work I consult with law firms that have clients charged with financial crime issues in both criminal and civil venues. During retirement I have attended many training courses involving financial crime techniques and have held both Certified Fraud Examiner (CFE) and Certified Anti Money Laundering Specialist (CAMS) designations. The CAMS is currently inactive.

5. Also as a retired agent, I was contracted by the IRS and Department of Justice (ICITAP), to deliver training in financial crime investigative techniques to law enforcement officers in Hungary, Thailand, Africa, Bosnia and Jamaica. These training courses also included money laundering awareness and investigative techniques.

6. Since retirement I have also worked for numerous financial institutions that were in regulatory distress due to their lack of a proper anti money laundering program and violations of the Bank Secrecy Act. As part of that work, I have conducted thousands of investigations of financial transactions within the financial institutions for a determination of whether a transaction or account or individual or corporation should be reported to the Federal Government pursuant to current law. I have identified many money laundering schemes, including terrorist financing that were reported to the government but had not been previously identified. Many of these investigations involved "structuring" and Money Service Businesses (MSB) to include check cashers, wire transfers, and money order sales. Also part of that review was to review transactions for the filing of CTRS if required. This included transactions in cash of more than the reporting threshold and those structured or broken down in an effort to avoid the CTR. I have also trained bank Anti Money Laundering Unit investigators on identifying suspicious transactions that required reporting pursuant to the Bank Secrecy Act. My resume is attached hereto.

7. The Currency and Foreign Transactions Reporting Act of 1970 (which legislative framework is commonly referred to as the "Bank Secrecy Act" or "BSA")

requires U.S. financial institutions to assist U.S. government agencies to detect and prevent money laundering. Specifically, the act requires financial institutions to keep records of cash purchases of negotiable instruments, file reports of cash transactions exceeding $10,000 (daily aggregate amount), and to report suspicious activity that might signify money laundering, tax evasion, or other criminal activities.

8.   Mr. Alan Eisner contacted me to assist him in the evaluation of this case. I had another retired IRS Special Agent, Robin Rager, assist me in this review of the government's evidence. Robin is also an experienced financial crimes investigator after more than 20 years as an IRS Special Agent. She also has substantial training in updated financial investigative techniques from the Association of Certified Fraud Examiners where she obtained her certification. Her background includes numerous money laundering and fraud investigations and she worked joint investigations with the U.S. Postal Service, FBI, ATF, DEA and state and local police departments. She was also on the Identity Theft Task Force and the Suspicious Activity Review (SAR) Team. Those assignments gave her additional experience in those areas. As part of her experience she reviewed "structured transactions", bank records, CTRs and interviewed numerous bank officers and employees relative to these transactions. She also has experience in investigating Money Service Businesses, such as check cashers where she would subpoena bank records and trace funds to determine violations and refer those to the proper prosecuting authority if warranted. She also has numerous commendations from the U.S. Attorney's Office, ATF, IRS, and state and local police departments for her work on financial investigations. Robin's resume is attached hereto.

9.   Robin and I have reviewed various documents and filings submitted by the government in this case including discovery.

10.   I have read the government's "Response to Defendant Karen Gasparian's Sentencing Position" filed in this case January 3, 2013. Robin Rager and I have prepared three spreadsheets based on discovery evidence and the government's spreadsheets. Def. Exhibit A and Def. Exhibit B are sorted spreadsheets from the government's original

spreadsheet. Def. Exhibit A was sorted to document the bundles with no name per the government's spreadsheet. Def. Exhibit B was sorted from the same government spreadsheet for bundles with multiple customer names. Def. Exhibit C is a spreadsheet we prepared based on our review of returned items as shown on bank statements and compared to like amounts on the government's spreadsheet. Since we did not have the actual items and there were on occasion multiple items with the same amount, we chose the ones we felt were closest to the returned item.

       11.    I am not a lawyer so I cannot comment on many of the legal aspects of the case presented. However, I am familiar with the Bank Secrecy Act as it applies to money laundering and am familiar with financial investigation techniques. The Bank Secrecy Act requires financial institutions to aggregate multiple currency transactions for the filing of a CTR "if the financial institution has knowledge that [the multiple transactions] are by or on behalf of any person and result in either cash in or cash out totaling more than $10,000.00 during any one business day." (See FinCEN website and related regulations).

       12.    There are several things that "jump out" to me from my review of these documents, the first being the multitude of references the government makes to "structuring" or "structuring checks". "Structuring checks" is not a violation of the Bank Secrecy Act (BSA), and if it occurred, I assume the government means checks in amounts less than $10,000.00; but that theory, in a BSA sense, is not correct. "Structuring" as defined in the BSA, is very simply, taking more than $10,000.00 in cash and either depositing it or withdrawing it (or conducting a transaction or related transactions with it) in amounts that are "structured" i.e. an amount more than $10,000.00 that is broken down to amounts less than $10,000.00, to make them appear to be below the reporting threshold of $10,000.00, so that a Currency Transaction Report (CTR) is not filed. There is no evidence of that here, even with the informant transactions to which Mr. Gasparian admits. We have tried to determine why the government keeps referring

1  to characterizing the case in these terms and I cannot come up with a reason because
2  there is simply no evidence of structuring occurring that we have found.
3          13.    The government alleges that the defendant did not file a CTR on numerous
4  occasions that would allow law enforcement to identify those who cashed checks (so they
5  could be interviewed). If those checks were cashed in amounts greater than $10,000.00
6  and a CTR had been filed, the names on the CTR would include those on the checks that
7  the government has seized and apparently did not interview them anyway. The
8  government was in possession of the "Binders" which they allege is *all cashed checks*
9  and apparently did not interview any of the people associated with the checks, so how do
10 they know which ones, if any, were cashed and which ones included transactions *that*
11 *required* a CTR filing? The government alleges that Mr. Gasparian kept the binders for
12 "the very purpose of keeping track of aggregated transactions" but they also state that Mr.
13 Gasparian's conspiracy was to conceal the identity of those who cashed checks so why
14 would he even keep the check copies? The government also had many of Mr.
15 Gasparian's files that had identification of individuals he dealt with and it seems they had
16 ample information to conduct interviews.
17         14.    The government was in possession of the Binders and checks they allege
18 were cashed, and the files of numerous individuals that contain drivers licenses and other
19 information. It seems to me that they should have started with those checks and then
20 some investigative work might prove if they were cashed, or not, and at least interview
21 the check makers and payees to determine their purpose, especially since they allege they
22 are from healthcare fraud.
23         15.    It is my understanding that Mr. Gasparian has admitted to the transactions
24 with the undercover informants, so any discussion here is a moot point.
25         16.    I have not seen any government evidence that he did cash checks in excess
26 of $10,000.00 outside of the informant's. And just because the informant's transactions
27 were committed in one fashion does not mean all of them were committed the same way.
28 The government states "it makes no sense that a customer would drop off multiple checks

exceeding $10,000.00 in one day and pick up cash on multiple occasions". This might occur for a variety of reasons, such as returned checks or late clearing of checks, and it is my understanding that Mr. Gasparian had to wait on some checks to clear before paying out on them. Otherwise he would be foolish and have a potential losing proposition in the check cashing business if he paid out before they cleared [or did not clear].

17.  The government shows no independent or corroborative evidence of "structuring" or even cashing checks by any third party witness other than the informant. The informants conducted approximately four transactions out of the 918 the government alleges were cashed (.435%) in their spreadsheet and Exhibit F. The government also applies the way checks were negotiated with the informants to all the other transactions. This would be similar to a fisherman catching a shark in the ocean and saying the ocean contains only sharks. Basic investigative techniques would call for corroborative evidence of the cashing of checks especially if that was part of the crime, and at least interviews of the parties involved.

18.  Our review of Special Agent Twedt's spreadsheets has uncovered some discrepancies. Agent Twedt declares that he determined that "There were 918 transactions in which over $10,000.00 in cash was paid out to a single name on the same date" [Declaration of SA Twedt, item 6b]. The government needs to prove or show with evidence, which transactions on which date and in what amount were transacted to determine if a CTR is even due and there is no evidence that any of them were even cashed (with the exception of the informant) other than being deposited. In fact, we reviewed a sample of the items deposited into the G&A accounts and many were returned, thereby negating any ability to cash them. Furthermore, the IRS BSA examiners did not find any evidence of "structuring". This case is about the extent to which Currency Transaction Reports were not filed for qualifying transactions of cash going out, not about depositing "structured checks".

19.  In order to prove which "bundled" checks were cashed I would have expected the government to: 1) subpoena the bank records of the check casher for all

"deposited and withdrawn items" to determine which checks were in fact negotiated at that bank; 2) obtain all "returned items" to see if any of the checks were not cashed for a variety of reasons; 3) obtain any cash withdrawals from the bank by the check casher to show the ability to cash; 4) interview the maker of the check for authenticity purposes and determine the purpose; 5) interview the payee of the check to determine when and where cashed and if a CTR was required; and, 6) obtain through subpoena, search warrant or request, the "cash receipts" of the check casher showing cashed checks (cash out). The casher of checks would certainly have some receipts to show they provided cash, just to protect themselves. And if most of these checks were from fraud, more would have bounced or would have stop payments placed on them, thereby helping the government find potential witnesses.

20. We reviewed SA Twedt's primary spreadsheet, bank statements for the year 2007 and other periods and some available individual transactions. We did not have all documents necessary to fully examine each transaction since the discovery did not contain some required items. SA Twedt's spreadsheet of the bundled items covers the period July 2006 to December 2007 and November 2008 to May 2009 totaling 918 "Bundles" and $24,541,974.82 [Exhibit F]. This spreadsheet appears to be the basis for other spreadsheets used in this case. He also prepared a spreadsheet of the year 2007 (Exhibit K) to show that over $100,000.00 was "structured" in a twelve month period. We again rebut this since there is no evidence of "structuring". Of the 918 bundles SA Twedt says were paid in cash "to a single name on a single day" [emphasis added] our review identified the following:

21. An example of the problem with the government's theory that the checks were cashed on a single day as shown on their spreadsheet (Exhibit F) can be shown by Bundle 222 on that spreadsheet. Robin Rager reviewed this and advised me her review of SA Twedt's Exhibit F on this transaction (and the original spreadsheet) showed that Bundle 222 was comprised of three separate checks totaling $14,260.00. It also shows that the "date at the bottom of the sheet" is January 5, 2007 and the transaction is one of

the 918 bundles that SA Twedt states is "over $10,000.00 in cash was paid out to a single name on the same date" (Declaration page 3, item 6b). Robin's review of the bank records from the discovery showed that one of these checks ($4,960.00) was deposited on January 6, 2007 at Mirae Bank and two ($4,700.00 and $4,600.00) were deposited on January 8, 2007 at Mirae Bank. This is in contrary to the government's theory that cash was paid out "on the same day" shown on the spreadsheet since these were deposited after that date. If they are relying on their spreadsheet dates for determining when a CTR was due it does not appear to be accurate.

22. Of the 918 bundles on SA Twedt's spreadsheet [Exhibit F] and using his spreadsheet, we identified approximately $521,632.06 in transactions that were noted as having "no name" or something similar. We cannot tell what these represent from the description and therefore they should not be used since it is unknown who received them if at all. [Def. Exhibit A]

23. There were some bundles that contained multiple names and therefore, may not require a CTR depending on the transaction, i.e. if each person received less than the reporting amount from a bundle. Those that fit this category should not be included because it is unknown how the transaction(s) occurred and who received what, thereby affecting the filing of an accurate CTR if required. One example of this would be Bundle 591 dated September 19, 2007 in the amount of $10,100.00 with the customer names "Armen and Artur". It is unknown how much was due to each person but a CTR may not have been required. Our review showed $1,816,728.27 in Bundles with multiple names that could be affected in this manner. [Def. Exhibit B]

24. We identified numerous "returned items" just in the year 2007 that were included in the bundles. This means that items in the bundles were "bounced" by the bank and not credited. There were occasions where similar amounts i.e. $5,000.00, could not be linked to a particular bundle since there were several bundles around the same time frame with that same amount, but we chose the best we could without the actual returned items which should have been obtained by the government. We reviewed the

8

two accounts used by SA Twedt for his review of documenting the bundles and corresponding deposits. Some of these returned items would reduce their respective Bundle below the reporting threshold and therefore not require a CTR. We identified approximately $783,949.48 in items that showed "returned" on the bank statement and attempted to match the same amount in the "bundles" on the original spreadsheet (same as Exhibit F) at the same approximate time. We cannot be sure of the specific transactions because the actual returned item was not obtained from the bank by the government. [Def. Exhibit C]

25. Also if each of the transactions paid a fee of 3% as alleged by the government then some transactions may be reduced below the reporting threshold after deduction of the fee and therefore should not be in the total amount. For example Bundle 9 [Exhibit F] dated July 18, 2006 in the amount of $10,017.93 with the Customer name of Gog, is included in the overall total. But if a fee of 3% or $300.53, was paid then the cash out amount would be $9,717.40 and no CTR would be required. These transactions close to the threshold should be excluded and were not.

26. SA Twedt prepared Exhibit K to show that more than $100,000.00 was transacted in a one-year period for sentencing enhancement. SA Twedt refers to Exhibit K in his declaration as a "spreadsheet I created documenting structured transactions completed in 2007, a twelve month period". We again disagree with his mischaracterization of the transactions as "structured" since his spreadsheet is of checks in some form of a "bundle". Additionally, many of those items were returned ($783,949.48-see above) for various reasons and not accounted for and should at a minimum be excluded. Exhibit K appears to be created from SA Twedt's primary spreadsheet, and just extracted for the year 2007. However, both spreadsheets list the "Bundle Number" which purports to represent specific "bundled checks" the government alleges were cashed. However, upon review of many of these by bundle number on Exhibit F and Exhibit K, the transaction detail does not match as it should. We are perplexed at this discrepancy and cannot rely on the spreadsheets. As I understand it,

9

Exhibit K is a spreadsheet of the bundled transactions for the year 2007 only and appears to have been extracted from Exhibit F which is the spreadsheet originally provided in discovery that totals $24,541,974.82 and is the basis for the sentencing of Mr. Gasparian. Exhibit K appears to total $5,164,988.97 for the year 2007 but by way of example the first item is for Bundle Number 204 with a transaction date of January 3, 2007, a customer name of Stepan and the sum of checks in the bundle $29,060.00. Exhibit F shows Bundle Number 204 with a transaction date of December 20, 2006, a customer name of Stepan and the sum of checks in the bundle $10,205.00. There are several like this that do not match and we cannot reconcile the reason, therefore neither should be utilized as being unreliable. Also, SA Twedt states in his declaration that he analyzed the 2007 year and the binders showed $13,288,922.69 in structured transactions and of that amount $5,164,989 in structured transactions was confirmed as deposited into G&A's operating accounts (Declaration page 5, item 8). Once again, this mischaracterized the transactions as "structured".

27. SA Twedt's Declaration states that his spreadsheet (Exhibit F) summarizes the binders and covers the time from July 2006 to December 2007 and from November 2008 through May 2009 (Declaration page 2, item 5a and page 3 item 6a). However, Exhibit F has two transactions in November of 2009 and one in December 2009 totaling $58,052.37 (Exhibit F bundle 916-918). It appears these dates should be 2006, again showing an error.

28. SA Twedt stated in his Declaration that Mr. Gasparian received at least $736,259.24 from illegal activities (Declaration page 6, item 9) from fees as calculated using the $24,541,974.82 amount. At best, only the fees paid by the informants on their transactions totaling $144,462.00 (Declaration page 7, item 13) equals $4,333.86, utilizing SA Twedt's computation amount of 3%, should be used for forfeiture purposes.

29. My experience as a Special Agent always included a thorough and complete investigation of any defendant, and I taught those trainee agents in my trust to do the same. And, that errors are not acceptable in the prosecution of anyone for any

reason. I always gave the defendant the benefit in any computation so there would be no question as to guilt and made sure all avenues were followed and possible defenses rebutted. Money laundering investigations are "following the money" not stopping at the first document. Furthermore, SA Twedt stated in his Declaration that he "assumed based on CW1 transactions, the organization of the notebook, and information I received from another check casher, that checks depicted on a sheet or sheets with the same handwritten name and date at the bottom was a single transaction" (Declaration page 4 item 6f). I would have taken this investigation much farther to prove it, and obtain corroborative evidence such as bank records, cash receipts, handwriting exemplars and third party interviews rather than relying on assuming anything.

30. This case is about cashing checks and not filing CTR'S when required, not about "structured transactions". Mr. Gasparian has admitted to that with the transactions he committed with the government's informant. The government relies on the spreadsheet of bundled checks that they allege were all cashed and therefore additional "structured transactions" that are relevant conduct. There is no evidence of structuring and no substantial corroborative evidence of the cashing of checks over $10,000.00 in a business day. It is likely other transactions occurred that required the filing of a CTR, but there is no evidence of those transactions. There are many adjustments that need to be considered in computing the relevant conduct if using the government's schedule as we have pointed out to the best of our ability. It appears that the spreadsheet prepared by the government is not accurate as shown above, and therefore is of questionable reliability.

I declare under the penalty of perjury that the foregoing is true and correct and to the best of my knowledge and belief.

Executed the 5th day of January 2013 in Miami, Florida.

David M. Landrum, Jr.
Financial Crimes Consultant

D A V I D   M.   L A N D R U M,   J R. ,  CFE

CONTACT INFORMATION

P.O. Box 906, Eufaula, Oklahoma  74432          Home: 918-452-4507, Cell: 405-203-3552

email: roninresources@gmail.com                     website:  www.roninresourcesgroup.com

EXPERIENCE 2001 TO PRESENT

**Independent Bank Secrecy Act and Financial Crimes Consultant**

- Case Manager for major fraud investigation directing investigators and reviewing reports for accuracy and proper evidence.  Author final report consolidating all evidence and make fraud determination recommendations.

- Assisted a Native American tribe in conducting an internal investigation relative to conflict of interest and diversion of assets.  Interviewed witnesses and reviewed financial records.  Met with tribal directors, tribe attorney and the U.S. Attorney to present evidence of violation of Federal law.

- Developed and delivered mandated training course on the Bank Secrecy Act for Indian Casinos, Insurance companies and Bank employees.

- Assisted outside counsel in conducting an internal investigation for the defense of an international foreign corporation, relative to potential criminal allegations of financial irregularities.

- Assisted outside counsel in conducting investigation of mortgage fraud within a major East coast lender.

- Quality Control Management and review of Suspicious Activity Report investigations for five major financial institutions under regulatory sanctions.  Reviewed and approved investigative reports for accuracy in facts and law for reporting to FinCen and regulators.  Trained bank employees in both Suspicious Activity investigative techniques and ACAMS certification test preparation.

- Provided investigative expertise to five additional major financial institutions for mandated BSA/Patriot Act compliance efforts. Conducted reviews for Know Your Customer (KYC), Enhanced Due Diligence (EDD) and suspicious activity after Federal sanctions; documented transactions to prove legitimacy and prepared Suspicious Activity Reports on qualifying transactions. Reviewed customer KYC and made recommendations to update files or conduct EDD for high-risk customers.  These financial institutions included Retail, International, Embassy, Private, Commercial, Brokerage and Correspondent Banking.

- BSA and Patriot Act experience includes money laundering, gambling, terrorist financing, fraud, corruption (Foreign Corrupt Practices Act), mortgage fraud, brokerage/investments, counterfeit checks, OFAC issues and identity theft matters.  Also includes experience in detailed investigation of suspicious transactions from numerous foreign countries i.e. South America, Africa, Asia, the Middle East and Europe. My experience further includes but is not limited to the following industries: Money Service Businesses, Foreign Embassies, Internet gambling, Indian gaming, government, military, diamond, garment, automobile, real estate, electronics, investment, airlines and oil production.

- Self-employed consultant providing legal counsel with financial investigative expertise in defending clients charged with financial crimes, such as fraud and money laundering, corruption, tax evasion and assisting in trial strategy for both criminal and civil litigation matters.

- Researched and developed money laundering, corruption, mortgage fraud and financial investigative techniques courses.[1] Trained law enforcement, bank personnel, private investigators, fraud examiners and regulatory officials in money laundering and financial crime investigative techniques in the U.S. and other worldwide venues including Jamaica, Africa, Hungary, Thailand, and Bosnia.

---

[1]  Several Money Laundering Courses accredited through the Oklahoma Council on Law Enforcement Education and Training (CLEET) for Private Investigators and Law Enforcement officers at various times (accreditation-presently inactive). Corruption Training delivered in Bosnia and Jamaica.

- Assisted the Treasury Department, Office of Technical Assistance, by development and delivery of money laundering and corruption investigative techniques training for law enforcement officers in Jamaica. Developed training material adopted by the Office of Technical Assistance for money laundering and corruption investigative techniques.
- Licensed Private Investigator in the State of Oklahoma assisting legal counsel by conducting various investigations as requested.

1976-2001
## Special Agent, IRS Criminal Investigation

- Conducted numerous financial investigations of violations of the Federal Money Laundering and tax statutes. Developed both documentary and testimonial evidence for trial presentation. Investigative experience includes money laundering, public corruption, Medicare/Medicaid fraud, conspiracy, drug trafficking, gambling, altered documents, embezzlement, asset diversions, income concealment and tax fraud. Conducted undercover investigations primarily of money laundering and banking violations. Organized and managed a Narcotics and Financial Crimes Task force consisting of members from Federal and State and Local agencies.
- Testified as a fact or summary witness in both Federal and State prosecution efforts and assisted prosecutors in trial preparation, grand jury indictments and plea negotiations.
- Trained new and senior agents for IRS-Criminal Investigation Division at the Federal Law Enforcement Training Academy in financial crime investigative techniques and provided new agents with on the job field training.
- On the Job Instructor for newly hired Special Agents. Trained and evaluated new agents through field work and documented their performance for management to meet agency training goals and requirements.
- Trained investigators from various foreign countries in financial crime investigative techniques at the Federal Law Enforcement Training Center. Co-authored and delivered training to IRS undercover personnel at IRS Headquarters in Washington, D.C.
- Member of the FBI Violent Crimes Task Force and the Organized Crime Drug Enforcement Task Force conducting financial investigations of major drug trafficking organizations and street gangs.
- EEOC investigator for internal complaints within the IRS. Also developed and delivered training to new EEOC investigators. Conducted internal investigations of discriminatory allegations within the IRS.

## Publications, Public Speaking and Committees

- Article on Suspicious Activity Reporting, "Big Brother is Watching You", the Oklahoma Criminal Defense Lawyers Association, *The Gauntlet*, Spring 2010.
- Speaker, Oklahoma Indian Gaming Association annual conference relative to identifying and documenting suspicious activity, August 5, 2007 and August 11, 2008.
- Speaker, BSA Compliance and Patriot Act Issues facing Indian Casinos, Annual Conference, United South and Easter Tribes, Inc., Commercial, Law, Legislation and Economic Development Committee, October 9, 2006.
- Article on Money Laundering risks facing Indian Casinos, *Native American Times*, July, 2006 and *Gambling Magazine*, July 19, 2006.
- Speaker, Global Knowledge Congress, Anti Money Laundering Investigations, Webinar, June 20, 2006.
- Article on banking liability in Money Laundering "sting" investigations, Association of Certified Anti Money Laundering Specialists, *ACAMS TODAY*, January 2006.

- Article on Witness Credibility in Money Laundering Investigations, Association of Certified Anti Money Laundering Specialists, *ACAMS TODAY*, March 2003.
- Guest Expert, The Verdict, KSBI-Channel 52, Oklahoma City, OK, two part series on Money Laundering, 2003.
- 2005 and 2006 Member, Educational Task Force, Association of Certified Anti Money Laundering Specialists (ACAMS).

**RECOGNITION**

- Letters of Recognition, Director of the Federal Bureau of Investigation; United States Attorney, Southern District of Texas; United States Attorney, Organized Crime Drug Enforcement Task Force, Western District of Oklahoma; United States Department of Justice, Organized Crime Section, Kansas City Strike Force; Victoria Texas Police Department and Special Act/Superior Performance Awards, IRS, Criminal Investigation Division.

**EDUCATION**

1972-1976        University of Central Oklahoma            Edmond, OK
- B.S., Accounting.
- Numerous in-service training courses from the IRS, FBI and other professional organizations.
- Continuing Education training for each certification and training at various banks on systems.

**PROFESSIONAL ORGANIZATIONS**

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners, (since 2003).
- Certified Anti-Money Laundering Specialist (CAMS), Association of Certified Anti-Money Laundering Specialists (active 2003-2011).

REFERENCES
On Request

# ROBIN R. RAGER, CFE

P.O. Box 4856, Glen Allen, Virginia 23058

804-316-2065(C)    Email: rager.robin@gmail.com

www.roninresourcesgroup.com

**CAREER SUMMARY**

Special Agent with the Internal Revenue Service, Criminal Investigation Division from December 1990 to May 2011. Criminal investigative experience in the areas of money laundering, bank secrecy violations, federal tax and tax related violations, as well as violations of other federal laws. Investigative experience includes money laundering, public corruption, unlicensed money service remitters, contraband cigarettes, conspiracy, gambling, altered documents, embezzlement, narcotics, concealment of assets, identity theft, structuring, multi-million dollar Ponzi schemes and tax fraud. I was also part of the Joint Terrorism Task Force in Virginia.

Since retirement in 2011, I was contracted to assist in "Look-back Projects" for several international banks by conducting investigations of numerous alerted transactions in both correspondent and retail banking and made recommendations relative to the filing of Suspicious Activity Reports and documenting other non suspicious activity. I also offer expert testimony on all financial crime matters as well as offer independent services as a Financial Crimes Consultant.

**PROFESSIONAL EXPERIENCE**

K-Rae, Inc                                            Richmond, VA             May 2011 to Present

Investigative and Financial Crimes Consultant

- Conducted financial investigations of alerted activity for regulator ordered "Look-backs" for several international banks under cease and desist orders. This included Know Your Customer (KYC) and transactional activity investigations on both commercial and retail customers.
- Because of the quality of my investigations, I was also selected to assist in the Quality Control process by reviewing other investigator's reports for accuracy, completeness of the report and related documentation and for the proper disposition. During this time, I was also conducting my own investigations and able to meet goals set by the bank for both quality control and investigations.
- I conducted investigations relative to KYC and Enhanced Due Diligence to meet regulatory requirements for the Customer Identification Program (CIP). I made recommendations based on policies and procedures to update and properly document each customer.
- BSA and USA PATRIOT Act experience includes money laundering, fraud, corruption, brokerage/investments, correspondent banking, retail banking, OFAC issues and structuring. Also includes experience in detailed investigation of suspicious transactions from numerous foreign countries i.e. South America, Africa, Asia, the Middle East and Europe. My experience further includes but is not limited to the following industries: Money Service Businesses, Foreign Embassies, government, diamond, garment, automobile, shipping, real estate, electronics, investment, airlines and oil production.
- I have extensive experience in South American banking and industries that includes transactional reviews, investigations, international KYC, EDD, and other due diligence matters. This experience required enhanced investigative procedures to document customers residing in foreign countries where the KYC was limited and other identifying information had not been obtained.
- Coordinated with a representative of the Virginia Association of Community Banks relative to providing training and compliance for their member banks.

- Prepared and developed money laundering and financial crimes investigation techniques training for state and local law enforcement officers.  This training included money laundering violations, bank secrecy act regulations and the preparation and use of suspicious activity reports.
- Provide legal counsel with financial investigative expertise in defending clients charged with financial crimes, such as money laundering, in both criminal and civil venues.  This includes reviewing financial and background information, research and conducting interviews of relevant witnesses for addition to an accurate and timely report consolidating all evidence for use in litigation.
- Conducted financial research and analysis of financial documents provided by clients to include but not limited to internet research, third party interviews, summarization and reconstruction of tax returns, cash flow analysis and other forensic accounting techniques. Provide a detailed comprehensive written report consolidating all evidence and other related matters for the client.
- Provided guidance relative to an EEOC complaint and wrongful termination suit.
- Provided expertise and consulting services to the legal team representing a Money Service Business that was charged with Federal violations of conspiracy and failure to maintain an effective anti-money laundering program.  These services included analysis of evidence and records relating to those violations.
- Provided expertise and consultation to the legal team representing a client charged with Federal domestic and international crimes that include money laundering, Internet gambling and other related matters.

| | |
|---|---|
| Internal Revenue Service, Criminal Investigation Division, Richmond, VA | July 93 – May 2011 |
| Corpus Christi, TX | December 90 – July 93 |

Special Agent – December 1990 to May 2011

- As a financial investigator, conducted criminal investigations of money laundering violations, tax and tax related violations, violations of the Bank Secrecy Act, as well as the enforcement of other related Federal laws.
- Conducted criminal investigations of Unlicensed Money Remitters, return preparers, contraband cigarettes, Ponzi scheme, public corruption, and other similar investigations.
- Thorough analysis of bank records, financial statements, corporate records and court related research, business books and records, Currency Transaction Reports, Suspicious Activity Reports (SAR), and FinCEN reports to also include the tracing of ownership, control and wire transfer of funds in foreign bank accounts in Europe, Caribbean and the Middle East.  Management of various financial software applications, internet searches and other online software tools.
- Compose complete, concise and accurate spreadsheets, affidavits, witness memorandums, comprehensive reports, prosecution reports, complaints and indictments.  Planned, prioritized and lead others in completing scheduled activities, which have resulted in timely work products and meeting deadlines.
- My financial investigations included evidentiary documentation of the backgrounds of both suspects and witnesses that included physical evidence and internet research.
- Interact in a professional manner with other law enforcement agencies to include the federal, state and local jurisdictions as well as the United States Attorney's Office and third party contacts.  Testified before the grand jury and as a summary witness at trial.
- I represented the Internal Revenue Service, Criminal Investigation Division as a member of the SAR-Review Team.  I reviewed and analyzed Suspicious Activity Reports (SARs) that had been prepared by financial institutions and filed with FinCEN.  I interacted with many banks and financial institution's AML departments relative to the SARs they filed.
- On-the-job instructor for newly hired agents.  I trained new agents in investigative and administrative procedures, including evaluation of performance in actual case investigations.   Provided management with periodic reports of the knowledge, skills and abilities of the trainees both in oral and written form.

Maintain a Top Secret Clearance renewed in 2010

Selected Accomplishments:

1. Recognized by the U.S. Attorney for the Eastern District of Virginia and the Metro Richmond ID Theft Task Force for specific contributions in money laundering investigations for numerous years.

2. Recognized as Law Enforcement Employee of the Year in 1997.

Tax Fraud Investigative Aide, IRS-CID, Corpus Christi, TX         09/86 – 12/90

Personnel Specialist, Department of the Navy, Brunswick ME         09/83 – 09/86

## EDUCATION AND PROFESSIONAL AFFILIATIONS

BS – Business Management – New Hampshire College 1991

Active Member of the Richmond ACAMS Chapter

Certified Fraud Examiner (CFE), Active member, Association of Certified Fraud Examiners

**Professional Training**

Federal Law Enforcement Training Academy, Glynco, Georgia

Continuing Professional Education in Fraud, Money Laundering, Bank Secrecy Act, Tax Related Matters and Asset Forfeiture.

I am familiar with Case Management Tool (CMT), Lotus Notes, and the "Transaction Analyzer" a proprietary investigative analysis system.   I have been trained in and/or familiar with Norkom Systems, World Check, Lexis Nexis, Bankersonline, State Corporation Registries, City and County Government Record Websites, Pacer, Dunn & Bradstreet, language translation websites and other appropriate investigative sources.